1  POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
2  1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
3  Telephone: (310) 405-7190
jpafiti@pomlaw.com
4

5  *Attorney for Plaintiff*

6  *[Additional Counsel on Signature Page]*

7

8                    UNITED STATES DISTRICT COURT
9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  TYLER HARDY, Individually and On Behalf
    of All Others Similarly Situated,                  Case No.
12
                              Plaintiff,
13                                                      CLASS ACTION
                  v.
14                                                      COMPLAINT FOR VIOLATIONS OF THE
    EMBARK TECHNOLOGY, INC. f/k/a                       FEDERAL SECURITIES LAWS
15  NORTHERN GENESIS ACQUISITION CORP.
    II, IAN ROBERTSON, KEN MANGET, ALEX                 DEMAND FOR JURY TRIAL
16  RODRIGUES, and RICHARD HAWWA,

17                            Defendants.

18

19        Plaintiff Tyler Hardy ("Plaintiff"), individually and on behalf of all others similarly situated, by

20  Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following

21  based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to

22  all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys,

23  which included, among other things, a review of the Defendants' public documents, conference calls

24  and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission

25  ("SEC") filings, wire and press releases published by and regarding Embark Technology, Inc. f/k/a

26  Northern Genesis Acquisition Corp. II ("Embark" or the "Company"), analysts' reports and advisories

27

28

                                        1
    CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Embark securities between January 12, 2021 and January 5, 2022, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Embark develops self-driving software solutions for the trucking industry in the U.S. The Company was originally a special purpose acquisition company ("SPAC"), also called a blank-check company, which is a development stage company that has no specific business plan or purpose or has indicated its business plan is to engage in a merger or acquisition with an unidentified company or companies, other entity, or person.

3.      On November 10, 2021, the Company consummated a merger transaction with Embark Trucks Inc., a Delaware corporation ("Legacy Embark"), whereby, among other things, the Company changed its name from "Northern Genesis Acquisition Corp. II" to "Embark Technology, Inc." (the "Business Combination").

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had performed inadequate due diligence into Legacy Embark; (ii) Legacy Embark and the Company

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

following the Business Combination held no patents and an insignificant amount of test trucks; (iii) accordingly, the Company had overstated its operational and technological capabilities; (iv) as a result of all the foregoing, the Company had overstated the business and financial prospects of the Company post-Business Combination; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On January 6, 2022, The Bear Cave published a short report entitled "Problems at Embark Technology (EMBK)" (the "Bear Cave Report").  The Bear Cave Report alleged, among other issues, "that Embark appears to lack true economic substance" and that its "current evaluation appears to be based on puffery rather than actual substance", noting that "[t]he company holds no patents, has only a dozen or so test trucks, and may be more bark than bite."

6.      On this news, Embark's stock price fell $1.37 per share, or 16.75%, to close at $6.81 per share on January 6, 2022.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Embark is headquartered in this Judicial District, Defendants

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired Embark securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Embark is a Delaware corporation with principal executive offices located at 424 Townsend Street, San Francisco, California 94107.  Embark's common stock and warrants trade in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbols "EMBK" and "EMBKW", respectively.  Before the consummation of the Business Combination, Embark was a Delaware corporation with principal executive offices located at 4801 Main Street, Suite 1000, Kansas City, Missouri 64112, and the Company's units, common stock, and warrants traded on the New York Stock Exchange ("NYSE") under the ticker symbols "NGAB.U", "NGAB", and "NGAB WS", respectively.

14.     Defendant Ian Robertson ("Robertson") served as Embark's Chief Executive Officer ("CEO") from before the start of the Class Period until the consummation of the Business Combination.

15.     Defendant Ken Manget ("Manget") served as Embark's Chief Financial Officer ("CFO") from before the start of the Class Period until the consummation of the Business Combination.

16.     Defendant Alex Rodrigues ("Rodrigues") has served as Embark's CEO since the consummation of the Business Combination.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

17.     Defendant Richard Hawwa ("Hawwa") has served as Embark's CFO since the consummation of the Business Combination.

18.     Defendants Robertson, Manget, Rodrigues, and Hawwa are sometimes referred to herein as the "Individual Defendants."

19.     The Individual Defendants possessed the power and authority to control the contents of Embark's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Embark's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Embark, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Embark develops self-driving software solutions for the trucking industry in the U.S. The Company was originally a SPAC, also called a blank-check company, which is a development stage company that has no specific business plan or purpose or has indicated its business plan is to engage in a merger or acquisition with an unidentified company or companies, other entity, or person.

21.     On November 10, 2021, the Company consummated a merger transaction with Legacy Embark, whereby, among other things, the Company changed its name from "Northern Genesis Acquisition Corp. II" to "Embark Technology, Inc."

**Materially False and Misleading Statements Issued During the Class Period**

22.    The Class Period begins on January 12, 2021, when the Company's securities began publicly trading on the NYSE pursuant to the materially false or misleading statements or omissions contained in the registration statement (including all amendments thereto) and related prospectus (collectively, the "Offering Documents") filed with the SEC in connection with the Company's initial public offering.  For example, the Offering Documents stated, *inter alia*:

> We believe in the ability of our management team to add significant value to a target company from a commercial, operating, strategic and sustainability perspective. In particular, we will seek to identify and acquire a business that could benefit from a hands-on owner with extensive operational experience and the public company expertise our management team possesses, or that relies on the target's executive and operational expertise but presents potential for an attractive risk-adjusted return profile following a business combination with us. Even fundamentally sound companies can often underperform their potential due to underinvestment, a temporary period of dislocation in the markets in which they operate, over-levered capital structures, excessive cost structures, incomplete management teams and/or a need to realign business strategies. In addition, these companies may have little or no experience operating in the public markets. Our management team has significant experience in identifying such opportunities and executing on strategies to surface value in a public market context.

> \*\*\*

> In evaluating a prospective target business, we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial and other information that will be made available to us. We will also utilize our operational and capital allocation experience.

> \*\*\*

> **Acquisition Criteria**

> We have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses for a business combination:

> - Ability to align with our sustainability principles and support reduction of carbon intensity;

> - Defined barriers to entry or sustainable competitive advantages;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- Predictable revenue and free cash flow to support reinvestment growth;

- Little material technology, scale-up or market risk and success not premised on future capital raises to achieve growth plans;

- Opportunity to benefit from our management team's network and expertise to drive improved financial performance; and

- Ability to benefit from access to the public capital markets

23.     On March 31, 2021, Legacy Embark issued a press release entitled, "Embark Universal Interface Accelerates Integration of Self-Driving Technology Across Major Truck OEM Platforms." The press release stated, in relevant part:

> Embark [. . .] today launches the Embark Universal Interface (EUI), a set of standardized self-driving components and the flexible interfaces necessary for major truck OEMs to more easily and robustly integrate Embark's autonomous technology onto their vehicle platforms.
>
> The EUI program sets Embark apart as the first autonomous developer to pursue integration with all four major US OEMs. By focusing on the intersection of four platform specifications, instead of designing to one OEM platform, Embark is building the industry's first universal system that is intentionally designed to integrate into any platform. Embark has designed its system from the beginning to work across platforms, a decision that has required an immense amount of upfront investment and thoughtfulness around cross-platform trade-offs. The EUI effort is the manifestation of this philosophy into a product.
>
> ***
>
> "We absolutely believe that integrating with OEMs is the path to market for self-driving trucks," said Alex Rodrigues, co-founder and chief executive officer of Embark. "We also believe that being cross-compatible and easy to integrate into all OEM's vehicles as their level 4 platforms continue to develop gives us a competitive advantage."

24.     On April 8, 2021, Legacy Embark issued a press release entitled, "Embark Launches Partner Development Program to Bring Embark Driver to Market."  The press release stated, in relevant part:

> "Embark's commitment to having carriers purchase and operate our autonomous trucks, while Embark provides a software subscription and support services, is a win-win because it leverages the logistical expertise of the carrier, allows the technology to scale more

7

quickly through existing shipper-carrier relationships and enables Embark to focus on delivering a safe and reliable autonomous truck," said Alex Rodrigues, Chief Executive Officer, and co-founder at Embark. "The learnings Embark has gained from hundreds of hauls with shippers and carriers over the years has helped us shape this new business model, and we are excited to announce it today."

25.     On April 15, 2021, the Company filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K").   The 2020 10-K contained substantively similar descriptions of the Company's acquisition process and criteria as discussed in the Offering Documents referenced, *supra*, in ¶ 22.

26.     Appended to the 2020 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Robertson and Manget, attesting that "the information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the period covered by the [2020 10-K]."

27.     On May 26, 2021, the Company's filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2021 (the "Q1 2021 10-Q").   The Q1 2021 10-Q stated, in relevant part, "[t]he accompanying unaudited condensed financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and in accordance with the instructions to Form 10-Q and Article 8 of Regulation S-X of the SEC."

28.     Appended to the Q1 2021 10-Q as exhibits were signed certifications pursuant to SOX by Defendants Robertson and Manget, attesting that "the information contained in the [Q1 2021 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

29.     On June 23, 2021, the Company and Legacy Embark issued a joint press release announcing "that they have entered into a definitive business combination agreement that will result in

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Embark becoming a publicly listed company." That press release quoted Defendant Robertson, who stated, in relevant part:

> The Northern Genesis team is enthused to partner with Embark as it continues to execute on its focused mission, a mission that began more than five years ago. Our respective teams share a conviction that success today demands alignment with the ongoing secular shifts towards sustainability and social responsibility; Embark's commitment to autonomous trucking delivers that alignment through enhanced fuel efficiency, improved driver working conditions, and safer roads for everyone [. . .] We are committed to leveraging our deep owner-operator business building experience to assist Embark on its transition from great private company to great public company.

30. The same press release also quoted Defendant Rodrigues, who stated, in relevant part:

> We have been solely focused on solving the problem of self-driving software for trucking since Embark's CTO, Brandon Moak, and I founded the company in 2016 [. . .] This singular and disciplined focus on the trucking market in the United States has allowed Embark to achieve many industry-first technology milestones – including the first self-driving truck to drive coast-to-coast – and positions Embark to be a leader in autonomous trucking software. The recent accomplishment of key technical milestones – including handling highway workzones on the fly – and the announcement of our Partner Development Program mark the start of Embark's transition from research to commercialization. After many years of R&D on the world's most mature self-driving truck software stack, we plan to enable carrier operation of self-driving trucks in the U.S. sunbelt beginning in 2024. Following the transaction with Northern Genesis we expect to have a war chest that fully funds this commercialization plan, and then some.

31. That same day, Legacy Embark issued a blog message from Defendant Rodrigues entitled, "Welcome to the Starting Line," which stated, in relevant part:

> Embark going public through this business combination transaction is exciting. It's exciting because it validates that the vision of Embark expands far beyond just the people within our four walls (physical & virtual), it's exciting because the company is growing to size itself against the challenge we have ahead of us, and it's exciting because we are in control of our destiny. That being said, I intend to make clear that we still have a lot of unfinished business. This transaction gives us the opportunity to meaningfully accomplish our mission. With the resulting capital we intend to deliver the first commercial self-driving truck and expand that opportunity across the sun-belt, and even then our work won't be complete. Going public is a means to fulfilling our potential and the starting line for the next phase of our journey.

***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

This means every one of us will have to become experts at managing change, tuning out the noise, and staying laser focused on Embark's mission. I want to take a moment to do exactly that — focus on the mission. Embark has always been, and continues to be, singularly focused on commercializing autonomous long-haul trucks. That mission is rooted in a few core benefits of our technology: safety, jobs, and efficiency. We know we can build long-haul trucks that will reduce the number of crashes, injuries, and fatalities on public roads. We know those trucks could create new opportunities for drivers to work short haul, staying closer to their families and increasing their quality of life. And we know that the efficiencies those trucks could unlock will make all the things that move on trucks cheaper across the board while reducing the environmental impact of transportation.

32.     On July 2, 2021, the Company filed a registration statement on Form S-4 with the SEC, which stated, in relevant part:

**Embark is an early stage company with a history of losses, and expects to incur significant expenses and continuing losses for the foreseeable future**.

Embark incurred net losses of $15.3 million and $21.5 million for the years ended December 31, 2019 and 2020, respectively **and has not recognized a material amount of revenue to date**. Embark has successfully shipped freight for shippers and carriers to utilizing its technology and Transfer Hub network but there is no guarantee that Embark's partnership model will get traction, grow or otherwise be successful or achieve sufficient scale for commercial viability. Embark's potential profitability is dependent upon a number of factors, many of which are beyond its control.

\*\*\*

**Phased Rollout of Multiple Onboarding Methods**

Embark expects to deploy its technology in two phases, Phase 1 targeting the Sunbelt states (approximately 90 billion semi-truck miles annually, which is estimated based on the Freight Analysis Framework produced through a partnership between the Bureau of Transportation Statistics and the Federal Highway Administration) and Phase 2 targeting all of the lower 48 states (approximately 300 billion semi-truck miles annually). Embark's coverage map includes the full set of locations Embark Driver equipped trucks are able to travel to. Embark is adding two types of locations to its coverage map, enabling two route models:

1.  Truck stops, which act as ideal transfer points that can be used by all carriers

2.  Highway-adjacent shipper locations, which allow Embark Driver-enabled trucks to travel direct-to-customer

With the transfer point model, Embark is able to focus on highway operations, the middle-mile, while Embark's carrier partners conduct the first/last-mile portions with

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

human drivers. These points will be located at existing facilities (e.g., truck stops) to provide a Day 1 drop-in solution for customers. Embark pioneered the transfer point model in 2017, partnering with Frigidaire and Ryder to deliver shipments. ***Since 2017, Embark has refined operations and now conducts daily shipments between Los Angeles and Phoenix***.

(Emphasis added.)

33.    On September 16, 2021, Legacy Embark issued a joint press release with Ryder System, Inc. entitled, "Embark Partners with Ryder to Launch Nationwide Network of Up to 100 Freight Transfer Points for Autonomous Fleets."  The press release stated, in relevant part:

Through the partnership, Embark plans to establish a network of strategically located transfer points—where freight is moved from driverless long-haul trucks to driver-enabled trucks for first- and last-mile delivery.

***

"A fully developed transfer point has to include autonomous truck maintenance services and efficient yard operations," says Alex Rodrigues, CEO of Embark. "By working with Ryder to offer best-in-class truck services throughout our transfer point network, we're laying the groundwork for seamless coast-to-coast operations of Embark-equipped trucks."

Embark pioneered the transfer point model in 2019 when the company unveiled its first sites in Los Angeles and Phoenix. Since then, Embark has conducted hundreds of hauls through these sites, refining required transfer point capabilities and evaluating a range of service providers to fulfill those capabilities.

34.    On September 22, 2021, Legacy Embark issued a press release entitled, "Embark Announces Advisory Board to Accelerate the Commercialization of its Self-Driving Technology."  The press release stated, in relevant part:

Embark [. . .] today announced the formation of its strategic advisory board, a committee of distinguished trucking and supply chain executives that will guide Embark's rapid business expansion. The board will advise Embark's overall business strategy and bolster Embark's ranks with some of the best and brightest minds in the transportation industry.

***

"Our new advisory board equips Embark with a brain trust that will help us navigate a complex and dynamic industry as we target commercial driver-out operations in 2024," said Alex Rodrigues, CEO of Embark. "These thought leaders bring extraordinary

11

experience to Embark and will be instrumental in our ability to execute against our business goals. We are privileged to have them on board and look forward to their contributions."

35.     On October 14, 2021, Legacy Embark issued a press release entitled, "Embark Opens Reservations to Partner Development Program Carriers Ahead of 2024 Commercial Launch, Securing 14,200 Reservations."  The press release stated, in relevant part:

Embark [. . .] today announced that carriers participating in Embark's Partner Development Program (PDP) have placed a combined 14,200 reservations for Embark-equipped autonomous trucks. These non-binding reservations – which reflect the results of customized in-depth demand planning analyses – cover reservations over a 5-year period, securing priority access to Embark-equipped trucks commencing upon the expected 2024 commercial launch of the Embark Driver software through the end of 2028. This remarkable interest from fleet partners is the initial result of extensive strategic planning, operational evaluation, and autonomous commercial hauling, which Embark believes demonstrates a commitment from both Embark and its partners to safely and rapidly deploy commercial autonomous trucks in the US Sunbelt beginning in 2024.

The 14,200 trucks reserved by PDP members, if purchased, represent a projected 10 billion billable Embark Driver miles over their lifetimes.1 By comparison, in 2024, Embark and its carrier partners plan to begin rapidly deploying the confirmed trucks on high-priority lanes across the country over time. These reservations, and the associated licensed miles, demonstrate that Embark's commercial preparation activities today should establish a base that enables Embark to meet its early year revenue targets.

"With these reservations, Embark is providing a competitive advantage to fleet partners who have invested the time and energy in preparing to deploy first," said Alex Rodrigues, CEO of Embark. "In just a few years, we believe our partners will be able to operate with a next-generation product that is safer, more efficient, and more sustainable, enabling them to utilize autonomous trucks to grow their business while retaining their existing driver workforce to serve on shorter routes."

36.     On October 19, 2021, the Company filed a prospectus on Form 424B3 with the SEC in connection with the Business Combination (the "October 19, 2021 Prospectus").  In providing an overview of Legacy Embark, the October 19, 2021 Prospectus stated, in relevant part:

Embark develops technologically advanced autonomous driving software for the truck freight industry and offers a carefully constructed business model that is expected to provide the industry with the most attractive path to adopting autonomous driving. Specifically, Embark has developed a Software as a Service ("SaaS") platform designed to interoperate with a broad range of truck OEM platforms, forgoing complicated and logistically challenging truck building or hardware manufacturing operations in favor of

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

focusing on a superior driving technology. At scale, domestic shippers and carriers will be able to access Embark technology via a subscription software license selected as an option at the time they specify the build of new semi-trucks.

\*\*\*

Embark has also spent considerable time and effort refining its business model. Embark is initially deploying its leading-edge technology in a very focused manner, targeting freight highway miles between transfer points located next to metropolitan areas in the lower "Sunbelt" region of the United States ( the "U.S."), leaving the "last mile" of driving to and from the transfer points to the industry's highly skilled human drivers. Embark's strategy is distinct from other industry players which seek to provide more complicated "end to end" autonomous driving that would entirely displace human drivers and potentially place these companies in competition with the industry's carriers. Unlike those competitors, Embark anticipates working with the industry's existing players to help them bring autonomous driving technology to market on their own terms. In addition, Embark believes its solution will be the safest and most reliable in the industry because of its disciplined geographic focus and emphasis on software development, which stands in contrast to Embark's competitors that focus on multiple domestic markets simultaneously, manufacturing autonomous trucks and/or competing directly with semi-truck OEMs or legacy carriers.

37.     Further, with respect to Legacy Embark's business model and go-to-market strategy, the October 19, 2021 Prospectus stated, in relevant part:

Embark's business model offers meaningful operational savings to carriers and shippers and collaborates rather than competes with carriers. To date, while not generating any revenue, Embark has completed hundreds of hauls with many major companies and has leveraged that experience into designing its business model and commercialization plans. Embark intends to make its technology available as a SaaS subscription on an OEM platform-agnostic basis, meaning that carriers will be able to subscribe to the Embark software for any new vehicles from any truck brand in their fleets. Embark believes this model will deliver compelling benefits across the entire trucking ecosystem by:

- Improving economics and alleviating driver shortages for carriers;
- Increasing fuel economy, reducing emissions and improving reliability, sustainability and safety for shippers;
- Providing an attractive cost of entry to autonomous vehicle technology without disrupting shippers' or carriers' truck preferences or supply chains;
- Permitting Embark to focus on its area of expertise — autonomous driving development — while the rest of the ecosystem can specialize on the areas they excel in, including logistics and manufacturing.

13

38.     Finally, with respect to Legacy Embark's technology, the October 19, 2021 Prospectus stated, in relevant part:

> Embark's technology solutions are designed to support the seamless integration of autonomous trucks into existing carrier fleets with the goal of alleviating the driver shortage, improving competitiveness for shippers, and improving unit economics for ecosystem participants. Its technology stack consists of three critical components including the Embark Driver, the Embark Universal Interface, and Embark Guardian. Together, these products make for a comprehensive, performant, and reliable freight solution from sourcing, to driving, and support. Embark aims to showcase a L4 driverless solution in 2023 followed by plans to scale commercial operations throughout the Southwestern United States in 2024.

39.     On November 10, 2021, Legacy Embark issued a press release entitled, "Embark Trucks, America's Longest-Running Self-Driving Truck Program, To List at a Valuation of Approximately $5 Billion on Nasdaq Under the Ticker 'EMBK'." The press release stated, in relevant part:

> Embark [. . .] today announced that it has completed its previously announced business combination with Northern Genesis Acquisition Corp. II ("Northern Genesis 2") (NYSE: NGAB) to take Embark public. The combined company has been renamed "Embark Technology, Inc." and its shares will commence trading on the Nasdaq Capital Market on November 11, 2021.
>
> ***
>
> The closing of the business combination caps a momentous year for Embark as the company seeks to continue to develop industry-leading autonomous truck technology. Since March 2021, Embark marked milestones across key business priorities:
>
> - **Technology Progress**: Embark unveiled the Embark Universal Interface, a set of standardized self-driving components and the flexible interfaces necessary for major truck OEMs to more easily and robustly integrate Embark's autonomous technology onto their vehicle platforms.
>
> - **Technical Partnerships**: Embark announced partnerships and collaborations with Tier 1 suppliers and technology providers including Cummins, NVIDIA, Luminar, and ZF to accelerate integration of the Embark Universal Interface within OEM vehicle platforms.
>
> - **Partner Development Program (PDP) & Reservations**: Embark launched its Partner Development Program with members including Werner Enterprises, Mesilla Valley Transportation, Bison Transport, AB Inbev, HP, and DHL, among

14

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

others. Carriers in the PDP have placed a combined 14,200 non-binding reservations for Embark-equipped autonomous trucks to date.

- **National Transfer Point Network**: Embark partnered with Ryder to launch a nationwide network of up to 100 Embark transfer points, where Ryder will provide yard operations, maintenance, and fleet management to support a seamless coast-to-coast autonomous network for Embark fleet partners.

- **Sustainability**: Embark worked with PDP member HP, Inc. to kick off the industry's first electric truck drayage program. The two are piloting first- and last-mile deliveries between transfer points and HP's distribution facilities using human-operated electric trucks in combination with autonomous trucks.

- **Management and Leadership**: Embark expanded its executive leadership team, adding Richard Hawwa as Chief Financial Officer, Sid Venkatesan as Chief Legal Officer, and Stephen Houghton as Chief Operations and Fleet Officer. Embark also added former U.S. Secretary of Transportation Elaine L. Chao to its Board of Directors. Additionally, Embark announced the formation of an industry advisory board, composed of six storied executives from companies like Cummins, Knight Transportation, Navistar, and others.

- **Policy**: Embark signed a joint MOU with the Arizona Department of Transportation to collaborate and share data on highway work zone safety. Embark also joined the board of the Self-Driving Coalition to strengthen the Coalition's position as the leading organization representing all facets of the AV industry.

Alex Rodrigues [. . .] added, "We are thrilled to reach this important milestone and become a public company to further our mission of evolving the trucking industry, and using autonomous software to create a safer, more efficient, and more sustainable freight ecosystem. Embark's co-founder and CTO, Brandon Moak, and I are incredibly proud of what our team has achieved, and we remain focused on delivering against key strategic initiatives to commercialize our technology and achieve key technical milestones. We remain differentiated as America's longest running self-driving truck program with an asset-light go-to-market strategy, our proprietary patent-pending Vision Map Fusion technology, and our carrier-friendly, platform- agnostic Embark Universal Interface approach. We believe that the capital raised in this transaction will help us achieve our commercialization plans to bring self-driving trucks to the U.S. Sunbelt in 2024."

"Embark has a strong group of shareholders who are excited to support its mission to create a better trucking industry," said Ian Robertson, Director and CEO of Northern Genesis 2. "I look forward to being a member of the Board of Directors and working with management of Embark as it starts this next stage of its life as a public company."

40.    The statements referenced in ¶¶ 22-39 were materially false and misleading because

Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

about the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had performed inadequate due diligence into Legacy Embark; (ii) Legacy Embark and the Company following the Business Combination held no patents and an insignificant amount of test trucks; (iii) accordingly, the Company had overstated its operational and technological capabilities; (iv) as a result of all the foregoing, the Company had overstated the business and financial prospects of the Company post-Business Combination; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

41.    On January 6, 2022, The Bear Cave published a short report entitled "Problems at Embark Technology (EMBK)".  Specifically, the Bear Cave Report alleged, in relevant part:

> Embark [. . .] describes itself as "an autonomous vehicle company building the software powering autonomous trucks" and merged with a SPAC in November. The company's 26-year-old CEO projects no revenue in 2022 and 2023, but $867 million in revenue in 2024 and $2.7 billion in 2025. Embark's current valuation appears to be based on puffery rather than actual substance. The company holds no patents, has only a dozen or so test trucks, and may be more bark than bite.

***

> More troubling is that Embark appears to lack true economic substance. For example, a July 2021 article titled, "Who's set to win Big Tech's 'insanely hot' race to self-driving trucks?" by the Commercial Carrier Journal didn't even mention Embark. One reason may be that the company "holds no patents on its products" and instead "relies heavily on trade secrets [and] proprietary know-how" according to Embark's SEC filings.

> For comparison, Embark competitor TuSimple has 357 issued patents and Aurora Innovation has over 1,100 awarded and pending patents. In its risk factors, Embark discloses it "may become subject to litigation brought by third parties claiming infringement, misappropriation or other violation by Embark of their intellectual property rights."

> Embark reassures investors about its plans by promoting its industry partnerships and 14,200+ "reservations" through its Partner Development Program. Those may be less than meet the eye.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

For example, Embark launched its Partner Development Program in April 2021 with large trucking companies Werner Enterprises and DHL among its initial members. Those partnerships may not be that valuable because Werner Enterprises is an investor in competitor TuSimple and DHL went on to order autonomous trucks built by TuSimple and Navistar. In podcasts, media appearances, and investor presentations Embark also touts over 14,200+ "reservations" from its partners, but rarely mentions those reservations are fully-refundable $500 deposits for software to be delivered in 2024-2028, and Embark's equity partners have the $500 deposit waived. Embark does not break down reservations by customer or disclose the percent that have paid $500 refundable deposits.

The SEC Division of Corporate Finance sent Embark a comment letter asking the company to "clarify the extent to which your estimates for miles driven for 2024 and 2025 are based on your existing agreements with your existing transportation partners." In response the company said it would revise its filings to "clarify that Embark's estimates for miles driven for 2024 and 2025 are not based on either Embark's existing agreements with its existing transportation partners or acquiring new customers for which Embark currently does not have a relationship." Instead, the company's estimates are "a penetration target of 1.1% in 2024 and 3.3% by 2025" for its trucking market.

***

In its August 2021 letter, the SEC wrote Embark:

> "We note that you have not generated revenue from principal operations through March 31, 2021; however, some of your disclosures do not appear to clearly convey this fact… Please revise throughout, including the summary, to ensure your disclosures are clear that the company is still in the process of developing and testing your technology, you have not earned revenue to date, and all products, route models, and partners are related to operations you expect to begin in the future but have not yet begun."

***

Despite not having any revenue, Embark has had some accounting issues. In November 2021, the company announced that its audited balance sheet for January 2021 and its financial statements ending March 2021 "should no longer be relied upon" due to a reclassification of some share types. Embark's prospectus also discloses: "Embark has identified deficiencies that together constitute a material weakness in its internal control over financial reporting as of December 31, 2019 and 2020."

None of these issues have deterred retail investors from Embark. The company has gained some favorable coverage on WallStreetBets due to its "extreme meme potential" because the CEO's "name is literally A-Rod."

Embark's largest outside investor is DCVC, which owns 17% of the company. On its website, DCVC's featured portfolio company is Zymergen (NASDAQ: ZY), a synthetic

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

biology company that has fallen over 80% since its April 2021 IPO after the company acknowledged its timeline to start reaching revenue "encountered technical issues." Other public DCVC portfolio companies include AbCellera Biologics (NASDAQ: ABCL), which has fallen over 75% since its December 2020 IPO, Desktop Metal (NYSE: DM), which has fallen nearly 50% since its December 2020 SPAC merger, Recursion Pharmaceuticals (NASDAQ: RXRX), which has fallen over 40% since its April 2021 IPO, Rocket Lab USA (NASDAQ: RKLB), which is up around 20% since its August 2021 SPAC merger, and SentinelOne (NYSE: S), which is flat since its July 2021 IPO.

After recording their interview with Embark's CEO, the hosts of "Pounding the Table" discussed the company and why they were bullish. One host said, "This is a company that is not making tons of revenue obviously… Are they making money today? In short, probably no."

42.     On this news, Embark's stock price fell $1.37 per share, or 16.75%, to close at $6.81 per share on January 6, 2022.

43.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Embark securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

45.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Embark securities were actively traded on the NASDAQ and NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Embark or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Embark;

- whether the Individual Defendants caused Embark to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Embark securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

49.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

50.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Embark  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Embark securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

51.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

52.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

53.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

54.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Embark securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Embark securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

56.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Embark securities.  Such reports, filings, releases and statements were materially false and

misleading in that they failed to disclose material adverse information and misrepresented the truth about Embark's finances and business prospects.

57.     By virtue of their positions at Embark, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

58.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Embark, the Individual Defendants had knowledge of the details of Embark's internal affairs.

59.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Embark.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Embark's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Embark securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Embark's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Embark securities at artificially inflated prices and relied upon

the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

60.     During the Class Period, Embark securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Embark securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Embark securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Embark securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

61.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

63.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.     During the Class Period, the Individual Defendants participated in the operation and management of Embark, and conducted and participated, directly and indirectly, in the conduct of Embark's business affairs.   Because of their senior positions, they knew the adverse non-public information about Embark's misstatement of income and expenses and false financial statements.

65.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Embark's financial condition and results of operations, and to correct promptly any public statements issued by Embark which had become materially false or misleading.

66.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Embark disseminated in the marketplace during the Class Period concerning Embark's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Embark to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Embark within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Embark securities.

67.     Each of the Individual Defendants, therefore, acted as a controlling person of Embark. By reason of their senior management positions and/or being directors of Embark, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Embark to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised control over the general operations of Embark and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

68.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Embark.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  April 1, 2022

                                             Respectfully submitted,

                                             POMERANTZ LLP

                                             */s/ Jennifer Pafiti*
                                             Jennifer Pafiti (SBN 282790)
                                             1100 Glendon Avenue, 15th Floor
                                             Los Angeles, California 90024
                                             Telephone: (310) 405-7190
                                             jpafiti@pomlaw.com

                                             POMERANTZ LLP
                                             Jeremy A. Lieberman
                                             (*pro hac vice* application forthcoming)
                                             J. Alexander Hood II
                                             (*pro hac vice* application forthcoming)
                                             600 Third Avenue, 20th Floor
                                             New York, New York 10016

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS