# EXHIBIT P

TABLE OF CONTENTS

**ANNEX A**

**EXECUTION VERSION**

**AGREEMENT AND PLAN OF MERGER**

by and among

**NORTHERN GENESIS ACQUISITION CORP. II,**

**NGAB MERGER SUB INC.,**

and

**EMBARK TRUCKS INC.**

dated as of June 22, 2021

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| | ARTICLE I | |
| | CERTAIN DEFINITIONS | |
| Section 1.1. | Definitions | A-2 |
| Section 1.2. | Construction | A-14 |
| Section 1.3. | Knowledge | A-15 |
| | ARTICLE II | |
| | THE MERGER; CLOSING | |
| Section 2.1. | The Merger | A-15 |
| Section 2.2. | Effects of the Merger | A-15 |
| Section 2.3. | Closing; Effective Time | A-15 |
| Section 2.4. | Closing Deliverables | A-16 |
| Section 2.5. | Governing Documents | A-17 |
| Section 2.6. | Directors and Officers | A-17 |
| Section 2.7. | Tax Free Reorganization Matters | A-17 |
| Section 2.8. | Closing Statements | A-17 |
| | ARTICLE III | |
| | EFFECTS OF THE MERGER | |
| Section 3.1. | Reclassification and Conversion of Securities | A-19 |
| Section 3.2. | Exchange Procedures | A-19 |
| Section 3.3. | Treatment of Company Awards | A-20 |
| Section 3.4. | Withholding | A-21 |
| Section 3.5. | Dissenting Shares | A-21 |
| | ARTICLE IV | |
| | REPRESENTATIONS AND WARRANTIES OF THE COMPANY | |
| Section 4.1. | Company Organization | A-22 |
| Section 4.2. | Subsidiaries | A-22 |
| Section 4.3. | Due Authorization | A-22 |
| Section 4.4. | No Conflict | A-23 |
| Section 4.5. | Governmental Authorities; Consents | A-23 |
| Section 4.6. | Capitalization of the Company | A-23 |
| Section 4.7. | Capitalization of Subsidiaries | A-24 |
| Section 4.8. | Financial Statements | A-25 |
| Section 4.9. | Undisclosed Liabilities | A-25 |
| Section 4.10. | Litigation and Proceedings | A-26 |
| Section 4.11. | Legal Compliance | A-26 |
| Section 4.12. | Contracts; No Defaults | A-26 |
| Section 4.13. | Company Benefit Plans | A-28 |
| Section 4.14. | Labor Relations; Employees | A-29 |
| Section 4.15. | Taxes | A-30 |
| Section 4.16. | Brokers' Fees | A-31 |

|  |  | Page |
|---|---|---|
| Section 4.17. | Insurance | A-31 |
| Section 4.18. | Licenses | A-31 |
| Section 4.19. | Equipment and Other Tangible Property | A-31 |
| Section 4.20. | Real Property | A-32 |
| Section 4.21. | Intellectual Property | A-32 |
| Section 4.22. | Privacy and Cybersecurity | A-33 |
| Section 4.23. | Environmental Matters | A-34 |
| Section 4.24. | Absence of Changes | A-34 |
| Section 4.25. | Anti-Corruption Compliance | A-34 |
| Section 4.26. | Sanctions and International Trade Compliance | A-34 |
| Section 4.27. | Information Supplied | A-35 |
| Section 4.28. | No Additional Representation or Warranties | A-35 |

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF ACQUIROR AND MERGER SUB

| Section 5.1. | Company Organization | A-36 |
|---|---|---|
| Section 5.2. | Due Authorization | A-36 |
| Section 5.3. | No Conflict | A-36 |
| Section 5.4. | Litigation and Proceedings | A-37 |
| Section 5.5. | SEC Filings | A-37 |
| Section 5.6. | Internal Controls; Listing; Financial Statements | A-37 |
| Section 5.7. | Governmental Authorities; Consents | A-38 |
| Section 5.8. | Trust Account | A-38 |
| Section 5.9. | Investment Company Act; JOBS Act | A-39 |
| Section 5.10. | Absence of Changes | A-39 |
| Section 5.11. | No Undisclosed Liabilities | A-39 |
| Section 5.12. | Capitalization of Acquiror | A-39 |
| Section 5.13. | Brokers' Fees | A-41 |
| Section 5.14. | Indebtedness | A-41 |
| Section 5.15. | Taxes | A-41 |
| Section 5.16. | Business Activities | A-42 |
| Section 5.17. | Stock Market Quotation | A-43 |
| Section 5.18. | Registration Statement, Proxy Statement and Proxy Statement/Registration Statement | A-43 |
| Section 5.19. | No Additional Representation or Warranties | A-43 |

ARTICLE VI

COVENANTS OF THE COMPANY

| Section 6.1. | Conduct of Business | A-44 |
|---|---|---|
| Section 6.2. | Inspection | A-46 |
| Section 6.3. | Preparation and Delivery of Additional Company Financial Statements | A-46 |
| Section 6.4. | Affiliate Agreements | A-47 |
| Section 6.5. | Acquisition Proposals | A-47 |

A-ii

|  |  | Page |
|---|---|---|
| **ARTICLE VII** | | |
| **COVENANTS OF ACQUIROR** | | |
| Section 7.1. | Employee Matters | A-47 |
| Section 7.2. | Trust Account Proceeds and Related Available Equity | A-48 |
| Section 7.3. | Listing | A-48 |
| Section 7.4. | No Solicitation by Acquiror | A-48 |
| Section 7.5. | Acquiror Conduct of Business | A-49 |
| Section 7.6. | Post-Closing Directors and Officers of Acquiror | A-50 |
| Section 7.7. | Indemnification and Insurance | A-50 |
| Section 7.8. | Acquiror Public Filings | A-51 |
| Section 7.9. | PIPE Subscriptions; Forward Purchase | A-51 |
| Section 7.10. | Stockholder Litigation | A-52 |
| Section 7.11. | Amendments to Acquiror Governing Documents | A-52 |
| **ARTICLE VIII** | | |
| **JOINT COVENANTS** | | |
| Section 8.1. | HSR Act; Other Filings | A-52 |
| Section 8.2. | Preparation of Proxy Statement/Registration Statement; Shareholders' Meeting and Approvals | A-53 |
| Section 8.3. | Support of Transaction | A-57 |
| Section 8.4. | Tax Matters | A-57 |
| Section 8.5. | Section 16 Matters | A-57 |
| Section 8.6. | Cooperation; Consultation | A-57 |
| **ARTICLE IX** | | |
| **CONDITIONS TO OBLIGATIONS** | | |
| Section 9.1. | Conditions to Obligations of Acquiror, Merger Sub, and the Company | A-57 |
| Section 9.2. | Conditions to Obligations of Acquiror and Merger Sub | A-58 |
| Section 9.3. | Conditions to the Obligations of the Company | A-58 |
| **ARTICLE X** | | |
| **TERMINATION/EFFECTIVENESS** | | |
| Section 10.1. | Termination | A-58 |
| Section 10.2. | Effect of Termination | A-59 |
| **ARTICLE XI** | | |
| **MISCELLANEOUS** | | |
| Section 11.1. | Trust Account Waiver | A-59 |
| Section 11.2. | Waiver | A-60 |
| Section 11.3. | Notices | A-60 |
| Section 11.4. | Assignment | A-61 |
| Section 11.5. | Rights of Third Parties | A-61 |
| Section 11.6. | Expenses | A-61 |
| Section 11.7. | Governing Law | A-61 |
| Section 11.8. | Headings; Counterparts | A-61 |
| Section 11.9. | Company and Acquiror Disclosure Letters | A-61 |
| Section 11.10. | Entire Agreement | A-62 |

|  |  | **Page** |
|---|---|---|
| Section 11.11. | Amendments | A-62 |
| Section 11.12. | Publicity | A-62 |
| Section 11.13. | Severability | A-62 |
| Section 11.14. | Jurisdiction; Waiver of Jury Trial | A-62 |
| Section 11.15. | Enforcement | A-63 |
| Section 11.16. | Non-Recourse | A-63 |
| Section 11.17. | Non-Survival of Representations, Warranties and Covenants | A-63 |
| Section 11.18. | Conflicts and Privilege | A-64 |

Exhibits

| Exhibit A | Form of Acquiror Second A&R Charter |
|---|---|
| Exhibit B | Form of Acquiror A&R Bylaws |
| Exhibit C | Form of Registration Rights Agreement |
| Exhibit D | Form of Incentive Equity Plan |
| Exhibit E | Form of Employee Stock Purchase Plan |

TABLE OF CONTENTS

## AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger, dated as of June 22, 2021 (this "Agreement"), is made and entered into by and among Northern Genesis Acquisition Corp. II, a Delaware corporation ("Acquiror"), NGAB Merger Sub Inc., a Delaware corporation and a direct wholly owned subsidiary of Acquiror ("Merger Sub"), and Embark Trucks Inc., a Delaware corporation (the "Company").

### RECITALS

**WHEREAS**, Acquiror is a blank check company incorporated as a Delaware corporation and incorporated for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or similar business combination with one or more businesses or entities;

**WHEREAS**, upon the terms and subject to the conditions of this Agreement, and in accordance with the Delaware General Corporation Law, as amended (the "DGCL"), (i) Merger Sub will merge with and into the Company, the separate corporate existence of Merger Sub will cease and the Company will be the surviving corporation and a wholly owned subsidiary of Acquiror (the "Merger") and (ii) Acquiror will change its name to "Embark Technology, Inc.";

**WHEREAS**, prior to the Effective Time (as defined below), (i) all of the Company Warrants (as defined below) will be exercised in full on a cash or cashless basis or terminated without exercise, as applicable, in accordance with their respective terms (the "Company Warrant Settlement") and (ii) each share of Company Founders Preferred Stock (as defined below) and Company Preferred Stock (as defined below) will be converted into one share of Company Common Stock (as defined below) (the "Company Preferred Conversion");

**WHEREAS**, upon the Effective Time and following the Company Warrant Settlement and Company Preferred Conversion, all shares of the Company's Capital Stock (as defined below) and Company Awards (as defined below) will be converted into the right to receive (in the case of the Company Awards, if and to the extent earned and subject to their respective terms) the Aggregate Merger Consideration (as defined below), as set forth in this Agreement;

**WHEREAS**, each of the parties intends that, for U.S. federal income tax purposes, (i) this Agreement shall constitute a "plan of reorganization" within the meaning of Section 368 of the Internal Revenue Code of 1986, as amended (the "Code") and the Treasury Regulations (as defined below) promulgated thereunder, and (ii) the Merger shall constitute a "reorganization" within the meaning of Section 368(a) of the Code and/or the Merger, the FPA Investment and the PIPE Investment shall be considered part of an overall plan in which the Company Stockholders exchange their shares of Company Capital Stock for the Merger Consideration in an exchange described in Section 351 of the Code;

**WHEREAS**, the Board of Directors of the Company has approved this Agreement and the documents contemplated hereby and the transactions contemplated hereby and thereby, declared it advisable for the Company to enter into this Agreement and the other documents contemplated hereby and recommended the approval of this agreement by the Company's stockholders;

**WHEREAS**, as a condition and inducement to Acquiror's willingness to enter into this Agreement, simultaneously with the execution and delivery of this Agreement, the Requisite Company Stockholders (as defined below) have executed and delivered to Acquiror a Company Holders Support Agreement (as defined below) pursuant to which the Requisite Company Stockholders have agreed, among other things, to vote (whether pursuant to a duly convened meeting of the stockholders of the Company or pursuant to an action by written consent of the stockholders of the Company) in favor of the adoption and approval, promptly following the time at which the Registration Statement (as defined below) shall have been declared effective and delivered or otherwise made available to stockholders, of this Agreement and the other documents contemplated hereby and the transactions contemplated hereby and thereby;

**WHEREAS**, the Board of Directors of Acquiror has (i) determined that it is advisable for Acquiror to enter into this Agreement and the documents contemplated hereby, (ii) approved the execution and delivery of this Agreement and the documents contemplated hereby and the transactions contemplated hereby

and thereby, and (iii) recommended the adoption and approval of this Agreement and the other documents contemplated hereby and the transactions contemplated hereby and thereby by the Acquiror Shareholders (as defined below);

WHEREAS, Acquiror, as sole shareholder of Merger Sub, has approved and adopted this Agreement and the documents contemplated hereby and the transactions contemplated hereby and thereby;

WHEREAS, in furtherance of the Merger and in accordance with the terms hereof, Acquiror shall provide an opportunity to its shareholders to have their outstanding Acquiror IPO Shares (as defined below) redeemed on the terms and subject to the conditions set forth in Acquiror's Governing Documents (as defined below) in connection with obtaining the Acquiror Shareholder Approval (as defined below) (the "Offer");

WHEREAS, as a condition and inducement to the Company's willingness to enter into this Agreement, simultaneously with the execution and delivery of this Agreement, the Sponsor (as defined below) has executed and delivered to the Company the Sponsor Support Agreement (as defined below) pursuant to which the Sponsor has agreed to, among other things, vote to adopt and approve this Agreement and the other documents contemplated hereby and the transactions contemplated hereby and thereby;

WHEREAS, as a condition and inducement to the Company's willingness to enter into this Agreement, simultaneously with the execution and delivery of this Agreement, the FPA Purchasers have concurrently agreed to subscribe for and purchase, and Acquiror has agreed to issue and sell to the FPA Purchasers, (i) 4,000,000 shares of Acquiror Class A Common Stock and (ii) 666,667 Acquiror Warrants in exchange for an aggregate purchase price of $40,000,000 (the "FPA Investment Amount"), on the terms and subject to the conditions set forth therein, such purchases to be consummated prior to or substantially concurrently with the Closing;

WHEREAS, on or prior to the date hereof, Acquiror entered into Subscription Agreements (as defined below) with PIPE Investors (as defined below) pursuant to which, and on the terms and subject to the conditions of which, such PIPE Investors agreed to purchase from Acquiror shares of Acquiror Class A Common Stock for an aggregate purchase price, together with the FPA Investment Amount, equal to at least the Minimum PIPE Investment Amount (as defined below), such purchases to be consummated prior to or substantially concurrently with the Closing; and

WHEREAS, at the Closing, Acquiror, the Sponsor, the Major Company Stockholders (as defined below), and certain of their respective Affiliates (as defined below), as applicable, shall enter into a Registration Rights Agreement (the "Registration Rights Agreement") in the form attached hereto as Exhibit C (with such changes as may be agreed in writing by Acquiror and the Company), which shall be effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and intending to be legally bound hereby, Acquiror, Merger Sub and the Company agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

Section 1.1. Definitions.   As used herein, the following terms shall have the following meanings:

"Acquiror" has the meaning specified in the Preamble hereto.

"Acquiror A&R Bylaws" has the meaning specified in Section 7.11(a).

"Acquiror Class A Common Stock" means Acquiror's Class A common stock, par value $0.0001 per share, as defined in the Acquiror Second A&R Charter on the Closing Date following the filing thereof.

"Acquiror Class B Common Stock" means Acquiror's Class B common stock, par value $0.0001 per share, as defined in the Acquiror Second A&R Charter on the Closing Date following the filing thereof.

A-2

"Acquiror Closing Statement" has the meaning specified in Section 2.8(a).

"Acquiror Common Stock" means, collectively, the Acquiror Class A Common Stock and the Acquiror Class B Common Stock.

"Acquiror Cure Period" has the meaning specified in Section 10.1(g).

"Acquiror Disclosure Letter" has the meaning specified in the introduction to Article V.

"Acquiror Financial Statements" has the meaning specified in Section 5.6(d).

"Acquiror Indemnified Parties" has the meaning specified in Section 7.7(a).

"Acquiror IPO Shares" means shares of Acquiror Pre-Transaction Common Stock issued by Acquiror pursuant to Acquiror's initial public offering, which shares are defined as "IPO Shares" in Acquiror's Governing Documents.

"Acquiror Option" has the meaning specified in Section 3.3(a).

"Acquiror Pre-Transaction Common Stock" means the Common Stock, par value $0.0001 per share, of Acquiror, as such class of Common Stock exists as of the date of this Agreement.

"Acquiror Private Placement Warrant" means an Acquiror Warrant issued by Acquiror to the Sponsor pursuant to a private placement in connection with Acquiror's initial public offering.

"Acquiror Public Warrant" means an Acquiror Warrant that was included in the units sold as part of Acquiror's initial public offering.

"Acquiror SEC Filings" has the meaning specified in Section 5.5.

"Acquiror Second A&R Charter" has the meaning specified in Section 7.11(a).

"Acquiror Securities" means the Acquiror Pre-Transaction Common Stock (or, following the Closing, Acquiror Common Stock), the Acquiror Warrants, and any other securities or equity interests of Acquiror.

"Acquiror Share Redemption" means the election of an eligible (as determined in accordance with Acquiror's Governing Documents) holder of Acquiror IPO Shares to redeem all or a portion of the Acquiror IPO Shares held by such holder at a per-share price, payable in cash, equal to a pro rata share of the aggregate amount on deposit in the Trust Account (including any interest earned on the funds held in the Trust Account) (as determined in accordance with Acquiror's Governing Documents) in connection with the Transaction Proposals.

"Acquiror Share Redemption Amount" means the aggregate amount payable with respect to all Acquiror Share Redemptions.

"Acquiror Shareholder Approval" means the approval of (i) the Charter Proposal by an affirmative vote of the holders of at least a majority of the outstanding shares of Acquiror Pre-Transaction Common Stock, at a shareholders' meeting duly called by the Board of Directors of Acquiror and held for such purpose, and (ii) each of the other Transaction Proposals by an affirmative vote of the holders of at least a majority of the outstanding shares of Acquiror Pre-Transaction Common Stock present in person or by proxy at a shareholders' meeting duly called by the Board of Directors of Acquiror and held for such purpose.

"Acquiror Shareholders" means the shareholders of Acquiror as of immediately prior to the Effective Time.

"Acquiror Shareholders' Meeting" has the meaning specified in Section 8.2(b).

"Acquiror Warrants" means each warrant to purchase one (1) share of Acquiror Pre-Transaction Common Stock (or, from and after the Closing, one (1) share of Acquiror Class A Common Stock), in each case at an exercise price of eleven Dollars fifty cents ($11.50) and includes, for the avoidance of doubt, the Acquiror Public Warrants, the Acquiror Private Placement Warrants, the Acquiror Working Capital Warrants, and warrants to be issued and sold pursuant to the Forward Purchase Agreements.

A-3

"Acquiror Working Capital Warrants" means up to 2,000,000 Acquiror Warrants, having the same terms as the Acquiror Private Placement Warrants, that may be issued prior to the Closing by Acquiror to the Sponsor pursuant to a private placement, at a price of $1.50 per Acquiror Warrant, including in satisfaction of Working Capital Loans.

"Acquisition Proposal" means, with respect to the Company and its Subsidiaries, other than the transactions contemplated hereby and other than the acquisition or disposition of inventory, equipment or other tangible personal property in the ordinary course of business, any offer or proposal relating to: (a) any acquisition or purchase, direct or indirect, of (i) 15% or more of the consolidated assets of the Company and its Subsidiaries or (ii) 15% or more of any class of equity or voting securities of (x) the Company or (y) one or more Subsidiaries of the Company holding assets constituting, individually or in the aggregate, 15% or more of the consolidated assets of the Company and its Subsidiaries; (b) any tender offer (including a self-tender offer) or exchange offer that, if consummated, would result in any Person beneficially owning 15% or more of any class of equity or voting securities of (i) the Company or (ii) one or more Subsidiaries of the Company holding assets constituting, individually or in the aggregate, 15% or more of the consolidated assets of the Company and its Subsidiaries; or (c) a merger, consolidation, share exchange, business combination, sale of substantially all the assets, reorganization, recapitalization, liquidation, dissolution or other similar transaction involving the sale or disposition of (i) the Company or (ii) one or more Subsidiaries of the Company holding assets constituting, individually or in the aggregate, 15% or more of the consolidated assets of the Company and its Subsidiaries.

"Action" means any claim, action, suit, audit, examination, assessment, arbitration, mediation or inquiry, or any proceeding or investigation, by or before any Governmental Authority.

"Adjusted Restricted Stock Award" has the meaning specified in Section 3.3(b).

"Adjusted Restricted Stock Unit Award" has the meaning specified in Section 3.3(c).

"Affiliate" means, with respect to any specified Person, any Person that, directly or indirectly, controls, is controlled by, or is under common control with, such specified Person, whether through one or more intermediaries or otherwise. The term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"Affiliate Agreements" has the meaning specified in Section 4.12(a)(v).

"Aggregate Fully Diluted Company Common Shares" means, without duplication, (a) the aggregate number of shares of Company Common Stock that are (i) issued and outstanding immediately prior to the Effective Time (including, for the avoidance of doubt, any Dissenting Shares) or (ii) issuable upon, or subject to, the settlement of Company Options (other than any Company Option with an exercise price equal to or greater than the Per Share Merger Consideration) Restricted Stock Awards, and Restricted Stock Unit Awards that, in each case, are outstanding and vested immediately prior to the Effective Time, *minus* (b) the Treasury Shares outstanding immediately prior to the Effective Time, *minus* (c) a number of shares equal to the aggregate exercise price of the Company Options described in clause (ii) above *divided by* the Per Share Merger Consideration; provided, that any Company Options, Restricted Stock Awards, Restricted Stock Unit Awards, warrants or other securities convertible or exchangeable for (or exercisable into) Company Capital Stock that, in the case of any of the foregoing in this proviso, are not vested as of immediately prior to the Closing, shall not be counted for purposes of determining the number of Aggregate Fully Diluted Company Common Shares.

"Aggregate Merger Consideration" means a number of shares of Acquiror Common Stock equal to the quotient obtained by *dividing* (i) an amount equal to (x) the Base Purchase Price *plus* (y) the Excess Acquiror Expense Amount (if any), *by* (ii) $10.00; provided that, for the avoidance of doubt, any shares of Acquiror Common Stock issued as Aggregate Merger Consideration hereunder shall be issued as shares of Acquiror Class B Common Stock to the Founders and shares of Acquiror Class A Common Stock to all other holders of Company Capital Stock.

"Agreement" has the meaning specified in the Preamble hereto.

A-4

"Agreement End Date" has the meaning specified in Section 10.1(e).

"Ancillary Agreements" has the meaning specified in Section 11.10.

"Anti-Bribery Laws" means the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977, as amended, and all other applicable anti-corruption and bribery Laws (including the U.K. Bribery Act 2010, and any rules or regulations promulgated thereunder or other Laws of other countries implementing the OECD Convention on Combating Bribery of Foreign Officials).

"Antitrust Authorities" means the Antitrust Division of the United States Department of Justice, the United States Federal Trade Commission or the antitrust or competition Law authorities of any other jurisdiction (whether United States, foreign or multinational).

"Antitrust Information or Document Request" means any request or demand for the production, delivery or disclosure of documents or other evidence, or any request or demand for the production of witnesses for interviews or depositions or other oral or written testimony, by any Antitrust Authorities relating to the transactions contemplated hereby or by any third party challenging the transactions contemplated hereby, including any so called "second request" for additional information or documentary material or any civil investigative demand made or issued by any Antitrust Authority or any subpoena, interrogatory or deposition.

"Audited Financial Statements" has the meaning specified in Section 4.8(a).

"Available Acquiror Cash" means the amount of cash available in the Trust Account immediately prior to Closing, plus the amount of the PIPE Investment Amount and FPA Investment Amount then held by the Acquiror or Merger Sub, plus the amount of any cash investments made into the Company after the date hereof and prior to the Closing Date which remain on the Company's balance sheet at Closing, minus the amount required to satisfy the Acquiror Share Redemption Amount.

"Base Purchase Price" means $4,250,000,000.

"Business Combination" has the meaning set forth in Article Sixth of Acquiror's Amended and Restated Certificate of Incorporation as in effect on the date hereof.

"Business Combination Proposal" means any offer, inquiry, proposal or indication of interest (whether written or oral, binding or non-binding, and other than an offer, inquiry, proposal or indication of interest with respect to the transactions contemplated hereby), relating to a Business Combination.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

"Charter Proposal" has the meaning specified in Section 8.2(b)(ii).

"Closing" has the meaning specified in Section 2.3(a).

"Closing Date" has the meaning specified in Section 2.3(a).

"Closing Statement" has the meaning specified in Section 2.8(c).

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning specified in the Preamble hereto.

"Company Award" shall mean a Company Option, a Restricted Stock Award, or a Restricted Stock Unit Award.

"Company Benefit Plan" has the meaning specified in Section 4.13(a).

"Company Capital Stock" means the shares of the Company Common Stock, the Company Founders Preferred Stock and the Company Preferred Stock.

"Company Closing Statement" has the meaning specified in Section 2.8(b).

A-5

TABLE OF CONTENTS

"Company Common Shares" means shares of Company Common Stock.

"Company Common Stock" means the shares of Common Stock, par value $0.00001 per share, of the Company.

"Company Cure Period" has the meaning specified in Section 10.1(e).

"Company Disclosure Letter" has the meaning specified in the introduction to Article IV.

"Company Exchange Shares" has the meaning specified in Section 3.1(a).

"Company Founders Preferred Stock" has the meaning specified in Section 4.6(a).

"Company Holders Support Agreement" means that certain Company Holders Support Agreement, dated as of the date hereof, by and among Acquiror, the Company, and Persons constituting the Requisite Company Stockholders, as amended or modified from time to time.

"Company Incentive Plan" means the Embark Trucks Inc. 2016 Stock Plan, as amended from time to time.

"Company Indemnified Parties" has the meaning specified in Section 7.7(a).

"Company Material Adverse Effect" means any event, state of facts, development, circumstance, occurrence or effect (collectively, "Events") that (i) has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, assets, results of operations or financial condition of the Company and its Subsidiaries, taken as a whole or (ii) does or would reasonably be expected to, individually or in the aggregate, prevent the ability of the Company to consummate the Merger; provided, however, that in no event would any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been or will be, a "Company Material Adverse Effect": (a) any change in applicable Laws or GAAP or any interpretation thereof following the date of this Agreement, (b) any change in interest rates or economic, political, business or financial market conditions generally, (c) the taking of any action required or specifically contemplated by this Agreement, (d) any natural disaster (including hurricanes, storms, tornados, flooding, earthquakes, volcanic eruptions or similar occurrences), pandemic or change in climate, (e) any acts of terrorism or war, the outbreak or escalation of hostilities, geopolitical conditions, local, national or international political conditions, (f) any failure of the Company to meet any projections or forecasts (provided that clause (f) shall not prevent a determination that any Event not otherwise excluded from this definition of Company Material Adverse Effect underlying such failure to meet projections or forecasts has resulted in a Company Material Adverse Effect), (g) any Events generally applicable to the industries or markets in which the Company and its Subsidiaries operate (including increases in the cost of products, supplies, materials or other goods purchased from third party suppliers), (h) COVID-19 or any COVID-19 Measures, or the Company's or any of its Subsidiaries' compliance therewith, (i) the announcement of this Agreement and consummation of the transactions contemplated hereby, including any termination of, reduction in or similar adverse impact (but in each case only to the extent attributable to such announcement or consummation) on relationships, contractual or otherwise, with any landlords, customers, suppliers, distributors, partners or employees of the Company and its Subsidiaries (it being understood that this clause (i) shall be disregarded for purposes of the representation and warranty set forth in Section 4.4 and the condition to Closing with respect thereto), (j) any matter set forth on the Company Disclosure Letter, or (k) any action taken by, or at the request of, Acquiror or Merger Sub; provided, further, that any Event referred to in clauses (a), (b), (d), (e), (g) or (h) above may be taken into account in determining if a Company Material Adverse Effect has occurred to the extent it has a disproportionate and adverse effect on the business, assets, results of operations or financial condition of the Company and its Subsidiaries, taken as a whole, relative to similarly situated companies in the industry in which the Company and its Subsidiaries conduct their respective operations, but only to the extent of the incremental disproportionate effect on the Company and its Subsidiaries, taken as a whole, relative to similarly situated companies in the industry in which the Company and its Subsidiaries conduct their respective operations.

"Company Option" means an option to purchase shares of Company Common Stock granted under the Company Incentive Plan.

A-6

"Company Plan and Budget" has the meaning set forth in Section 6.1.

"Company Preferred Conversion" has the meaning specified in the Recitals hereto.

"Company Preferred Stock" means the shares of the Series A-1 Preferred Stock, the Series A-2 Preferred Stock, the Series A-3 Preferred Stock, the Series A-4 Preferred Stock, the Series A-5 Preferred Stock, the Series A-6 Preferred Stock, the Series A-7 Preferred Stock, the Series B Preferred Stock and the Series C Preferred Stock.

"Company Registered Intellectual Property" has the meaning specified in Section 4.21(a).

"Company Stockholder Approvals" means the approval of this Agreement and the transactions contemplated hereby, including the Merger and the transactions contemplated thereby, by the (i) affirmative vote or written consent of the holders of at least a majority of the voting power of the outstanding Company Capital Stock, voting as a single class and on an as-converted basis, and (ii) the affirmative vote or written consent of the holders of at least a majority of the voting power of the outstanding Company Preferred Stock, voting as a single class and on an as-converted basis, in each case, pursuant to the terms and subject to the conditions of the Company's Governing Documents and applicable Law.

"Company Transaction Expenses" means the following out-of-pocket fees and expenses paid or payable by the Company or any of its Subsidiaries (whether or not billed or accrued for) as a result of or in connection with the negotiation, documentation and consummation of the transactions contemplated hereby: (i) all fees, costs, expenses, brokerage fees, commissions, finders' fees and disbursements of financial advisors, investment banks, data room administrators, attorneys, accountants and other advisors and service providers, (ii) Transfer Taxes, and (iii) any and all filing fees payable by the Company or any of its Subsidiaries to the Antitrust Authorities in connection with the transactions contemplated hereby.

"Company Transaction Liabilities" means Company Transaction Expenses and any other out-of-pocket fees and expenses paid or payable by the Company or any of its Subsidiaries (whether or not billed or accrued for) as a result of or in connection with the consummation of the transactions contemplated hereby, including: (i) liabilities in respect of Dissenting Shares; (ii) change-in-control payments, transaction bonuses, retention payments, severance or similar compensatory payments payable by the Company or any of its Subsidiaries as a result of the transactions contemplated hereby, including the portion of payroll Taxes arising therefrom, (iii) amounts owing or that may become owed, payable or otherwise due, directly or indirectly, by the Company or any of its Subsidiaries pursuant to any Affiliate Agreement or any termination thereof in connection with the consummation of the transactions contemplated hereby; and (iv) any other fees, costs or liabilities incurred by the Company or any of its subsidiaries to obtain any consent or approval under, or otherwise in relation to, any other contract, agreement, permit, license or similar arrangement as a result of the transactions contemplated hereby.

"Company Warrant Settlement" has the meaning specified in the Recitals hereto.

"Company Warrants" has the meaning set forth in Section 4.6(c) of the Company Disclosure Letter.

"Confidentiality Agreement" has the meaning specified in Section 11.10.

"Constituent Corporations" has the meaning specified in Section 2.1(a).

"Contracts" means any legally binding contracts, agreements, subcontracts, leases, and purchase orders.

"Copyleft License" means any license that requires, as a condition of use, modification and/or distribution of software subject to such license, that such software subject to such license, or other software incorporated into, derived from, or used or distributed with such software subject to such license (i) in the case of software, be made available or distributed in a form other than binary (*e.g.*, source code form), (ii) be licensed for the purpose of preparing derivative works, (iii) be licensed under terms that allow the Company's or any Subsidiary of the Company's products or portions thereof or interfaces therefor to be reverse engineered, reverse assembled or disassembled (other than by operation of Law) or (iv) be redistributable at no license fee. Copyleft Licenses include the GNU General Public License, the GNU Lesser General

A-7

Public License, the Mozilla Public License, the Common Development and Distribution License, the Eclipse Public License and all Creative Commons "sharealike" licenses.

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions or mutations thereof or any other epidemics, pandemics or disease outbreaks.

"COVID-19 Measures" means any actions taken or omitted in response to the COVID-19 pandemic and the effects resulting from such taken or omitted actions (including (a) any required or recommended quarantines, travel restrictions, "stay-at-home" orders, social distancing measures, or other safety measures, (b) workforce reductions, workplace or worksite shutdowns or slowdowns, factory closures, (c) any delays in shipment of products to customers or in receipt of deliveries of supplies from vendors, and (d) other measures initiated, to the extent reasonably necessary or appropriate to respond to, or mitigate the effects of, the COVID-19 pandemic).

"D&O Indemnified Parties" has the meaning specified in Section 7.7(a).

"DGCL" has the meaning specified in the Recitals hereto.

"Disclosure Letter" means, as applicable, the Company Disclosure Letter or the Acquiror Disclosure Letter.

"Dissenting Shares" has the meaning specified in Section 3.5.

"Dollars" or "$" means lawful money of the United States.

"Effective Time" has the meaning specified in Section 2.3(b).

"Embark Group" has the meaning specified in Section 11.18(b).

"Environmental Laws" means any and all applicable Laws relating to Hazardous Materials, pollution, or the protection or management of the environment or natural resources, or protection of human health (with respect to exposure to Hazardous Materials).

"ERISA" has the meaning specified in Section 4.13(a).

"ERISA Affiliate" means any Affiliate or business, whether or not incorporated, that together with the Company would be deemed to be a "single employer" within the meaning of Section 414(b) of the Code.

"ESPP" has the meaning specified in Section 7.1(a).

"Excess Acquiror Expense Amount" means an amount equal to (i) the excess of the Outstanding Acquiror Expenses over $32,000,000 *divided by* (ii) (x) 1 *minus* (y) an amount equal to (A) the aggregate pro forma ownership percentage of Acquiror immediately after Closing (assuming the Excess Acquiror Expense Amount is $0) by the persons who were holders of shares of Company Common Stock and the holders of Company Awards immediately prior to the Closing *divided by* (B) 100; provided, that, for the avoidance of doubt, to the extent the aggregate Outstanding Acquiror Expenses is an amount equal to or less than $32,000,000, the Excess Acquiror Expense Amount shall be $0.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange Agent" has the meaning specified in Section 3.2(a).

"Exchange Ratio" means the quotient obtained by dividing (a) the number of shares constituting the Aggregate Merger Consideration, by (b) the number of Aggregate Fully Diluted Company Common Shares.

"Export Approvals" has the meaning specified in Section 4.26(a).

"Financial Statements" has the meaning specified in Section 4.8(a).

"Forward Purchase Agreements" means (a) the Amended and Restated Forward Purchase Agreement by and between Acquiror and Northern Genesis Capital II LLC, and (b) each additional Forward Purchase Agreement by and between Acquiror and an institutional investor party thereto, in each case entered into

A-8

prior to the date hereof, as amended as of the date hereof and as further amended, restated, modified or supplemented from time to time, together with any subscription or similar agreement implementing the terms thereof.

"Founders" means Alex Rodrigues and Brandon Moak and any Permitted Trust (as defined in the Acquiror Second A&R Charter) of either Person.

"FPA Investment" means the purchase of shares of Acquiror Class A Common Stock and Acquiror Warrants pursuant to the Forward Purchase Agreements.

"FPA Investment Amount" has the meaning specified in the Recitals hereto.

"FPA Purchasers" means one or more Persons who have agreed, on or prior to the date hereof, to purchase, upon or immediately prior to the Closing, Acquiror Class A Common Stock and Acquiror Forward Purchase Warrants pursuant to the terms of a Forward Purchase Agreement.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Governing Documents" of a corporation are its certificate of incorporation and by-laws, the "Governing Documents" of a limited partnership are its limited partnership agreement and certificate of limited partnership and the "Governing Documents" of a limited liability company are its operating agreement and certificate of formation.

"Governmental Authority" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, court or tribunal.

"Governmental Authorization" has the meaning specified in Section 4.5.

"Governmental Order" means any order, judgment, injunction, decree, writ, stipulation, determination or award, in each case, entered by or with any Governmental Authority.

"Hazardous Material" means any (i) pollutant, contaminant, chemical, (ii) industrial, solid, liquid or gaseous toxic or hazardous substance, material or waste, (iii) petroleum or any fraction or product thereof, (iv) asbestos or asbestos-containing material, (v) polychlorinated biphenyl, (vi) chlorofluorocarbons, and (vii) other substance, material or waste, in each case, which are regulated under any Environmental Law or as to which liability may be imposed pursuant to Environmental Law.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Husch Blackwell" has the meaning specified in Section 11.18(a).

"Incentive Equity Plan" has the meaning specified in Section 7.1(a).

"Indebtedness" means with respect to any Person, without duplication, any obligations, contingent or otherwise, in respect of (a) the principal of and premium (if any) in respect of all indebtedness for borrowed money, including accrued interest and any per diem interest accruals, (b) the principal and interest components of capitalized lease obligations under GAAP, (c) amounts drawn (including any accrued and unpaid interest) on letters of credit, bank guarantees, bankers' acceptances and other similar instruments (solely to the extent such amounts have actually been drawn), (d) the principal of and premium (if any) in respect of obligations evidenced by bonds, debentures, notes and similar instruments, (e) the termination value of interest rate protection agreements and currency obligation swaps, hedges or similar arrangements (without duplication of other indebtedness supported or guaranteed thereby), (f) the principal component of all obligations to pay the deferred and unpaid purchase price of property and equipment which have been delivered, including "earn outs" and "seller notes", (g) breakage costs, prepayment or early termination premiums, penalties, or other fees or expenses payable as a result of the consummation of the transactions contemplated hereby in respect of any of the items in the foregoing clauses (a) through (f), and (h) all liabilities of another Person guaranteed directly or indirectly by the applicable Person, jointly or severally.

A-9

"Intellectual Property" means any rights in or to the following, throughout the world, including all U.S. and foreign: (i) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof; (ii) registered and unregistered trademarks, logos, service marks, trade dress and trade names, slogans, pending applications therefor, and internet domain names, together with the goodwill of the Company or any of its Subsidiaries or their respective businesses symbolized by or associated with any of the foregoing; (iii) registered and unregistered copyrights, and applications for registration of copyright, including such corresponding rights in software and other works of authorship; and (iv) trade secrets, know-how, processes, and other confidential information or proprietary rights.

"Intended Tax Treatment" has the meaning specified in Section 2.7.

"Interim Financial Statements" means, collectively, the Q1 Interim Financial Statements, the Q2 Interim Financial Statements and the Q3 Interim Financial Statements.

"Interim Period" has the meaning specified in Section 6.1.

"International Trade Laws" means all Laws relating to the import, export, re-export, deemed export, deemed re-export, or transfer of information, data, goods, and technology, including but not limited to the Export Administration Regulations administered by the United States Department of Commerce, the International Traffic in Arms Regulations administered by the United States Department of State, customs and import Laws administered by United States Customs and Border Protection, any other export or import controls administered by an agency of the United States government, the anti-boycott regulations administered by the United States Department of Commerce and the United States Department of the Treasury, and other Laws adopted by Governmental Authorities of other countries relating to the same subject matter as the United States Laws described above.

"Intervening Event" means an event or circumstance with respect to the Company (and not Acquiror) that was not known, or the consequences of which were not known by the Board of Directors of Acquiror as of or prior to the date of this Agreement and did not result from or arise out of the announcement or pendency of, or any actions required to be taken by the Company (or to be refrained from being taken by the Company) pursuant to this Agreement, which event or circumstance, or any consequence thereof, (i) becomes known to the Board of Directors of Acquiror prior to obtaining the Acquiror Shareholder Approval and (ii) has resulted in a Company Material Adverse Effect.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"IRS" means Internal Revenue Service.

"JOBS Act" has the meaning specified in Section 5.6(a).

"Latham" has the meaning specified in Section 11.18(b).

"Law" means any statute, law, ordinance, rule, regulation or Governmental Order, in each case, of any Governmental Authority.

"Leased Real Property" means all real property (other than Owned Real Property) that is leased, licensed, or subleased to or otherwise used or occupied by the Company or any of its Subsidiaries.

"Legal Proceedings" has the meaning specified in Section 4.10.

"Letter of Transmittal" has the meaning specified in Section 3.2(b).

"Licenses" means any approvals, authorizations, consents, licenses, registrations, permits or certificates of a Governmental Authority.

"Lien" means all liens, mortgages, deeds of trust, pledges, hypothecations, encumbrances, security interests, adverse claim, options, restrictions, claims or other liens of any kind whether consensual, statutory or otherwise.

"Major Company Stockholder" means each of the holders of Company Capital Stock set forth on Section 8.2(a)(v) of the Company Disclosure Letter.

A-10

"Merger" has the meaning specified in the Recitals hereto.

"Merger Certificate" has the meaning specified in Section 2.1(a).

"Merger Sub" has the meaning specified in the Preamble hereto.

"Merger Sub Capital Stock" means the shares of the common stock, par value $0.0001 per share, of Merger Sub.

"Minimum Available Acquiror Cash Amount" means an amount equal to $295,000,000.

"Minimum PIPE Investment Amount" has the meaning specified in Section 5.12(e).

"Modification in Recommendation" has the meaning specified in Section 8.2(b).

"Nasdaq" has the meaning specified in Section 7.3.

"NG Group" has the meaning specified in Section 11.18(a).

"NG Representative" has the meaning specified in Section 7.6(a)(ii).

"NYSE" has the meaning specified in Section 5.6(c).

"Offer" has the meaning specified in the Recitals hereto.

"Offer Documents" has the meaning specified in Section 8.2(a)(i).

"Open Source License" means any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Definition (as promulgated by the Free Software Foundation), or any substantially similar license, including any license approved by the Open Source Initiative or any Creative Commons License. "Open Source Licenses" shall include Copyleft Licenses.

"Open Source Materials" means any software subject to an Open Source License.

"Outstanding Acquiror Expenses" means all expenses incurred, accrued, or payable by Acquiror or its subsidiaries, or on Acquiror's behalf by Sponsor or any representative of Acquiror or Sponsor (which shall include any deferred underwriting fees and any outstanding amounts under any Working Capital Loans), in any case prior to the Closing that remain unpaid immediately prior to Closing; provided, however, that Outstanding Acquiror Expenses shall not include any payments due or other liabilities with respect to (a) Acquiror Share Redemptions; (b) Company Transaction Liabilities; (c) the Aggregate Merger Consideration or any securities to be issued or other consideration to be paid under the Subscription Agreements or Forward Purchase Agreements; or (d) any liability recorded by Acquiror as a result of the classification of any Acquiror Warrants as derivatives or other instruments rather than as equity.

"Outstanding Acquiror Shares" has the meaning specified in Section 5.12(a).

"Outstanding Acquiror Warrants" has the meaning specified in Section 5.12(b).

"Owned Real Property" means all real property owned in fee simple by the Company or any of its Subsidiaries.

"Per Share Merger Consideration" means the product obtained by multiplying (i) the Exchange Ratio by (ii) $10.00.

"Permitted Liens" means (i) mechanic's, materialmen's and similar Liens arising in the ordinary course of business with respect to any amounts not yet due and payable or which are being contested in good faith through appropriate proceedings, (ii) Liens for Taxes (A) not yet due and payable or (B) which are being contested in good faith through appropriate proceedings and for which adequate accruals or reserves have been established in accordance with GAAP, (iii) defects or imperfections of title, easements, encroachments, covenants, rights-of-way, conditions, matters that would be apparent from a physical inspection or current, accurate survey of such real property, restrictions and other similar charges or encumbrances that do not, in the aggregate, materially impair the value or materially interfere with the present use of the Owned Real Property or Leased Real Property, (iv) with respect to any Leased Real Property (A) the interests and rights

A-11

of the respective lessors with respect thereto, including any statutory landlord liens and any Lien thereon, (B) any Lien permitted under a Real Property Lease, and (C) any Liens encumbering the underlying fee title of the real property of which the Leased Real Property is a part, (v) zoning, building, entitlement and other land use and environmental regulations promulgated by any Governmental Authority that do not, in the aggregate, materially interfere with the current use of, or materially impair the value of, the Owned Real Property or Leased Real Property, (vi) non-exclusive licenses of Intellectual Property entered into in the ordinary course of business, (vii) ordinary course purchase money Liens and Liens securing rental payments under operating or capital lease arrangements for amounts not yet due or payable, (viii) other Liens arising in the ordinary course of business and not incurred in connection with the borrowing of money in connection with workers' compensation, unemployment insurance or other types of social security, (ix) reversionary rights in favor of landlords under any Real Property Leases with respect to any of the buildings or other improvements owned by the Company or any of its Subsidiaries, (x) restrictions on transfer under applicable securities Laws, (xi) Liens set forth on Section 1.1 of the Company Disclosure Letter and (xii) Liens that do not, individually or in the aggregate, materially and adversely affect, or materially disrupt or materially limit, the ordinary course operation of the businesses of the Company and its Subsidiaries, taken as a whole.

"Person" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, Governmental Authority or instrumentality or other entity of any kind.

"PIPE Investment" means the purchase of shares of Acquiror Class A Common Stock pursuant to the Subscription Agreements.

"PIPE Investment Amount" means the aggregate gross purchase price received by Acquiror prior to or substantially concurrently with Closing for the shares in the PIPE Investment.

"PIPE Investors" means those certain investors participating in the PIPE Investment pursuant to the Subscription Agreements.

"Proxy Statement" has the meaning specified in Section 8.2(a)(i).

"Proxy Statement/Registration Statement" has the meaning specified in Section 8.2(a)(i).

"Q1 Interim Financial Statements" has the meaning specified in Section 6.3(a).

"Q2 Interim Financial Statements" has the meaning specified in Section 6.3(b).

"Q3 Interim Financial Statements" has the meaning specified in Section 6.3(c).

"Real Property Leases" has the meaning specified in Section 4.20(a)(ii).

"Registration Rights Agreement" has the meaning specified in the Recitals hereto.

"Registration Statement" means the Registration Statement on Form S-4, or other appropriate form, including any pre-effective or post-effective amendments or supplements thereto, to be filed with the SEC by Acquiror under the Securities Act with respect to the Registration Statement Securities.

"Registration Statement Securities" has the meaning specified in Section 8.2(a)(i).

"Requisite Company Stockholders" means each of the holders of Company Capital Stock set forth on Section 8.2(c) of the Company Disclosure Letter, which holders, taken together, represent the holders of (i) a majority of the Company Capital Stock then outstanding, and (ii) a majority of the Company Preferred Stock then outstanding.

"Restricted Stock Award" means an award of restricted shares of Company Common Stock granted under the Company Incentive Plan, which includes any shares of Company Common Stock issued pursuant to early-exercised Company Options that remain subject to vesting conditions.

"Restricted Stock Unit Award" means an award of restricted stock units based on shares of Company Common Stock (whether to be settled in cash or shares), granted under the Company Incentive Plan.

A-12

"Sanctioned Country" means at any time, a country or territory which is itself the subject or target of any country-wide or territory-wide Sanctions Laws (at the time of this Agreement, the Crimea region, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means (i) any Person identified in any sanctions-related list of designated Persons maintained by (a) the United States Department of the Treasury's Office of Foreign Assets Control, the United States Department of Commerce, Bureau of Industry and Security, or the United States Department of State; (b) Her Majesty's Treasury of the United Kingdom; (c) any committee of the United Nations Security Council; or (d) the European Union; (ii) any Person located, organized, or resident in, organized in, or a Governmental Authority or government instrumentality of, any Sanctioned Country; and (iii) any Person directly or indirectly owned or controlled by, or acting for the benefit or on behalf of, a Person described in clause (i) or (ii), either individually or in the aggregate.

"Sanctions Laws" means those trade, economic and financial sanctions Laws administered, enacted or enforced from time to time by (i) the United States (including the Department of the Treasury's Office of Foreign Assets Control), (ii) the European Union and enforced by its member states, (iii) the United Nations, or (iv) Her Majesty's Treasury of the United Kingdom.

"Sarbanes-Oxley Act" means the Sarbanes-Oxley Act of 2002.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Series A-1 Preferred Stock" has the meaning specified in Section 4.6(a).

"Series A-2 Preferred Stock" has the meaning specified in Section 4.6(a).

"Series A-3 Preferred Stock" has the meaning specified in Section 4.6(a).

"Series A-4 Preferred Stock" has the meaning specified in Section 4.6(a).

"Series A-5 Preferred Stock" has the meaning specified in Section 4.6(a).

"Series A-6 Preferred Stock" has the meaning specified in Section 4.6(a).

"Series A-7 Preferred Stock" has the meaning specified in Section 4.6(a).

"Series B Preferred Stock" has the meaning specified in Section 4.6(a).

"Series C Preferred Stock" has the meaning specified in Section 4.6(a).

"Sponsor" means Northern Genesis Sponsor II LLC, a Delaware limited liability company.

"Sponsor Support Agreement" means that certain Support Agreement, dated as of the date hereof, by and among the Sponsor, Acquiror and the Company, as amended or modified from time to time.

"Subscription Agreements" means the subscription agreements pursuant to which the PIPE Investment will be consummated.

"Subsidiary" means, with respect to a Person, a corporation or other entity of which more than 50% of the voting power of the equity securities or equity interests is owned, directly or indirectly, by such Person. As of the date hereof, the Company does not have any Subsidiaries.

"Surviving Corporation" has the meaning specified in Section 2.1(b).

"Tax Return" means any return, declaration, report, statement, information statement or other document filed or required to be filed with any Governmental Authority with respect to Taxes, including any claims for refunds of Taxes, any information returns and any schedules, attachments, amendments or supplements of any of the foregoing.

"Taxes" means any and all federal, state, local, foreign or other taxes imposed by any Governmental Authority, including all income, gross receipts, license, payroll, recapture, net worth, employment, excise,

A-13

severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, ad valorem, value added, inventory, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, alternative or add-on minimum, or estimated taxes, and including any interest, penalty, or addition thereto.

"Terminating Acquiror Breach" has the meaning specified in Section 10.1(g).

"Terminating Company Breach" has the meaning specified in Section 10.1(e).

"Transaction Proposals" has the meaning specified in Section 8.2(b)(ii).

"Transactions" means, collectively, the Merger, the PIPE Investment, and the FPA Investment.

"Transfer Taxes" has the meaning specified in Section 8.4.

"Treasury Regulations" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

"Treasury Share" means a share of Company Common Stock held in the treasury of the Company immediately prior to the Effective Time.

"Trust Account" has the meaning specified in Section 11.1.

"Trust Agreement" has the meaning specified in Section 5.8.

"Trust Claims" has the meaning specified in Section 11.1.

"Trustee" has the meaning specified in Section 5.8.

"Unpaid Company Transaction Liabilities" has the meaning specified in Section 2.4(c).

"Warrant Agreement" means the Warrant Agreement, dated as of January 12, 2021, between Acquiror and Continental Stock Transfer & Trust Company.

"Working Capital Loans" means any loan made to Acquiror by any of the Sponsor, an Affiliate of the Sponsor, or any of Acquiror's officers or directors, and evidenced by a promissory note, for the purpose of financing costs incurred in connection with a proposed Business Combination or other working capital purposes.

"Written Consent" has the meaning specified in Section 8.2(c).

Section 1.2. Construction.

(a) Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article" or "Section" refer to the specified Article or Section of this Agreement; (v) the word "including" shall mean "including, without limitation" and (vi) the word "or" shall be disjunctive but not exclusive.

(b) Unless the context of this Agreement otherwise requires, references to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(c) Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

(d) All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(e) The term "actual fraud" means, with respect to a party to this Agreement, an actual and intentional fraud with respect to the making of the representations and warranties pursuant to

A-14

Article IV or Article V (as applicable), provided, that such actual and intentional fraud of such Person shall only be deemed to exist if any of the individuals included on Section 1.3 of the Company Disclosure Letter (in the case of the Company) or Section 1.3 of the Acquiror Disclosure Letter (in the case of Acquiror) had actual knowledge (as opposed to imputed or constructive knowledge) that the representations and warranties made by such Person pursuant to, in the case of the Company, Article IV as qualified by the Company Disclosure Letter, or, in the case of Acquiror, Article V as qualified by the Acquiror Disclosure Letter, were actually breached when made, with the express intention that the other party to this Agreement rely thereon to its detriment.

(f)   When used herein, "ordinary course" and "ordinary course of business" mean an action taken, or omitted to be taken, in the ordinary and usual course of the Company's and its Subsidiaries' business (including, for the avoidance of doubt, actions taken in response to COVID-19, including when determining whether actions taken after the date of this Agreement are in the ordinary course of business).

Section 1.3. Knowledge.   As used herein, (i) the phrase "to the knowledge" of the Company shall mean the knowledge of the individuals identified on Section 1.3 of the Company Disclosure Letter and (ii) the phrase "to the knowledge" of Acquiror shall mean the knowledge of the individuals identified on Section 1.3 of the Acquiror Disclosure Letter, in each case, as such individuals would have acquired in the exercise of a reasonable inquiry of direct reports.

## ARTICLE II

## THE MERGER; CLOSING

Section 2.1. The Merger.

(a)   Upon the terms and subject to the conditions set forth in this Agreement, Acquiror, Merger Sub and the Company (Merger Sub and the Company sometimes being referred to herein as the "Constituent Corporations") shall cause Merger Sub to be merged with and into the Company, with the Company being the surviving corporation in the Merger. The Merger shall be consummated in accordance with this Agreement and shall be evidenced by a certificate of merger with respect to the Merger (as so filed, the "Merger Certificate"), executed by the Constituent Corporations in accordance with the relevant provisions of the DGCL, such Merger to be effective as of the Effective Time.

(b)   Upon consummation of the Merger, the separate corporate existence of Merger Sub shall cease and the Company, as the surviving corporation of the Merger (hereinafter referred to for the periods at and after the Effective Time as the "Surviving Corporation"), shall continue its corporate existence under the DGCL, as a wholly owned subsidiary of Acquiror.

Section 2.2. Effects of the Merger.   At and after the Effective Time, the Surviving Corporation shall thereupon and thereafter possess all of the rights, privileges, powers and franchises, of a public as well as a private nature, of the Constituent Corporations, and shall become subject to all the restrictions, disabilities and duties of each of the Constituent Corporations; and all rights, privileges, powers and franchises of each Constituent Corporation, and all property, real, personal and mixed, and all debts due to each such Constituent Corporation, on whatever account, shall become vested in the Surviving Corporation; and all property, rights, privileges, powers and franchises, and all and every other interest shall become thereafter the property of the Surviving Corporation as they are of the Constituent Corporations; and the title to any real property vested by deed or otherwise or any other interest in real estate vested by any instrument or otherwise in either of such Constituent Corporations shall not revert or become in any way impaired by reason of the Merger; but all Liens upon any property of a Constituent Corporation shall thereafter attach to the Surviving Corporation and shall be enforceable against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it; all of the foregoing in accordance with the applicable provisions of the DGCL.

Section 2.3. Closing; Effective Time.

(a)   In accordance with the terms and subject to the conditions of this Agreement, the closing of the Merger (the "Closing") shall take place electronically through the exchange of documents via e-mail

A-15

TABLE OF CONTENTS

or facsimile on the date which is three (3) Business Days after the first date on which all conditions set forth in Article IX shall have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver thereof) or such other time and place as Acquiror and the Company may mutually agree in writing. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date".

(b)    In connection with the Closing, Acquiror, Merger Sub, and the Company shall cause the Merger Certificate to be executed and duly submitted for filing with the Secretary of State of the State of Delaware in accordance with the applicable provisions of the DGCL. The Merger shall become effective at the time when the Merger Certificate has been accepted for filing by the Secretary of State of the State of Delaware, or at such later time as may be agreed by Acquiror and the Company in writing and specified in the Merger Certificate (the "Effective Time").

Section 2.4. Closing Deliverables.

(a)    At the Closing, the Company will deliver or cause to be delivered:

(i)    to Acquiror, a certificate signed by an officer of the Company, dated as of the Closing Date, certifying that, to the knowledge and belief of such officer, the conditions specified in Section 9.2(a) and Section 9.2(b) have been fulfilled;

(ii)    to Acquiror, the written resignations of all of the directors of the Company (other than any such Persons identified as initial directors of the Surviving Corporation, in accordance with Section 2.6), effective as of the Effective Time;

(iii)    to Acquiror, the Registration Rights Agreement, duly executed by the Major Company Stockholders who have elected to execute the Registration Rights Agreement; and

(iv)    to Acquiror, a certificate on behalf of the Company, prepared in a manner consistent and in accordance with the requirements of Treasury Regulation Sections 1.897-2(g), (h) and 1.1445-2(c)(3), certifying that no interest in the Company is, or has been during the relevant period specified in Section 897(c)(1)(A)(ii) of the Code, a "U.S. real property interest" within the meaning of Section 897(c) of the Code, and a form of notice to the Internal Revenue Service prepared in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2); provided, however, that notwithstanding anything to the contrary, the sole remedy under this Agreement for any failure of the Company to deliver a certification and notice pursuant to this Section 2.4(a)(iv) shall be for Acquiror, the Company or the Exchange Agent, as applicable, to withhold from payments pursuant to this Agreement in accordance with Section 3.4 any Taxes that are required to be withheld by such Person pursuant to Section 1445 of the Code by reason of such failure.

(b)    At the Closing, Acquiror will deliver or cause to be delivered:

(i)    to the Exchange Agent, the portion of the Aggregate Merger Consideration payable in respect of the Company Exchange Shares, for further distribution to the Company's stockholders pursuant to Section 3.2;

(ii)    to the Company, a certificate signed by an officer of Acquiror, dated as of the Closing Date, certifying that, to the knowledge and belief of such officer, the conditions specified in Section 9.3(a) and Section 9.3(b) have been fulfilled;

(iii)    to the Company, the Registration Rights Agreement, duly executed by duly authorized representatives of Acquiror and the Sponsor; and

(iv)    to the Company, the written resignations of all of the directors and officers of Acquiror and Merger Sub (other than those Persons identified as initial directors or officers, respectively, of Acquiror after the Effective Time, in accordance with the provisions of Section 2.6 and Section 7.6), effective as of the Effective Time.

(c)    At the Closing, Acquiror shall pay or cause to be paid, by wire transfer of immediately available funds, (i) all Outstanding Acquiror Expenses as set forth on the final Acquiror Closing

A-16

Statement and (ii) all accrued and unpaid Company Transaction Liabilities ("Unpaid Company Transaction Liabilities") as set forth on the final Company Closing Statement; provided, that any Unpaid Company Transaction Liabilities due to current or former employees, independent contractors, officers, or directors of the Company or any of its Subsidiaries shall be paid to the Company for further payment to such employee, independent contractor, officer or director through the Company's payroll.

Section 2.5. Governing Documents.

(a)   The certificate of incorporation and bylaws of the Company in effect immediately prior to the Effective Time shall be the certificate of incorporation and bylaws of the Surviving Corporation until thereafter amended as provided therein and under the DGCL.

(b)   The certificate of incorporation and bylaws of Acquiror as of immediately prior to the Effective Time (which shall be in the forms of the Acquiror Second A&R Charter and Acquiror A&R Bylaws, respectively), shall be the certificate of incorporation and bylaws of Acquiror from and after the Effective Time, until thereafter amended as provided therein and under the DGCL.

Section 2.6. Directors and Officers.

(a)   The (i) officers of the Company as of immediately prior to the Effective Time shall be the officers of the Surviving Corporation from and after the Effective Time, and (ii) the persons set forth on Section 2.6(a) of the Company Disclosure Letter shall be the directors of the Surviving Corporation from and after the Effective Time, in each case, each to hold office in accordance with the Governing Documents of the Surviving Corporation.

(b)   The parties shall take all actions necessary to ensure that, upon and immediately following the Effective Time, the Persons identified as the initial post-Closing directors and officers of Acquiror in accordance with the provisions of Section 7.6 shall be the directors and officers (and in the case of such officers, holding such positions as are set forth on Section 7.6 of the Company Disclosure Letter), respectively, of Acquiror, each to hold office in accordance with the Governing Documents of Acquiror.

Section 2.7. Tax Free Reorganization Matters.   The parties intend that, for United States federal income tax purposes (and for purposes of any applicable state or local income tax law that follows U.S. federal income tax treatment), (i) the Merger will qualify as a "reorganization" within the meaning of Section 368(a) of the Code and the Treasury Regulations to which each of Acquiror and the Company are to be parties under Section 368(b) of the Code and the Treasury Regulations and/or the Merger, the FPA Investment and the PIPE Investment shall be considered part of an overall plan in which the Company Stockholders exchange their shares of Company Capital Stock for the Merger Consideration in an exchange described in Section 351 of the Code, and (ii) this Agreement is intended to be, and is adopted as, a plan of reorganization for purposes of Sections 354, 361 and the 368 of the Code and within the meaning of Treasury Regulations Section 1.368-2(g) and 1.368-3(a) (the "Intended Tax Treatment"). None of the parties will take any action, or knowingly fail to take any action, which action or failure would be reasonably expected to cause the Merger to fail to qualify for the Intended Tax Treatment. The Merger shall be reported by the parties for all Tax purposes in accordance with the foregoing, unless otherwise required by a Governmental Authority as a result of a "determination" within the meaning of Section 1313(a) of the Code. The parties shall cooperate with each other and their respective counsel to document and support the Intended Tax Treatment, including providing factual support letters.

Section 2.8. Closing Statements.

(a)   Acquiror shall use its reasonable best efforts to prepare and deliver to the Company no less than three (3) Business Days prior to the Closing, and not earlier than the time that holders of Acquiror IPO Shares can no longer elect redemption in accordance with the Acquiror Share Redemption, a written statement (the "Acquiror Closing Statement"):

(i)   certifying the number of (A) shares of Acquiror Pre-Transaction Common Stock and Acquiror Warrants to be issued and outstanding immediately prior to the Effective Time (other

A-17

than as a result of the closing of the Merger), and (B) Acquiror IPO Shares to be redeemed pursuant to Acquiror Share Redemptions; and

(ii)   setting forth Acquiror's good faith estimate of (A) the amount of cash to be available in the Trust Account as of the Effective Time, (B) the amount of cash to be held by the Acquiror or Merger Sub outside the Trust Account as of the Effective Time (excluding any of the PIPE Investment Amount or FPA Investment Amount then held by the Acquiror or Merger Sub), (C) the Acquiror Share Redemption Amount, and (D) the aggregate amount of Outstanding Acquiror Expenses as of the Effective Time, including in each case relevant supporting documentation used by Acquiror in calculating such amounts reasonably requested by the Company.

(b)   The Company shall use its reasonable best efforts to prepare and deliver to the Acquiror no less than (3) Business Days prior to the Closing a written statement (the "Company Closing Statement"):

(i)   confirming that the Company Warrant Settlement and the Company Preferred Conversion will be completed in connection with the Closing and that, as of immediately after such completion and the Closing, the Company will have no issued and outstanding securities other than Company Common Stock issued to Acquiror;

(ii)   certifying (A) the number of Company Common Shares, Treasury Shares, Dissenting Shares, and Company Exchange Shares to be issued and outstanding immediately prior to the Effective Time; (B) an updated list of all Company Awards to be outstanding immediately prior to the Effective Time, including the holder thereof, the type of Company Award, the number of shares of Company Common Stock subject thereto, vesting schedule and, if applicable, the exercise price thereof; and (C) the record holders of any of the foregoing that are entitled to receive, by reason of the Merger (subject, in the case of any Company Awards, to the terms thereof), Acquiror Class B Common Stock; and

(iii)   setting forth the Company's good faith estimate of any Unpaid Company Transaction Liabilities, which shall include the respective amounts and wire transfer instructions for the payment thereof (other than with respect to amounts payable through the Company's payroll), together with corresponding invoices for the foregoing.

(c)   From and after delivery of the Acquiror Closing Statement and the Company Closing Statement (each, a "Closing Statement"):

(i)   The parties shall use their respective reasonable best efforts to (A) cooperate with each other and provide each other such additional information reasonably requested by such other party in connection with such other party's review of the Closing Statements, (B) reasonably consider any and all changes reasonably requested by such other party and (C) revise its Closing Statement as necessary to render such Closing Statement true and correct and reflective of the terms of this Agreement; and

(ii)   The parties shall use their respective reasonable best efforts to jointly calculate in accordance with the terms hereof and shall use their respective reasonable best efforts to mutually confirm (A) the number of shares of Acquiror Common Stock constituting the Aggregate Merger Consideration, including the number of shares thereof consisting of Acquiror Class A Common Stock and Acquiror Class B Common Stock, (B) the Exchange Ratio, and (C) the portion of the Aggregate Merger Consideration payable from and after the Effective Time in respect of the Company Exchange Shares, including the number of shares thereof consisting of Acquiror Class A Common Stock and Acquiror Class B Common Stock

(d)   Notwithstanding anything to the contrary herein, (i) no requested changes to any Closing Statement received from another party or any dispute among the parties with respect to any Closing Statement shall prevent or delay the Closing and (ii) no actual or alleged breach of or failure to comply with the terms of this Section 2.8 shall serve as the basis for the failure of any closing condition set forth in Article IX to be satisfied.

A-18

**ARTICLE III**

**EFFECTS OF THE MERGER**

Section 3.1. <u>Reclassification and Conversion of Securities</u>.

(a)   At the Effective Time, by virtue of the Merger and without any action on the part of any holder of Company Common Stock, each share of Company Common Stock that is issued and outstanding immediately prior to the Effective Time (other than (i) any shares of Company Common Stock subject to Company Awards (which shall be respectively subject to <u>Section 3.3</u>), (ii) any Treasury Shares, which shall be canceled as part of the Merger and shall not constitute Company Capital Stock hereunder as of the Effective Time, and (iii) any Dissenting Shares) (such shares of Company Common Stock, other than such exclusions in clauses (i)-(iii), the "<u>Company Exchange Shares</u>"), shall be canceled and converted into the right to receive the applicable portion of the Aggregate Merger Consideration determined pursuant to <u>Section 3.1(c)</u>.

(b)   At the Effective Time, by virtue of the Merger and without any action on the part of Acquiror or Merger Sub, each share of Merger Sub Capital Stock shall be converted into a share of common stock, par value $0.0001, of the Surviving Corporation.

(c)   Each holder of Company Exchange Shares immediately prior to the Effective Time shall be entitled to receive a portion of the Aggregate Merger Consideration equal to (i) the Exchange Ratio, <u>multiplied by</u> (ii) the number of Company Exchange Shares held by such holder immediately prior to the Effective Time, with fractional shares rounded down to the nearest whole share. Any shares of Acquiror Common Stock issued as part of the Aggregate Merger Consideration pursuant to this <u>Section 3.1(c)</u> shall be issued as shares of Acquiror Class B Common Stock to the Founders and shares of Acquiror Class A Common Stock to all other holders of Company Common Stock. Each of the parties to this Agreement intend that the Aggregate Merger Consideration payable to the holders of Company Common Stock pursuant to the Merger and this Agreement are entirely in consideration for such holders' shares of Company Common Stock held immediately prior to the Merger and agree to report the same for U.S. federal and applicable state income tax purposes entirely as consideration for such Company Common Stock (and not as compensation for services and/or any consideration for other property, etc.), unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

(d)   Immediately prior to the Effective Time, by virtue of the effectiveness of the Acquiror Second A&R Charter and without any further action on the part of any holder of Acquiror Pre-Transaction Common Stock, the Acquiror Pre-Transaction Common Stock, as a class, shall be reclassified as the Acquiror Class A Common Stock, with each share of Acquiror Pre-Transaction Common Stock that is issued and outstanding at such time thereafter constituting one share of Acquiror Class A Common Stock. From and after the Effective Time until presented for exchange, each certificate that previously represented shares of Acquiror Pre-Transaction Common Stock shall represent the shares of Acquiror Class A Common Stock, equal in number to the number of shares of Acquiror Pre-Transaction Common Stock previously represented by such certificate. In addition, immediately prior to the Effective Time, any shares of Acquiror Pre-Transaction Common Stock (or Acquiror Class A Common Stock) held in the treasury of Acquiror shall be cancelled.

(e)   Notwithstanding anything in this Agreement to the contrary, no fractional shares of Acquiror Common Stock shall be issued in the Merger.

Section 3.2. <u>Exchange Procedures</u>

(a)   Prior to the Closing, Acquiror shall appoint an exchange agent (the "<u>Exchange Agent</u>"), reasonably acceptable to the Company, to act as the agent for the purpose of paying the portion of the Aggregate Merger Consideration payable in respect of Company Exchange Shares. At or before the Effective Time, Acquiror shall deposit with the Exchange Agent the number of shares of Acquiror Class A Common Stock and Acquiror Class B Common Stock constituting the portion of the Aggregate Merger Consideration payable in respect of the Company Exchange Shares.

(b)   Reasonably promptly after the Effective Time, Acquiror shall send, or shall cause the Exchange Agent to send, to each record holder of Company Exchange Shares a letter of transmittal

A-19

and instructions (which shall specify that the delivery shall be effected, and the risk of loss and title shall pass, only upon proper transfer of each share to the Exchange Agent, and which letter of transmittal will be in customary form and have such other provisions as Acquiror may reasonably specify) for use in such exchange (each, a "Letter of Transmittal").

(c)  Each holder of Company Exchange Shares shall be entitled to receive such portion of the Aggregate Merger Consideration upon receipt of an "agent's message" by the Exchange Agent (or such other evidence, if any, of transfer as the Exchange Agent may reasonably request), together with a duly completed and validly executed Letter of Transmittal and such other documents as may reasonably be requested by the Exchange Agent. No interest shall be paid or accrued upon the transfer of any share.

(d)  Promptly following the date that is one (1) year after the Effective Time, Acquiror shall instruct the Exchange Agent to deliver to Acquiror all documents in its possession relating to the transactions contemplated hereby, and the Exchange Agent's duties shall terminate. Thereafter, any portion of the Aggregate Merger Consideration deposited with the Exchange Agent that remains unclaimed shall be returned to Acquiror, and any Person that was a holder of Company Exchange Shares immediately prior to the Effective Time that has not exchanged such Company Exchange Shares for an applicable portion of the Aggregate Merger Consideration in accordance with this Section 3.2 prior to the date that is one (1) year after the Effective Time may transfer such Company Exchange Shares to Acquiror and (subject to applicable abandoned property, escheat and similar Laws) receive in consideration therefor, and Acquiror shall promptly deliver, such applicable portion of the Aggregate Merger Consideration without any interest thereupon. None of Acquiror, Merger Sub, the Company, the Surviving Corporation or the Exchange Agent shall be liable to any Person in respect of any of the Aggregate Merger Consideration delivered to a public official pursuant to and in accordance with any applicable abandoned property, escheat or similar Laws. If any such shares shall not have not been transferred immediately prior to such date on which any amounts payable pursuant to this Article III would otherwise escheat to or become the property of any Governmental Authority, any such amounts shall, to the extent permitted by applicable Law, become the property of the Surviving Corporation, free and clear of all claims or interest of any Person previously entitled thereto.

Section 3.3.  Treatment of Company Awards.

(a)  As of the Effective Time, each Company Option that is then outstanding shall be converted into the right to receive an option relating to shares of Acquiror Common Stock upon substantially the same terms and conditions as are in effect with respect to such option immediately prior to the Effective Time, including with respect to vesting and termination-related provisions (each, an "Acquiror Option"), except that (a) such Acquiror Option shall relate to that whole number of shares of Acquiror Common Stock (rounded down to the nearest whole share) equal to the number of Company Common Shares subject to such Company Option, *multiplied by* the Exchange Ratio, and (b) the exercise price per share for each such Acquiror Option shall be equal to the exercise price per share of such Company Option in effect immediately prior to the Effective Time, *divided by* the Exchange Ratio (the exercise price per share, as so determined, being rounded up to the nearest full cent); provided, however, that the conversion of the Company Options will be made in a manner consistent with Treasury Regulation Section 1.424-1, such that such conversion will not constitute a "modification" of such Company Options for purposes of Section 409A or Section 424 of the Code. For the avoidance of doubt, each Acquiror Option held by any person shall relate to shares of Acquiror Class A Common Stock.

(b)  As of the Effective Time, each Restricted Stock Award that is outstanding immediately prior to the Effective Time shall be converted into the right to receive restricted shares of Acquiror Common Stock (each, an "Adjusted Restricted Stock Award") with substantially the same terms and conditions as were applicable to such Restricted Stock Award immediately prior to the Effective Time (including with respect to vesting and termination-related provisions), except that such Adjusted Restricted Stock Award shall relate to such number of shares of Acquiror Common Stock as is equal to the product of (i) the number of Company Common Shares subject to such Restricted Stock Award immediately prior to the Effective Time, *multiplied by* (ii) the Exchange Ratio, with any fractional shares rounded down to the nearest whole share. For the avoidance of doubt, each Adjusted Restricted Stock Award held by any person shall represent the right to receive shares of Acquiror Class A Common Stock.

A-20

TABLE OF CONTENTS

(c)  As of the Effective Time, each Restricted Stock Unit Award that is outstanding immediately prior to the Effective Time shall be converted into the right to receive restricted stock units based on shares of Acquiror Common Stock (each, an "Adjusted Restricted Stock Unit Award") with substantially the same terms and conditions as were applicable to such Restricted Stock Unit Award immediately prior to the Effective Time (including with respect to vesting and termination-related provisions), except that such Adjusted Restricted Stock Unit Award shall relate to such number of shares of Acquiror Common Stock as is equal to the product of (i) the number of shares of Company Common Stock subject to such Restricted Stock Unit Award immediately prior to the Effective Time, *multiplied by* (ii) the Exchange Ratio, with any fractional shares rounded down to the nearest whole share. For the avoidance of doubt, each Adjusted Restricted Stock Unit Award held by any person shall represent the right to receive restricted stock units based on shares of Acquiror Class A Common Stock.

(d)  The Company shall take all necessary actions to effect the treatment of Company Options, Restricted Stock Awards and Restricted Stock Unit Awards pursuant to Section 3.3(a), Section 3.3(b) and Section 3.3(c), respectively, in accordance with the Company Incentive Plan and the applicable award agreements and to ensure that no Acquiror Option may be exercised prior to the effective date of an applicable Form S-8 (or other applicable form, including Form S-1 or Form S-3) of Acquiror. The Board of Directors of the Company shall amend the Company Incentive Plan and take all other necessary actions, effective as of immediately prior to the Closing, in order to (i) cancel the remaining unallocated share reserve under the Company Incentive Plan and provide that shares in respect of Company Awards that for any reason become re-eligible for future issuance shall be cancelled, (ii) provide that no new Company Awards will be granted under the Company Incentive Plan, and (iii) provide that no Company Options shall be subject to the Option Exchange Program, as defined therein.

Section 3.4. Withholding.   Notwithstanding any other provision to this Agreement, Acquiror, the Company and the Exchange Agent, as applicable, shall be entitled to deduct and withhold from any amount payable pursuant to this Agreement such Taxes that are required to be deducted and withheld by Acquiror, the Company or the Exchange Agent, as applicable, from such amounts under the Code or any other applicable Law (as reasonably determined by Acquiror, the Company, or the Exchange Agent, respectively); provided, that Acquiror shall use commercially reasonable efforts to provide the Company with at least ten (10) days' prior written notice of any amounts that it intends to withhold in connection with the payment of the Aggregate Merger Consideration and will reasonably cooperate with the Company to reduce or eliminate any applicable withholding. To the extent that any amounts are so deducted and withheld, such deducted and withheld amounts shall be (i) timely remitted to the appropriate Governmental Authority and (ii) treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

Section 3.5. Dissenting Shares.   Notwithstanding any provision of this Agreement to the contrary, shares of Company Common Stock issued and outstanding immediately prior to the Effective Time and held by a holder who has not voted in favor of adoption of this Agreement or consented thereto in writing and who is entitled to demand and has properly exercised appraisal rights of such shares in accordance with Section 262 of the DGCL (such shares of Company Common Stock being referred to collectively as the "Dissenting Shares" until such time as such holder fails to perfect or otherwise waives, withdraws, or loses such holder's appraisal rights under the DGCL with respect to such shares) shall not be converted into a right to receive a portion of the Aggregate Merger Consideration, but instead shall be entitled to only such rights as are granted by Section 262 of the DGCL; provided, however, that if, after the Effective Time, such holder fails to perfect, waives, withdraws, or loses such holder's right to appraisal pursuant to Section 262 of the DGCL, or if a court of competent jurisdiction shall determine that such holder is not entitled to the relief provided by Section 262 of the DGCL, such shares of Company Common Stock shall be treated as if they had been converted as of the Effective Time into the right to receive a portion of the Aggregate Merger Consideration in accordance with Section 3.1 without interest thereon, upon transfer of such shares. The Company shall provide Acquiror prompt written notice of any demands received by the Company for appraisal of shares of Company Common Stock, any waiver or withdrawal of any such demand, and any other demand, notice, or instrument delivered to the Company prior to the Effective Time that relates to such demand. Except with the prior written consent of Acquiror (which consent shall not be unreasonably conditioned, withheld, delayed or denied), the Company shall not make any payment with respect to, or settle, or offer to settle, any such demands.

A-21

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the disclosure letter delivered to Acquiror and Merger Sub by the Company on the date of this Agreement (the "Company Disclosure Letter") (each section of which, subject to Section 11.9, qualifies the correspondingly numbered and lettered representations in this Article IV), the Company represents and warrants to Acquiror and Merger Sub as follows:

Section 4.1. Company Organization.   The Company has been duly incorporated and is validly existing under the Laws of the State of Delaware, and has the requisite corporate power and authority to own, lease or operate all of its properties and assets and to conduct its business as it is now being conducted. The Governing Documents of the Company, as amended to the date of this Agreement and as previously made available by or on behalf of the Company to Acquiror, are true, correct and complete. The Company is duly licensed or qualified and in good standing as a foreign or extra-provincial corporation (or other entity, if applicable) in each jurisdiction in which its ownership of property or the character of its activities is such as to require it to be so licensed or qualified or in good standing, as applicable, except where the failure to be so licensed or qualified or in good standing would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 4.2. Subsidiaries.   A complete list of each Subsidiary of the Company and its jurisdiction of incorporation, formation or organization, as applicable, is set forth on Section 4.2 of the Company Disclosure Letter. The Subsidiaries of the Company have been duly formed or organized and are validly existing under the Laws of their jurisdiction of incorporation or organization and have the requisite power and authority to own, lease or operate all of their respective properties and assets and to conduct their respective businesses as they are now being conducted. True, correct and complete copies of the Governing Documents of the Company's Subsidiaries, in each case, as amended to the date of this Agreement, have been previously made available to Acquiror by or on behalf of the Company. Each Subsidiary of the Company is duly licensed or qualified and in good standing as a foreign or extra-provincial corporation (or other entity, if applicable) in each jurisdiction in which its ownership of property or the character of its activities is such as to require it to be so licensed or qualified or in good standing, as applicable, except where the failure to be so licensed or qualified or in good standing would not have, or would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 4.3. Due Authorization.

(a)   The Company has all requisite corporate power and authority to execute and deliver this Agreement and the other documents to which it is contemplated hereby to be a party and (subject to the Company Stockholder Approvals and the approvals described in Section 4.5) to consummate the transactions contemplated hereby and thereby and to perform all of its obligations hereunder and thereunder. The execution and delivery of this Agreement and the other documents to which the Company is contemplated hereby to be a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by the Board of Directors of the Company, and no other company or corporate proceeding on the part of the Company is necessary to authorize this Agreement and the other documents to which the Company is contemplated hereby to be a party. This Agreement has been, and on or prior to the Closing, the other documents to which the Company is contemplated hereby to be a party will be, duly and validly executed and delivered by the Company, and this Agreement constitutes, and on or prior to the Closing, the other documents to which the Company is contemplated hereby to be a party will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity.

(b)   On or prior to the date of this Agreement, the Board of Directors of the Company has duly adopted resolutions (i) determining that this Agreement and the other documents to which the Company is contemplated hereby to be a party and the transactions contemplated hereby and thereby are advisable and fair to, and in the best interests of, the Company and its stockholders, as applicable, and (ii) authorizing and approving the execution, delivery and performance by the Company of this

A-22

TABLE OF CONTENTS

Agreement and the other documents to which the Company is contemplated hereby to be party and the transactions contemplated hereby and thereby. No other corporate action is required on the part of the Company or any of its stockholders to enter into this Agreement or the documents to which the Company is contemplated hereby to be a party or to approve the Merger other than the Company Stockholder Approvals.

Section 4.4. No Conflict.   Subject to the receipt of the consents, approvals, authorizations and other requirements set forth in Section 4.5 and except as set forth on Section 4.4 of the Company Disclosure Letter, the execution and delivery by the Company of this Agreement and the documents to which the Company is contemplated hereby to be a party and the consummation of the transactions contemplated hereby and thereby do not and will not (a) violate or conflict with any provision of, or result in the breach of or a default under, the Governing Documents of the Company, (b) violate or conflict with any provision of, or result in the breach of or a default under, any Law or Governmental Order applicable to the Company or any of the Company's Subsidiaries, (c) violate or conflict with any provision of, or result in the breach of, or result in the loss of any right or benefit under, or cause acceleration under, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, any Contract of the type described in Section 4.12(a) to which the Company or any of the Company's Subsidiaries is a party or by which the Company or any of the Company's Subsidiaries may be bound, or terminate or result in the termination of any such foregoing Contract or (d) result in the creation of any Lien (other than Permitted Liens) upon any of the properties or assets of the Company or any of the Company's Subsidiaries, except, in the case of clauses (b) through (d), to the extent that the occurrence of the foregoing would not (i) have, or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of the Company to enter into and perform their obligations under this Agreement or (ii) be material to the business of the Company and its Subsidiaries, taken as a whole.

Section 4.5. Governmental Authorities; Consents.   Assuming the truth and completeness of the representations and warranties of Acquiror contained in this Agreement, no consent, waiver, approval or authorization of, or designation, declaration or filing with, or notification to, any Governmental Authority (each, a "Governmental Authorization") is required on the part of the Company or its Subsidiaries with respect to the Company's execution or delivery of this Agreement or the consummation by the Company of the transactions contemplated hereby, except for (i) applicable requirements of the HSR Act; (ii) any consents, approvals, authorizations, designations, declarations, waivers or filings, the absence of which would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of the Company to perform or comply with on a timely basis any material obligation of the Company under this Agreement or to consummate the transactions contemplated hereby and (iii) the filing of the Merger Certificate in accordance with the DGCL.

Section 4.6. Capitalization of the Company.

(a)   As of the date of this Agreement, the authorized capital stock of the Company consists of (x) 150,000,000 shares of Company Common Stock, of which 47,763,826 shares are issued and outstanding as of the date of this Agreement, (y) 1,124,856 shares of Founders Preferred Stock, par value $0.00001 per share (the "Company Founders Preferred Stock"), of which 162,558 shares are issued and outstanding as of the date of this Agreement, and (z) 87,355,585 shares of Company Preferred Stock (of which (i) 3,654,873 shares are designated as Series A-1 Preferred Stock, par value $0.00001 per share, of which 3,654,873 shares are issued and outstanding as of the date of this Agreement (the "Series A-1 Preferred Stock"), (ii) 5,372,703 shares are designated as Series A-2 Preferred Stock, par value $0.00001 per share, of which 5,372,703 shares are issued and outstanding as of the date of this Agreement (the "Series A-2 Preferred Stock"), (iii) 2,485,296 shares are designated as Series A-3 Preferred Stock, par value $0.00001 per share, of which 2,485,296 shares are issued and outstanding as of the date of this Agreement (the "Series A-3 Preferred Stock"), (iv) 590,688 shares are designated as Series A-4 Preferred Stock, par value $0.00001 per share, of which 590,688 shares are issued and outstanding as of the date of this Agreement (the "Series A-4 Preferred Stock"), (v) 2,680,236 shares are designated as Series A-5 Preferred Stock, par value $0.00001 per share, of which 2,680,236 shares are issued and outstanding as of the date of this Agreement (the "Series A-5 Preferred Stock"), (vi) 3,647,817 shares are designated as Series A-6 Preferred Stock, par value $0.00001 per share, of which 3,647,817 shares are issued and outstanding as of the date of this Agreement (the "Series A-6 Preferred Stock"),

A-23

(vii) 15,139,917 shares are designated as Series A-7 Preferred Stock, par value $0.00001 per share, of which 15,139,917 shares are issued and outstanding as of the date of this Agreement (the "Series A-7 Preferred Stock"), (viii) 32,834,601 shares are designated as Series B Preferred Stock, par value $0.00001 per share, of which 32,834,601 shares are issued and outstanding as of the date of this Agreement (the "Series B Preferred Stock"), and (ix) 20,949,454 shares are designated as Series C Preferred Stock, par value $0.00001 per share, of which 20,949,454 shares are issued and outstanding as of the date of this Agreement (the "Series C Preferred Stock")), and there are no other authorized equity interests of the Company that are issued and outstanding. Except as set forth on Section 4.6(a) of the Company Disclosure Letter, all of the issued and outstanding shares of Company Capital Stock (i) have been duly authorized and validly issued and are fully paid and non-assessable; (ii) have been offered, sold and issued in compliance with applicable Law, including federal and state securities Laws, and all requirements set forth in (1) the Governing Documents of the Company and (2) any other applicable Contracts governing the issuance of such securities; (iii) are not subject to, nor have they been issued in violation of, any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of any applicable Law, the Governing Documents of the Company or any Contract to which the Company is a party or otherwise bound; and (iv) are free and clear of any Liens, other than restrictions on transfer under applicable securities Laws. All shares of Company Common Stock are uncertificated, book-entry shares.

(b)   As of the date of this Agreement, (i) Company Options to purchase 8,760,253 shares of Company Common Stock, with an aggregate exercise price equal to $5,162,826, are outstanding, (ii) Restricted Stock Awards with respect to zero (0) shares of Company Common Stock are outstanding and (iii) Restricted Stock Unit Awards with respect to zero (0) shares of Company Common Stock, are outstanding. The Company has provided to Acquiror, prior to the date of this Agreement, a true and complete list of each Person who, as of the date of this Agreement, holds a Company Award, including the type of Company Award, the number of shares of Company Common Stock subject thereto, vesting schedule and, if applicable, the exercise price thereof. All Company Options, Restricted Stock Awards and Restricted Stock Unit Awards are evidenced in all material respects by award agreements in substantially the forms previously made available to Acquiror. Each Company Option, each Restricted Stock Award, and each Restricted Stock Unit Award was validly issued and properly approved by the Board of Directors of the Company (or appropriate committee thereof).

(c)   Except as otherwise set forth in this Section 4.6 or on Section 4.6(c) of the Company Disclosure Letter, there are no securities of the Company issued and outstanding, and the Company has not granted any outstanding subscriptions, options, stock appreciation rights, warrants, rights or other securities (including debt securities) convertible into or exchangeable or exercisable for shares of Company Capital Stock, any other commitments, calls, conversion rights, rights of exchange or privilege (whether pre-emptive, contractual or by matter of Law), plans or other agreements of any character providing for the issuance of additional shares, the sale of treasury shares or other equity interests, or for the repurchase or redemption of shares or other equity interests of the Company or the value of which is determined by reference to shares or other equity interests of the Company, and there are no voting trusts, proxies or agreements of any kind which may obligate the Company to issue, purchase, register for sale, redeem or otherwise acquire any shares of Company Capital Stock.

Section 4.7. Capitalization of Subsidiaries.

(a)   The outstanding shares of capital stock or equity interests of each of the Company's Subsidiaries (i) have been duly authorized and validly issued and are, to the extent applicable, fully paid and non-assessable; (ii) have been offered, sold and issued in compliance with applicable Law, including federal and state securities Laws, and all requirements set forth in (1) the Governing Documents of each such Subsidiary, and (2) any other applicable Contracts governing the issuance of such securities; (iii) are not subject to, and have not been issued in violation of, any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of any applicable Law, the Governing Documents of each such Subsidiary or any Contract to which each such Subsidiary is a party or otherwise bound; and (iv) are free and clear of any Liens, other than restrictions on transfer under applicable securities Laws.

A-24

(b)  The Company owns of record and beneficially all the issued and outstanding shares of capital stock or equity interests of such Subsidiaries free and clear of any Liens other than Permitted Liens.

(c)  Except as set forth on Section 4.7(c) of the Company Disclosure Letter, there are no outstanding capital stock or equity interests of, and no subscriptions, options, warrants, rights or other securities (including debt securities) exercisable or exchangeable for any capital stock or equity interests of, such Subsidiaries, any other commitments, calls, conversion rights, rights of exchange or privilege (whether pre-emptive, contractual or by matter of Law), plans or other agreements of any character providing for the issuance of additional shares, the sale of treasury shares or other equity interests, or for the repurchase or redemption of shares or other equity interests of such Subsidiaries or the value of which is determined by reference to shares or other equity interests of the Subsidiaries, and there are no voting trusts, proxies or agreements of any kind which may obligate any Subsidiary of the Company to issue, purchase, register for sale, redeem or otherwise acquire any of its capital stock or equity interests.

Section 4.8. Financial Statements.

(a)  Attached as Section 4.8(a) of the Company Disclosure Letter are true and complete copies of the audited consolidated balance sheets and statements of operations, comprehensive loss, stockholders' equity and cash flows of the Company and its Subsidiaries as of and for the years ended December 31, 2020 and December 31, 2019, together with the auditor's reports thereon (the "Audited Financial Statements" and, together with the applicable Interim Financial Statements, if and when delivered pursuant to Section 6.3, the "Financial Statements").

(b)  Except as set forth on Section 4.8(b) of the Company Disclosure Letter, the Audited Financial Statements and, when delivered pursuant to Section 6.3, the Interim Financial Statements (i) fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries, as at the respective dates thereof, and the consolidated results of their operations, their consolidated incomes, their consolidated changes in stockholders' equity (with respect to the Audited Financial Statements only) and their consolidated cash flows for the respective periods then ended (subject, in the case of the Interim Financial Statements, to normal year-end adjustments and the absence of footnotes), (ii) were prepared in conformity with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto and, in the case of the Interim Financial Statements, the absence of footnotes or the inclusion of limited footnotes), (iii) were prepared from, and are in accordance in all material respects with, the books and records of the Company and its consolidated Subsidiaries and (iv) when delivered by the Company for inclusion in the Registration Statement for filing with the SEC following the date of this Agreement in accordance with Section 6.3, will comply in all material respects with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act applicable to a registrant, in effect as of the respective dates thereof.

(c)  As of the date hereof, neither the Company (including, to the knowledge of the Company, any employee thereof) nor any independent auditor of the Company has identified or been made aware of (i) any significant deficiency or material weakness in the system of internal accounting controls utilized by the Company, (ii) any fraud, whether or not material, that involves the Company's management or other employees who have a role in the preparation of financial statements or the internal accounting controls utilized by the Company or (iii) any claim or allegation regarding any of the foregoing.

(d)  Management of the Company believes that the net proceeds of the Transactions, taken together with existing cash on the Company's balance sheet, are sufficient to fund the Company through commercialization of its business.

Section 4.9. Undisclosed Liabilities.  Except as set forth on Section 4.9 of the Company Disclosure Letter, as of the date hereof, there is no other liability, debt (including Indebtedness) or obligation of, or claim or judgment against, the Company or any of the Company's Subsidiaries (whether direct or indirect, absolute or contingent, accrued or unaccrued, known or unknown, liquidated or unliquidated, or due or to become due), except for liabilities, debts, obligations, claims or judgments (a) reflected or reserved for on

A-25

TABLE OF CONTENTS

the Financial Statements or disclosed in the notes thereto or (b) that have arisen since the date of the most recent balance sheet included in the Financial Statements in the ordinary course of business of the Company and its Subsidiaries.

Section 4.10. <u>Litigation and Proceedings</u>.    Except as set forth on <u>Section 4.10</u> of the Company Disclosure Letter, as of the date hereof (a) there are no pending or, to the knowledge of the Company, threatened, lawsuits, actions, suits, judgments, claims, proceedings or any other Actions (including any investigations or inquiries initiated, pending or threatened by any Governmental Authority), or other proceedings at law or in equity (collectively, "<u>Legal Proceedings</u>"), against the Company or any of the Company's Subsidiaries or their respective properties or assets; and (b) there is no outstanding Governmental Order imposed upon the Company or any of the Company's Subsidiaries, nor binding upon any properties or assets of the Company or any of the Company's Subsidiaries' respective businesses, except, in each case, as would not be, or would not reasonably be expected to be, material to the business of the Company and its Subsidiaries, taken as a whole.

Section 4.11. <u>Legal Compliance</u>.

(a)   As of the date hereof, each of the Company and its Subsidiaries is in compliance with all applicable Laws in all material respects.

(b)   For the past three (3) years, none of the Company or any of its Subsidiaries has received any written notice of, or been charged with, the violation of any Laws, except where such violation has not been material to the business of the Company and its Subsidiaries, taken as a whole.

(c)   The Company and its Subsidiaries maintain a program of policies, procedures and internal controls reasonably designed and implemented to provide reasonable assurance that violation of applicable Law by any of the Company's or its Subsidiaries' directors, officers, employees or its or their respective agents, representatives or other Persons, acting on behalf of the Company or any of the Company's Subsidiaries, will be prevented, detected and deterred.

Section 4.12. <u>Contracts; No Defaults</u>.

(a)   <u>Section 4.12(a)</u> of the Company Disclosure Letter contains a listing of all Contracts described in clauses (i) through (xiv) below to which, as of the date of this Agreement, the Company or any of the Company's Subsidiaries is a party or by which they are bound, other than a Company Benefit Plan. True, correct and complete copies of the Contracts listed on <u>Section 4.12(a)</u> of the Company Disclosure Letter have previously been delivered to or made available to Acquiror or its agents or representatives, together with all amendments thereto.

(i)   each note, debenture, other evidence of Indebtedness, guarantee, loan, credit or financing agreement or instrument or other Contract for money borrowed by the Company or any of the Company's Subsidiaries, including any agreement or commitment for future loans, credit or financing, in each case, in excess of $1,000,000;

(ii)   each Contract for the acquisition of any Person or any business unit thereof or the disposition of any material assets of the Company or any of its Subsidiaries in the last two (2) years, in each case, involving payments in excess of $1,000,000, other than Contracts (A) in which the applicable acquisition or disposition has been consummated and there are no material obligations ongoing, or (B) between the Company and its wholly owned Subsidiaries;

(iii)   each lease, rental or occupancy agreement, license, installment and conditional sale agreement and other Contract that provides for the ownership of, leasing of, title to, use of, or any leasehold or other interest in any real or personal property that involves aggregate payments in excess of $1,000,000 in any calendar year;

(iv)   each Contract involving the formation of a (A) joint venture, (B) partnership, or (C) limited liability company (excluding, in the case of clauses (B) and (C), any wholly owned Subsidiary of the Company);

A-26

(v)   material Contracts (other than employment agreements or arrangements (including the Company Benefit Plans), Governing Documents and those entered into in the ordinary course of business) between the Company or any of its Subsidiaries, on the one hand, and (A) any stockholder of the Company or any Affiliate thereof, (B) any Affiliate of the Company or of any of the Company's Subsidiaries (other than the Company or any of the Company's Subsidiaries), (C) any director, officer, manager or employee of the Company or any of the Company's Subsidiaries, or (D) a member of the immediate family of any of the foregoing Persons, on the other hand (collectively, "Affiliate Agreements");

(vi)   employment or similar Contracts with any employee of the Company or any of its Subsidiaries that provide for an annual base salary greater than $250,000;

(vii)   Contracts containing covenants of the Company or any of the Company's Subsidiaries (A) prohibiting or limiting the right of the Company or any of the Company's Subsidiaries to engage in or compete with any Person in any line of business in any material respect or (B) prohibiting or restricting the Company's and the Company's Subsidiaries' ability to conduct their business with any Person in any geographic area in any material respect;

(viii)   any collective bargaining (or similar) agreement or Contract between the Company or any of the Company's Subsidiaries, on one hand, and any labor union or other body representing employees of the Company or any of the Company's Subsidiaries, on the other hand;

(ix)   each Contract (including license agreements, coexistence agreements, and agreements with covenants not to sue, but not including non-disclosure agreements, contractor services agreements, consulting services agreements, employment agreements or employee invention assignment agreements, incidental trademark licenses incident to marketing, printing or advertising Contracts) pursuant to which the Company or any of the Company's Subsidiaries (i) grants to a third Person the right to use material Intellectual Property of the Company and its Subsidiaries or (ii) is granted by a third Person the right to use Intellectual Property that is material to the business of the Company and its Subsidiaries (other than Contracts granting nonexclusive rights to use commercially available off-the-shelf software and Open Source Licenses);

(x)   each Contract requiring capital expenditures by the Company or any of the Company's Subsidiaries after the date of this Agreement in an amount in excess of $1,000,000 in any calendar year;

(xi)   any Contract that grants to any Person (other than the Company or its Subsidiaries) (A) any "most favored nation" rights or (B) a right of first refusal, first offer or similar preferential right to purchase or otherwise acquire equity interests in or any material assets of the Company or any of the Company's Subsidiaries;

(xii)   each Contract that involves aggregate payments by or to the Company or any of its Subsidiaries in excess of $2,500,000 in any calendar year, including any such Contracts with any service provider, supplier, licensor, licensee or customer;

(xiii)   Contracts requiring the payment by the Company or any of its Subsidiaries of any material change of control, transaction bonus or similar payment to any Person as a result of the consummation of the transactions contemplated hereby (and not tied to any subsequent event or condition, such as a termination of employment);

(xiv)   any Contract not otherwise identified pursuant to the foregoing if the violation, breach or termination thereof would reasonably be expected to have a Company Material Adverse Effect; and

(xv)   any outstanding commitment to enter into any Contract of the type described in subsections (i) through (xiv) of this Section 4.12(a).

(b)   Except for any Contract that will terminate upon the expiration of the stated term thereof prior to the Closing Date, all of the Contracts listed pursuant to Section 4.12(a) in the Company Disclosure Letter are (i) in full force and effect and (ii) represent the legal, valid and binding obligations

A-27

of the Company or the Subsidiary of the Company party thereto and, to the knowledge of the Company, represent the legal, valid and binding obligations of the counterparties thereto. Except, in each case, where the occurrence of such breach or default or failure to perform would not be material to the Company and its Subsidiaries, taken as a whole, (x) the Company and its Subsidiaries have performed in all respects all respective obligations required to be performed by them to date under such Contracts listed pursuant to Section 4.12(a) and neither the Company, the Company's Subsidiaries, nor, to the knowledge of the Company, any other party thereto is in breach of or default under any such Contract, (y) during the last twelve (12) months, neither the Company nor any of its Subsidiaries has received any written claim or written notice of termination or breach of or default under any such Contract, and (z) to the knowledge of the Company, no event has occurred which individually or together with other events, would reasonably be expected to result in a breach of or a default under any such Contract by the Company or its Subsidiaries or, to the knowledge of the Company, any other party thereto (in each case, with or without notice or lapse of time or both).

Section 4.13. Company Benefit Plans.

(a)    Section 4.13(a) of the Company Disclosure Letter sets forth a complete list, as of the date hereof, of each material Company Benefit Plan. For purposes of this Agreement, a "Company Benefit Plan" means an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") or any other plan, policy, program or agreement (including any employment, bonus, incentive or deferred compensation, employee loan, equity or equity-based compensation, severance, retention, supplemental retirement, change in control or similar plan, policy, program or agreement) providing compensation or other benefits to any current or former director, officer, individual consultant, employee, which are maintained, sponsored or contributed to by the Company or any of the Company's Subsidiaries, or to which the Company or any of the Company's Subsidiaries is a party or has any liability, and in each case whether or not (i) subject to the Laws of the United States, (ii) in writing or (iii) funded, but excluding in each case any Multiemployer Plan and any statutory plan, program or arrangement that is required under applicable Law and maintained by any Governmental Authority. With respect to each material Company Benefit Plan, the Company has made available to Acquiror, to the extent applicable, true, complete and correct copies of (A) such Company Benefit Plan (or, if not written a written summary of its material terms) and all plan documents, trust agreements, insurance Contracts or other funding vehicles and all amendments thereto, (B) the most recent summary plan descriptions, including any summary of material modifications, (C) the most recent annual reports (Form 5500 series) filed with the IRS with respect to such Company Benefit Plan, (D) the most recent actuarial report or other financial statement relating to such Company Benefit Plan, and (E) the most recent determination or opinion letter, if any, issued by the IRS with respect to any Company Benefit Plan and any pending request for such a determination letter.

(b)    Except as set forth on Section 4.13(b) of the Company Disclosure Letter or would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole, (i) each Company Benefit Plan has been operated and administered in compliance with its terms and all applicable Laws, including ERISA and the Code, and (ii) each Company Benefit Plan which is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS as to its qualification or may rely upon an opinion letter for a prototype plan and, to the knowledge of the Company, no fact or event has occurred that would reasonably be expected to adversely affect the qualified status of any such Company Benefit Plan.

(c)    Neither the Company nor any of its ERISA Affiliates has sponsored or contributed to, been required to contribute to, or had any actual or contingent liability under, a Multiemployer Plan or other pension plan subject to Title IV of ERISA at any time within the previous six (6) years.

(d)    Except would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole, with respect to each Company Benefit Plan, no Legal Proceedings (other than routine claims for benefits in the ordinary course of business) are pending or, to the knowledge of the Company, threatened and, to the knowledge of the Company, no facts or circumstances exist that would reasonably be expected to give rise to any such Legal Proceedings.

A-28

(e)   No Company Benefit Plan provides medical, surgical, hospitalization, death or similar benefits (whether or not insured) for employees or former employees of the Company or any Subsidiary for periods extending beyond their retirement or other termination of service, other than (i) coverage mandated by applicable Law, or (ii) benefits the full cost of which is borne by the current or former employee (or his or her beneficiary).

(f)   Except as set forth on Section 4.13(f) of the Company Disclosure Letter, the consummation of the transactions contemplated hereby will not, either alone or in combination with another event (such as termination following the consummation of the transactions contemplated hereby), (i) entitle any current or former employee, officer or other service provider of the Company or any Subsidiary of the Company to any material severance pay or any other compensation or benefits payable or to be provided by the Company or any Subsidiary of the Company as expressly provided in this Agreement, (ii) accelerate the time of payment, funding or vesting, or materially increase the amount of material compensation or benefits due any such employee, officer or other individual service provider by the Company or a Subsidiary of the Company, (iii) accelerate the vesting and/or settlement of any Company Award or (iv) result in any "excess parachute payment" under Section 280G of the Code. No Company Benefit Plan provides for a Tax gross-up, make whole or similar payment with respect to the Taxes imposed under Sections 409A or 4999 of the Code.

Section 4.14. Labor Relations; Employees.

(a)   Except as set forth on Section 4.14(a) of the Company Disclosure Letter, (i) neither the Company nor any of its Subsidiaries is a party to or bound by any collective bargaining agreement, or any similar agreement, (ii) no such agreement is being negotiated by the Company or any of the Company's Subsidiaries, and (iii) in the past three (3) years, no labor union or any other employee representative body has requested or, to the knowledge of the Company, has sought to represent any of the employees of the Company or its Subsidiaries. In the past three (3) years, there has been no actual or, to the knowledge of the Company, threatened strike, slowdown, work stoppage, lockout or other labor dispute against or affecting the Company or any Subsidiary of the Company, except as would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

(b)   Each of the Company and its Subsidiaries are, and have been for the past three (3) years, in compliance with all applicable Laws respecting labor and employment including, but not limited to, all Laws respecting terms and conditions of employment, health and safety, wages and hours, holiday pay and the calculation of holiday pay, working time, employee classification (with respect to both exempt vs. non-exempt status and employee vs. independent contractor and worker status), child labor, immigration, employment discrimination, disability rights or benefits, equal opportunity and equal pay, plant closures and layoffs, affirmative action, workers' compensation, labor relations, employee leave issues and unemployment insurance, except where the failure to comply would not reasonably be expected to be, individually or in the aggregate, material to the Company and its Subsidiaries, taken as a whole.

(c)   In the past three (3) years, the Company and its Subsidiaries have not received (i) notice of any unfair labor practice charge pending or, to the knowledge of the Company, threatened before the National Labor Relations Board or any other Governmental Authority against them, (ii) notice of any complaints, grievances or arbitrations arising out of any collective bargaining agreement or any other complaints, grievances or arbitration procedures against them, (iii) notice of any charge or complaint with respect to or relating to them pending before the Equal Employment Opportunity Commission, (iv) notice of the intent of any Governmental Authority responsible for the enforcement of labor, employment, wages and hours of work, child labor, immigration, or occupational safety and health Laws to conduct an investigation with respect to or relating to them or notice that such investigation is in progress, or (v) notice of any complaint, lawsuit or other proceeding pending or threatened in any forum by or on behalf of any present or former employee of such entities, any applicant for employment or classes of the foregoing alleging breach of any express or implied Contract of employment, any applicable Law governing employment or the termination thereof or other discriminatory, wrongful or tortious conduct in connection with the employment relationship, in each case, except as would not reasonably be expected to be material to the Company and its Subsidiaries, taken as a whole.

A-29

TABLE OF CONTENTS

(d)   In the past three (3) years, the Company and its Subsidiaries have not engaged in layoffs, furloughs or employment terminations sufficient to trigger application of the Workers' Adjustment and Retraining Notification Act or any similar state or local law relating to group terminations, the liability for which has not been satisfied in all material respects. The Company and its Subsidiaries have not engaged in material layoffs, furloughs, employment terminations (other than for cause) or effected any broad-based salary or other compensation or benefits reductions, in each case, whether temporary or permanent, since January 1, 2020 through the date hereof.

Section 4.15. Taxes.

(a)   All material Tax Returns required to be filed by or with respect to the Company or any of its Subsidiaries have been timely filed (taking into account any applicable extensions), all such Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects.

(b)   All material Taxes due and payable by the Company and its Subsidiaries (whether or not shown on any Tax Return) have been paid, other than Taxes being contested in good faith and for which adequate reserves have been established in accordance with GAAP.

(c)   The Company and each of its Subsidiaries have withheld from amounts owing to any employee, creditor or other Person all material Taxes required by Law to be withheld, paid over to the proper Governmental Authority in a timely manner all such withheld amounts required to have been so paid over and complied in all material respects with all applicable withholding and related reporting requirements with respect to such Taxes.

(d)   There are no Liens for any material amount of Taxes (other than Permitted Liens) upon the property or assets of the Company or any of its Subsidiaries.

(e)   No claim, assessment, deficiency or proposed adjustment for any material amount of Tax has been asserted or assessed in writing by any Governmental Authority against the Company or any of its Subsidiaries that remains unresolved or unpaid except for claims, assessments, deficiencies or proposed adjustments being contested in good faith and for which adequate reserves have been established in accordance with GAAP.

(f)   There are no ongoing or pending legal proceedings with respect to any material taxes of the Company or any of its Subsidiaries presently in progress, and there are no waivers, extensions or requests for any waivers or extensions of any statute of limitations currently in effect with respect to any material Taxes of the Company or any of its Subsidiaries.

(g)   Neither the Company nor any of its Subsidiaries is a party to any Tax indemnification or Tax sharing or similar agreement (other than any such agreement solely between the Company and its existing Subsidiaries and customary commercial Contracts (or Contracts entered into in the ordinary course of business) not primarily related to Taxes).

(h)   Neither the Company nor any of its Subsidiaries has been a party to any transaction treated by the parties as a distribution of stock qualifying for Tax-free treatment under Section 355 of the Code in the two (2) years prior to the date of this Agreement.

(i)   Neither the Company nor any of its Subsidiaries (i) has any material liability for Taxes of any other Person (other than the Company and its Subsidiaries) under Treasury Regulation Section 1.1502-6 or any similar provision of state, local or foreign Tax Law or as a transferee or successor or by Contract (other than customary commercial Contracts (or Contracts entered into in the ordinary course of business) not primarily related to Taxes) or (ii) has within the last thirty-six (36) months been a member of an affiliated, consolidated, combined or unitary group filing for U.S. federal, state or local income Tax purposes, other than a group the common parent of which was or is the Company or any of its Subsidiaries.

(j)   No written claim has been made by any Governmental Authority within the last thirty-six (36) months where the Company or any of its Subsidiaries does not file Tax Returns that it is or may be subject to taxation in that jurisdiction that has not since been resolved.

A-30

(k)   Neither the Company nor any of its Subsidiaries has participated in a "listed transaction" within the meaning of Treasury Regulation 1.6011-4(b)(2).

(l)   Neither the Company nor any of its Subsidiaries will be required to include any material amount in taxable income, exclude any material item of deduction or loss from taxable income, for any taxable period (or portion thereof) beginning after the Closing Date as a result of any (i) installment sale or open transaction disposition made prior to the Closing outside the ordinary course of business, (ii) prepaid amount received or deferred revenue recognized prior to the Closing outside the ordinary course of business, (iii) change in method of accounting for a taxable period ending on or prior to the Closing Date made or requested prior to the Closing, (iv) "closing agreements" described in Section 7121 of the Code (or any similar provision of state, local or foreign Law) executed prior to the Closing, or (v) any election pursuant to Section 965(h) of the Code.

(m)   The Company has not taken any action, nor to the knowledge of the Company or any of its Subsidiaries are there any facts or circumstances, that would reasonably be expected to prevent the Merger from qualifying for the Intended Tax Treatment.

Section 4.16. Brokers' Fees.   Except as set forth on Section 4.16 of the Company Disclosure Letter, no broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated hereby based upon arrangements made by the Company, any of the Company's Subsidiaries' or any of their Affiliates for which Acquiror, Merger Sub, the Company or any of the Company's Subsidiaries has any obligation.

Section 4.17. Insurance.   Section 4.17 of the Company Disclosure Letter contains a list of, as of the date hereof, all material policies or binders of property, fire and casualty, product liability, workers' compensation, and other forms of insurance held by, or for the benefit of, the Company or any of the Company's Subsidiaries as of the date of this Agreement. True, correct and complete copies of such insurance policies as in effect as of the date hereof have previously been made available to Acquiror. All such policies are in full force and effect, all premiums due have been paid, and no notice of cancellation or termination has been received by the Company or any of the Company's Subsidiaries with respect to any such policy. Except as disclosed on Section 4.17 of the Company Disclosure Letter, no insurer has denied or disputed coverage of any material claim under an insurance policy during the last twelve (12) months.

Section 4.18. Licenses.   The Company and its Subsidiaries possess all of the material Licenses reasonably required to permit the Company and its Subsidiaries to acquire, originate, own, operate, use and maintain their material assets in all material respects in the manner in which they are now operated and maintained and to conduct the material business operations of the Company and its Subsidiaries in all material respects as currently conducted, except as would not be reasonably expected to materially disrupt the conduct of business by the Company and its Subsidiaries. Each such material License held by the Company or any of the Company's Subsidiaries is in full force and effect. Neither the Company nor any of its Subsidiaries (a) is in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a material default or violation) in any material respect of any term, condition or provision of any material License to which it is a party, (b) is or has been the subject of any pending or threatened Action by a Governmental Authority seeking the revocation, suspension, termination, modification, or impairment of any material License, or (c) has received any notice that any Governmental Authority that has issued any material License intends to cancel, terminate, or not renew any such material License, except to the extent such material License may be amended, replaced, or reissued as a result of and as necessary to reflect the transactions contemplated hereby, or as otherwise disclosed in Section 4.4 of the Company Disclosure Letter.

Section 4.19. Equipment and Other Tangible Property.   The Company or one of its Subsidiaries owns and has good title to, and has the legal and beneficial ownership of or a valid leasehold interest in or right to use by license or otherwise, all material machinery, equipment and other tangible property reflected on the books of the Company and its Subsidiaries as owned by the Company or one of its Subsidiaries, free and clear of all Liens other than Permitted Liens. All material personal property and leased personal property assets of the Company and its Subsidiaries are structurally sound and in good operating condition and repair (ordinary wear and tear expected) and are suitable for their present use.

A-31

Section 4.20. Real Property.

(a)  Section 4.20(a) of the Company Disclosure Letter sets forth a true, correct and complete list as of the date of this Agreement of all Leased Real Property and all Real Property Leases (as hereinafter defined) pertaining to such Leased Real Property. With respect to each parcel of Leased Real Property:

(i)  The Company or one of its Subsidiaries holds a good and valid leasehold estate in such Leased Real Property, free and clear of all Liens, except for Permitted Liens.

(ii)  The Company and its Subsidiaries have delivered to Acquiror true, correct and complete copies of all leases, lease guaranties, subleases, agreements for the leasing, use or occupancy of, or otherwise granting a right in and to the Leased Real Property by or to the Company and its Subsidiaries, including all amendments, terminations and modifications thereof (collectively, the "Real Property Leases"), and none of such Real Property Leases have been modified in any material respect, except to the extent that such modifications have been disclosed by the copies delivered to Acquiror.

(iii)  The Company and its Subsidiaries', as applicable, possession and quiet enjoyment of the Leased Real Property under such Real Property Leases has not been materially disturbed and, to the knowledge of the Company, there are no material disputes with respect to such Real Property Leases.

(iv)  As of the date of this Agreement, no party, other than the Company or its Subsidiaries, has any right to use or occupy the Leased Real Property or any portion thereof.

(v)  Neither the Company nor any of its Subsidiaries have received written notice of any current condemnation proceeding or proposed similar Action or agreement for taking in lieu of condemnation with respect to any portion of the Leased Real Property.

(b)  None of the Company or any of its Subsidiaries owns any Owned Real Property.

Section 4.21. Intellectual Property.

(a)  Section 4.21(a) of the Company Disclosure Letter lists each item of Intellectual Property that is registered and applied-for with a Governmental Authority and is owned by the Company or any of the Company's Subsidiaries as of the date of this Agreement, whether applied for or registered in the United States or internationally as of the date of this Agreement ("Company Registered Intellectual Property"). The Company or one of the Company's Subsidiaries is the sole and exclusive beneficial and record owner of all of the items of Company Registered Intellectual Property, and, to the knowledge of the Company, all such Company Registered Intellectual Property is subsisting and, excluding any pending applications included in the Company Registered Intellectual Property, is valid and enforceable.

(b)  Except as would not be expected to be material to the Company and its Subsidiaries, taken as a whole, the Company or one of its Subsidiaries owns, free and clear of all Liens (other than Permitted Liens), or has a valid right to use, all material Intellectual Property reasonably necessary for the continued conduct of the business of the Company and its Subsidiaries in substantially the same manner as such business has been operated during the twelve (12) months prior to the date hereof, provided that the foregoing shall not be deemed a representation or warranty regarding non-infringement, validity or enforceability of Intellectual Property.

(c)  To the knowledge of the Company, the Company and its Subsidiaries are not infringing upon, misappropriating or otherwise violating any Intellectual Property of any third Person. There is no action pending to which the Company or such Subsidiary of the Company is a named party, or to the knowledge of the Company, that is threatened in writing, alleging the Company's or such Subsidiaries' infringement, misappropriation or other violation of any Intellectual Property of any third Person and there has not been, within the three (3) years preceding the date of this Agreement, any such action brought or threatened in writing.

(d)  Except as set forth on Section 4.21(d) of the Company Disclosure Letter, to the knowledge of the Company as of the date of this Agreement (i) no Person is infringing upon, misappropriating or

A-32

otherwise violating any material Intellectual Property of the Company or any of the Company's Subsidiaries in any material respect, and (ii) the Company and its Subsidiaries have not sent to any Person within the three (3) years preceding the date of this Agreement (or, in the case of any Subsidiary of the Company or any business unit, as applicable, that was acquired within the eighteen (18) period prior to the date of this Agreement, within the twelve (12) months preceding the date of this Agreement) any written notice, charge, complaint, claim or other written assertion against such third Person claiming infringement or violation by or misappropriation of any Intellectual Property of the Company or any of the Company's Subsidiaries.

(e)   The Company and its Subsidiaries take commercially reasonable measures to protect the confidentiality of trade secrets included in their Intellectual Property that are material to the business of the Company and its Subsidiaries. To the knowledge of the Company, there has not been any material unauthorized disclosure of or unauthorized access to any trade secrets of the Company or any of the Company's Subsidiaries to or by any Person in a manner that has resulted or may result in the misappropriation of, or loss of trade secret or other rights in and to such information.

(f)   With respect to the software used or held for use in the business of the Company and its Subsidiaries, to the knowledge of the Company, no such software contains any undisclosed or hidden device or feature designed to disrupt, disable, or otherwise impair the functioning of any software or any "back door," "time bomb", "Trojan horse," "worm," "drop dead device," or other malicious code or routines that permit unauthorized access or the unauthorized disablement or erasure of such or other software or information or data (or any parts thereof) of the Company or its Subsidiaries or customers of the Company and its Subsidiaries.

(g)   The Company's and its Subsidiaries' use and distribution of (i) software developed by the Company or any Subsidiary, and (ii) Open Source Materials, is in material compliance with all Open Source Licenses applicable thereto. None of the Company or any Subsidiary of the Company has used any Open Source Materials in a manner that requires any proprietary software or Intellectual Property owned by the Company or any of the Company's Subsidiaries, to be subject to Copyleft Licenses.

Section 4.22. Privacy and Cybersecurity.

(a)   The Company and its Subsidiaries maintain and are in compliance with, and during the three (3) years preceding the date hereof have maintained and been in compliance with, (i) all applicable Laws relating to the privacy and/or security of personal information, (ii) the Company's and its Subsidiaries' posted or publicly facing privacy policies, and (iii) the Company's and its Subsidiaries' contractual obligations concerning cybersecurity, data security and the security of the Company's and each of its Subsidiaries' information technology systems, in each case of (i)-(iii) above, other than any non-compliance that, individually or in the aggregate, has not been and would not reasonably be expected to be material to the Company and its Subsidiaries. There are no Actions by any Person (including any Governmental Authority) pending to which the Company or any of the Company's Subsidiaries is a named party or, to the knowledge of the Company, threatened in writing against the Company or its Subsidiaries alleging a violation of any third Person's privacy or personal information rights.

(b)   During the three (3) years preceding the date of this Agreement (i) there have been no material breaches of the security of the information technology systems of the Company and its Subsidiaries, and (ii) there have been no disruptions in any information technology systems that materially adversely affected the Company's and its Subsidiaries' business or operations. The Company and its Subsidiaries take commercially reasonable and legally compliant measures designed to protect confidential, sensitive or personally identifiable information in its possession or control against unauthorized access, use, modification, disclosure or other misuse, including through administrative, technical and physical safeguards. To the knowledge of the Company, neither the Company nor any Subsidiary of the Company has (A) experienced any incident in which such information was stolen or improperly accessed, including in connection with a breach of security, or (B) received any written notice or complaint from any Person with respect to any of the foregoing, nor has any such notice or complaint been threatened in writing against the Company or any of the Company's Subsidiaries.

A-33

Section 4.23. Environmental Matters.

(a)   The Company and its Subsidiaries are and, except for matters which have been fully resolved, have been in material compliance with all Environmental Laws.

(b)   There has been no material release of any Hazardous Materials by the Company or its Subsidiaries (i) at, in, on or under any Leased Real Property or in connection with the Company's and its Subsidiaries' operations off-site of the Leased Real Property or (ii) to the knowledge of the Company, at, in, on or under any formerly owned or Leased Real Property during the time that the Company owned or leased such property or at any other location where Hazardous Materials generated by the Company or any of the Company's Subsidiaries have been transported to, sent, placed or disposed of.

(c)   Neither the Company nor its Subsidiaries are subject to any current Governmental Order relating to any material non-compliance with Environmental Laws by the Company or its Subsidiaries or the investigation, sampling, monitoring, treatment, remediation, removal or cleanup of Hazardous Materials.

(d)   No material Legal Proceeding is pending or, to the knowledge of the Company, threatened with respect to the Company's and its Subsidiaries' compliance with or liability under Environmental Laws, and, to the knowledge of the Company, there are no facts or circumstances which could reasonably be expected to form the basis of such a Legal Proceeding.

(e)   The Company has made available to Acquiror all material environmental reports, assessments, audits and inspections and any material communications or notices from or to any Governmental Authority concerning any material non-compliance of the Company or any of the Company's Subsidiaries with, or liability of the Company or any of the Company's Subsidiaries under, Environmental Law.

Section 4.24. Absence of Changes.   From the date of the most recent balance sheet included in the Financial Statements to the date of this Agreement, there has not been any Company Material Adverse Effect.

Section 4.25. Anti-Corruption Compliance.

(a)   For the past three (3) years, neither the Company nor any of its Subsidiaries, nor, to the knowledge of the Company, any director, officer, employee or agent acting on behalf of the Company or any of the Company's Subsidiaries, has offered or given anything of value to: (i) any official or employee of a Governmental Authority, any political party or official thereof, or any candidate for political office or (ii) any other Person, in any such case while knowing that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to any official or employee of a Governmental Authority or candidate for political office, in each case in violation of the Anti-Bribery Laws.

(b)   Each of the Company and its Subsidiaries has instituted and maintains policies and procedures reasonably designed to ensure compliance in all material respects with the Anti-Bribery Laws.

(c)   To the knowledge of the Company, as of the date hereof, there are no current or pending internal investigations, third party investigations (including by any Governmental Authority), or internal or external audits that address any material allegations or information concerning possible material violations of the Anti-Bribery Laws related to the Company or any of the Company's Subsidiaries.

Section 4.26. Sanctions and International Trade Compliance.

(a)   The Company and its Subsidiaries (i) are, and have been for the past five (5) years, in compliance in all material respects with all International Trade Laws and Sanctions Laws, and (ii) have obtained all required licenses, consents, notices, waivers, approvals, orders, registrations, declarations, or other authorizations from, and have made any material filings with, any applicable Governmental Authority for the import, export, re-export, deemed export, deemed re-export, or transfer required under

A-34

the International Trade Laws and Sanctions Laws (the "Export Approvals"). There are no pending or, to the knowledge of the Company, threatened, claims, complaints, charges, investigations, voluntary disclosures or Legal Proceedings against the Company or any of the Company's Subsidiaries related to any International Trade Laws or Sanctions Laws or any Export Approvals.

(b)    Neither the Company nor any of its Subsidiaries nor any of their respective directors or officers or, to the knowledge of the Company, employees or any of the Company's or its Subsidiaries' respective agents, representatives or other Persons acting on behalf of the Company or any of the Company's Subsidiaries, (i) is, or has during the past five (5) years been, a Sanctioned Person or (ii) has transacted business directly or knowingly indirectly with any Sanctioned Person or in any Sanctioned Country in violation of Sanctions Laws.

Section 4.27. Information Supplied.   None of the information supplied or to be supplied by the Company or any of the Company's Subsidiaries specifically in writing for inclusion in the Registration Statement will, at the date on which the Proxy Statement/Registration Statement is first mailed to the Acquiror Shareholders or at the time of the Acquiror Shareholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

Section 4.28. No Additional Representation or Warranties.   Except as provided in this Article IV, neither the Company nor any of its Affiliates, nor any of their respective directors, managers, officers, employees, equityholders, partners, members or representatives has made, or is making, any representation or warranty whatsoever to Acquiror or Merger Sub or their Affiliates and no such party shall be liable in respect of the accuracy or completeness of any information provided to Acquiror or Merger Sub or their Affiliates. Without limiting the foregoing, and notwithstanding anything to the contrary herein, each of Acquiror and Merger Sub, on behalf of themselves and each of their respective directors, managers, officers, employees, equityholders, partners, members or representatives, acknowledge and agree that Acquiror has made its own investigation of the Company and that neither the Company nor any of its Affiliates, agents or representatives is making any representation or warranty whatsoever, express or implied, beyond those expressly given by the Company in Article IV, including any implied warranty or representation as to condition, merchantability, suitability or fitness for a particular purpose or trade as to any of the assets of the Company or its Subsidiaries. Without limiting the generality of the foregoing, it is understood that any cost estimates, financial or other projections or other predictions that may be contained or referred to in the Company Disclosure Letter or elsewhere, as well as any information, documents or other materials (including any such materials contained in any "data room" (whether or not accessed by Acquiror or its representatives) or reviewed by Acquiror pursuant to the Confidentiality Agreement) or management presentations that have been or shall hereafter be provided to Acquiror or any of its Affiliates, agents or representatives are not and will not be deemed to be representations or warranties of the Company, and no representation or warranty is made as to the accuracy or completeness of any of the foregoing except as may be expressly set forth in Article IV of this Agreement. Except as otherwise expressly set forth in this Agreement, Acquiror understands and agrees that any assets, properties and business of the Company and its Subsidiaries are furnished "as is", "where is" and subject to and except as otherwise provided in the representations and warranties contained in Article IV, with all faults and without any other representation or warranty of any nature whatsoever.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF ACQUIROR AND MERGER SUB

Except as set forth in (i) in the case of Acquiror, any Acquiror SEC Filings filed or submitted on or prior to the date hereof (excluding (a) any disclosures in any risk factors section that do not constitute statements of fact, disclosures in any forward-looking statements disclaimer and other disclosures that are generally cautionary, predictive or forward-looking in nature and (b) any exhibits or other documents appended thereto) (it being acknowledged that nothing disclosed in such Acquiror SEC Filings will be deemed to modify or qualify the representations and warranties set forth in Section 5.8, Section 5.12 and Section 5.15), or (ii) in the case of Acquiror and Merger Sub, in the disclosure letter delivered by Acquiror and Merger Sub to the Company (the "Acquiror Disclosure Letter") on the date of this Agreement (each

A-35

section of which, subject to <u>Section 11.9</u>, qualifies the correspondingly numbered and lettered representations in this <u>Article V</u>), Acquiror and Merger Sub represent and warrant to the Company as follows:

Section 5.1. <u>Company Organization</u>.   Each of Acquiror and Merger Sub has been duly incorporated and is validly existing as a corporation in good standing under the Laws of the State of Delaware, and has the requisite corporate power and authority to own, lease or operate all of its properties and assets and to conduct its business as it is now being conducted. The copies of Acquiror's Governing Documents and the Governing Documents of Merger Sub, in each case, as amended prior to the date of this Agreement, previously delivered by Acquiror to the Company, are true, correct and complete. Merger Sub has no assets or operations other than those required to effect the transactions contemplated hereby. All of the equity interests of Merger Sub are held directly by Acquiror. Each of Acquiror and Merger Sub is duly licensed or qualified and in good standing as a foreign corporation or company in all jurisdictions in which its ownership of property or the character of its activities is such as to require it to be so licensed or qualified, except where failure to be so licensed or qualified would not reasonably be expected to be, individually or in the aggregate, material to Acquiror.

Section 5.2. <u>Due Authorization</u>.

(a)   Each of Acquiror and Merger Sub has all requisite corporate power and authority to (a) execute and deliver this Agreement and the documents to which it is contemplated hereby to be a party, and (b) subject to the Acquiror Shareholder Approvals, consummate the transactions contemplated hereby and thereby and perform all obligations to be performed by it hereunder and thereunder. The execution and delivery of this Agreement and the documents to which Acquiror or Merger Sub is contemplated hereby to be a party and the consummation of the transactions contemplated hereby and thereby have been (i) duly and validly authorized and approved by the Board of Directors of Acquiror and by Acquiror as the sole shareholder, as applicable, of Merger Sub and (ii) determined by the Board of Directors of Acquiror as advisable to Acquiror and the Acquiror Shareholders and recommended for approval by the Acquiror Shareholders. No other company proceeding on the part of Acquiror or Merger Sub is necessary to authorize this Agreement and the documents to which it is contemplated hereby to be a party (other than the Acquiror Shareholder Approval). This Agreement has been, and at or prior to the Closing, the other documents to which Acquiror or Merger Sub is contemplated hereby to be a party will be, duly and validly executed and delivered by each of Acquiror and Merger Sub, as applicable, and this Agreement constitutes, and at or prior to the Closing, the other documents to which Acquiror or Merger Sub is contemplated hereby to be a party will constitute, a legal, valid and binding obligation of Acquiror and/or Merger Sub, as applicable, enforceable against Acquiror and/or Merger Sub, as applicable, in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity.

(b)   Assuming that a quorum (as determined pursuant to Acquiror's Governing Documents) is present, (i) the Charter Proposal shall require approval by an affirmative vote of the holders of a majority of the outstanding shares of Acquiror Pre-Transaction Common Stock, at a shareholders' meeting duly called by the Board of Directors of Acquiror and held for such purpose, and (ii) each of the other Transaction Proposals shall require approval by an affirmative vote of the holders of a majority of the outstanding shares of Acquiror Pre-Transaction Common Stock present in person or by proxy at a shareholders' meeting duly called by the Board of Directors of Acquiror and held for such purpose.

(c)   The foregoing votes are the only votes of any of Acquiror's share capital necessary in connection with entry into this Agreement by Acquiror and Merger Sub and the consummation of the transactions contemplated hereby, including the Closing.

(d)   At a meeting duly called and held, the Board of Directors of Acquiror has unanimously approved the transactions contemplated by this Agreement as a Business Combination.

Section 5.3. <u>No Conflict</u>.   Subject to the Acquiror Shareholder Approval, the execution and delivery of this Agreement by Acquiror and Merger Sub and the other documents contemplated hereby by Acquiror and Merger Sub and the consummation of the transactions contemplated hereby and thereby do not and will not (a) violate or conflict with any provision of, or result in the breach of or default under, the Governing

TABLE OF CONTENTS

Documents of Acquiror or Merger Sub, (b) violate or conflict with any provision of, or result in the breach of or default under, any applicable Law or Governmental Order applicable to Acquiror or Merger Sub, (c) violate or conflict with any provision of, or result in the breach of, or result in the loss of any right or benefit under, or cause acceleration under, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, any Contract to which Acquiror or Merger Sub is a party or by which Acquiror or Merger Sub may be bound, or terminate or result in the termination of any such Contract or (d) result in the creation of any Lien upon any of the properties or assets of Acquiror or Merger Sub, except, in the case of clauses (b) through (d), to the extent that the occurrence of the foregoing would not (i) have, or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Acquiror or Merger Sub to enter into and perform their obligations under this Agreement or (ii) be material to Acquiror.

Section 5.4. <u>Litigation and Proceedings</u>.   There are no pending or, to the knowledge of Acquiror, threatened Legal Proceedings against Acquiror or Merger Sub, their respective properties or assets, or, to the knowledge of Acquiror, any of their respective directors, managers, officers or employees (in their capacity as such), other than matters arising after the date hereof that would not reasonably be expected to be material to Acquiror. There are no investigations or other inquiries pending or, to the knowledge of Acquiror, threatened by any Governmental Authority against Acquiror or Merger Sub, their respective properties or assets, or, to the knowledge of Acquiror, any of their respective directors, managers, officers or employees (in their capacity as such). There is no outstanding Governmental Order imposed upon Acquiror or Merger Sub, nor are any assets of Acquiror's or Merger Sub's respective businesses bound or subject to any Governmental Order the violation of which would, individually or in the aggregate, reasonably be expected to be material to Acquiror. As of the date hereof, each of Acquiror and Merger Sub is in compliance with all applicable Laws in all material respects. For the past three (3) years, Acquiror and Merger Sub have not received any written notice of or been charged with the violation of any Laws, except where such violation has not been, individually or in the aggregate, material to Acquiror.

Section 5.5. <u>SEC Filings</u>.   Acquiror has timely filed or furnished all statements, prospectuses, registration statements, forms, reports and documents required to be filed by it with the SEC since January 12, 2021, pursuant to the Exchange Act or the Securities Act (collectively, as they have been amended since the time of their filing through the date hereof, the "<u>Acquiror SEC Filings</u>"). Each of the Acquiror SEC Filings, as of the respective date of its filing (or if amended or superseded by a filing prior to the date of this Agreement or the Closing Date, then on the date of such filing), complied in all material respects with the applicable requirements of the Securities Act, the Exchange Act, the Sarbanes-Oxley Act and any rules and regulations promulgated thereunder applicable to the Acquiror SEC Filings. As of the respective date of its filing (or if amended or superseded by a filing prior to the date of this Agreement or the Closing Date, then on the date of such filing), the Acquiror SEC Filings did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading. As of the date hereof, there are no outstanding or unresolved comments in comment letters received from the SEC with respect to the Acquiror SEC Filings. To the knowledge of Acquiror, none of the Acquiror SEC Filings filed on or prior to the date hereof is subject to ongoing SEC review or investigation as of the date hereof.

Section 5.6. <u>Internal Controls; Listing; Financial Statements</u>.

(a)   Except as not required in reliance on exemptions from various reporting requirements by virtue of Acquiror's status as an "emerging growth company" within the meaning of the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 ("<u>JOBS Act</u>"), Acquiror has established and maintains disclosure controls and procedures (as defined in Rule 13a-15 under the Exchange Act). Such disclosure controls and procedures are designed to ensure that material information relating to Acquiror, including its consolidated Subsidiaries, if any, is made known to Acquiror's principal executive officer and its principal financial officer by others within those entities, particularly during the periods in which the periodic reports required under the Exchange Act are being prepared. Such disclosure controls and procedures are effective in timely alerting Acquiror's principal executive officer and principal financial officer to material information required to be included in Acquiror's periodic reports required under the Exchange Act. Since January 12, 2021, Acquiror has established and maintained a system of internal controls over financial reporting (as defined in Rule 13a-15 under

A-37

TABLE OF CONTENTS

the Exchange Act) sufficient to provide reasonable assurance regarding the reliability of Acquiror's financial reporting and the preparation of Acquiror Financial Statements for external purposes in accordance with GAAP.

(b)   Each director and executive officer of Acquiror has filed with the SEC on a timely basis all statements required by Section 16(a) of the Exchange Act and the rules and regulations promulgated thereunder. Acquiror has not taken any action prohibited by Section 402 of the Sarbanes-Oxley Act.

(c)   Since January 12, 2021, Acquiror has complied in all material respects with the applicable listing and corporate governance rules and regulations of the New York Stock Exchange (the "NYSE"). The Acquiror Pre-Transaction Common Stock is registered pursuant to Section 12(b) of the Exchange Act and is listed for trading on the NYSE. There is no Legal Proceeding pending or, to the knowledge of Acquiror, threatened against Acquiror by the NYSE or the SEC with respect to any intention by such entity to deregister the Acquiror Pre-Transaction Common Stock or prohibit or terminate the listing of Acquiror Pre-Transaction Common Stock on the NYSE.

(d)   The Acquiror SEC Filings contain true and complete copies of (i) the audited balance sheet as of December 31, 2020, and statements of operations, changes in stockholder's equity and cash flows of Acquiror for the period from September 25, 2020 (inception) through December 31, 2020, together with the auditor's reports thereon (the "Acquiror Audited Financial Statements" and (ii) if and when filed prior to the Effective Time, the unaudited balance sheet and statement of operations, stockholders' equity, and cash flows of Acquiror as of and for the relevant interim periods ending March 31, 2021, June 30, 2021, and September 30, 2021 (together with the Acquiror Audited Financial Statements, the "Acquiror Financial Statements"). Except as disclosed in the Acquiror SEC Filings, the Acquiror Financial Statements (i) fairly present in all material respects the financial position of Acquiror as at the respective dates thereof and the results of operations and consolidated cash flows for the respective periods then ended, (ii) were prepared in conformity with GAAP applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto), and (iii) comply in all material respects with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act in effect as of the respective dates thereof. The books and records of Acquiror have been, and are being, maintained in all material respects in accordance with GAAP and any other applicable legal and accounting requirements.

(e)   There are no outstanding loans or other extensions of credit made by Acquiror to any executive officer (as defined in Rule 3b-7 under the Exchange Act) or director of Acquiror. Acquiror has not taken any action prohibited by Section 402 of the Sarbanes-Oxley Act.

(f)   Neither Acquiror (including any employee thereof) nor Acquiror's independent auditors has identified or been made aware of (i) any significant deficiency or material weakness in the system of internal accounting controls utilized by Acquiror, (ii) any fraud, whether or not material, that involves Acquiror's management or other employees who have a role in the preparation of financial statements or the internal accounting controls utilized by Acquiror or (iii) any claim or allegation regarding any of the foregoing.

Section 5.7. Governmental Authorities; Consents.   Assuming the truth and completeness of the representations and warranties of the Company contained in this Agreement, no consent, waiver, approval or authorization of, or designation, declaration or filing with, or notification to, any Governmental Authority or other Person is required on the part of Acquiror or Merger Sub with respect to Acquiror's or Merger Sub's execution or delivery of this Agreement or the consummation of the transactions contemplated hereby, except for (i) applicable requirements of the HSR Act, and (ii) as otherwise disclosed on Section 5.7 of the Acquiror Disclosure Letter.

Section 5.8. Trust Account.   As of the date of this Agreement, Acquiror has at least $414,000,000 in the Trust Account (including an aggregate of approximately $14,490,000 of deferred underwriting commissions and other fees being held in the Trust Account), such monies invested in United States government securities or money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act pursuant to the Investment Management Trust Agreement, dated as of January 12, 2021, between Acquiror and Continental Stock Transfer & Trust Company, as trustee (the

A-38

TABLE OF CONTENTS

"Trustee") (the "Trust Agreement"). There are no separate Contracts, side letters or other arrangements or understandings (whether written or unwritten, express or implied) that would cause the description of the Trust Agreement in the Acquiror SEC Filings to be inaccurate or that would entitle any Person (other than Acquiror, shareholders of Acquiror holding Acquiror IPO Shares who shall have elected to redeem their Acquiror IPO Shares pursuant to Acquiror's Governing Documents and the underwriters of Acquiror's initial public offering with respect to deferred underwriting commissions) to any portion of the proceeds in the Trust Account. Prior to the Closing, none of the funds held in the Trust Account may be released other than to pay Taxes and payments to shareholders of Acquiror holding Acquiror IPO Shares who shall have elected to redeem their Acquiror IPO Shares pursuant to Acquiror's Governing Documents. There are no claims or proceedings pending or, to the knowledge of Acquiror, threatened with respect to the Trust Account. Acquiror has performed all material obligations required to be performed by it to date under, and is not in default, breach or delinquent in performance or any other respect (claimed or actual) in connection with, the Trust Agreement, and no event has occurred which, with due notice or lapse of time or both, would constitute such a default or breach thereunder. As of the Effective Time, the obligations of Acquiror to dissolve or liquidate pursuant to Acquiror's Governing Documents shall terminate, and as of the Effective Time, Acquiror shall have no obligation whatsoever pursuant to Acquiror's Governing Documents to dissolve and liquidate the assets of Acquiror by reason of the consummation of the transactions contemplated hereby. To Acquiror's knowledge, as of the date hereof, following the Effective Time, no Acquiror Shareholder shall be entitled to receive any amount from the Trust Account except to the extent such Acquiror Shareholder is exercising an Acquiror Share Redemption. As of the date hereof, assuming the accuracy of the representations and warranties of the Company contained herein and the compliance by the Company with its obligations hereunder, neither Acquiror or Merger Sub have any reason to believe that any of the conditions to the use of funds in the Trust Account will not be satisfied or funds then available in the Trust Account will not be available to Acquiror and Merger Sub on the Closing Date.

Section 5.9. Investment Company Act; JOBS Act. Acquiror is not an "investment company" or a Person directly or indirectly "controlled" by or acting on behalf of an "investment company", in each case within the meaning of the Investment Company Act. Acquiror constitutes an "emerging growth company" within the meaning of the JOBS Act.

Section 5.10. Absence of Changes. Since January 12, 2021, (a) there has not been any event or occurrence that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Acquiror or Merger Sub to enter into and perform their obligations under this Agreement and (b) except as set forth in Section 5.10 of the Acquiror Disclosure Letter, Acquiror and Merger Sub have, in all material respects, conducted their business and operated their properties in the ordinary course of business.

Section 5.11. No Undisclosed Liabilities. Except for any fees and expenses payable by Acquiror or Merger Sub as a result of or in connection with the consummation of the transactions contemplated hereby, there is no liability, debt or obligation of or claim or judgment against Acquiror or Merger Sub (whether direct or indirect, absolute or contingent, accrued or unaccrued, known or unknown, liquidated or unliquidated, or due or to become due), except for liabilities and obligations (i) reflected or reserved for on the financial statements or disclosed in the notes thereto included in Acquiror SEC Filings, (ii) that have arisen since the date of the most recent balance sheet included in the Acquiror SEC Filings in the ordinary course of business of Acquiror and Merger Sub, or (iii) which would not be, or would not reasonably be expected to be, material to Acquiror.

Section 5.12. Capitalization of Acquiror.

(a) As of the date of this Agreement, the authorized capital stock of Acquiror consists of (i) 100,000,000 shares of Acquiror Pre-Transaction Common Stock, of which 51,750,000 shares are issued and outstanding as of the date of this Agreement (the "Outstanding Acquiror Shares"), and (ii) 1,000,000 shares of Preferred Stock, par value $0.0001 per share, of which no shares are issued and outstanding as of the date of this Agreement. The Outstanding Acquiror Shares constitute all of the issued and outstanding shares of capital stock of Acquiror as of the date of this Agreement. All Outstanding Acquiror Shares (i) have been duly authorized and validly issued and are fully paid and non-assessable; (ii) have been offered, sold and issued in compliance with applicable Law, including federal and state securities Laws, and all requirements set forth in (1) Acquiror's Governing Documents, and

(2) any other applicable Contracts governing the issuance of such securities; and (iii) are not subject to, nor have they been issued in violation of, any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of any applicable Law, Acquiror's Governing Documents or any Contract to which Acquiror is a party or otherwise bound.

(b)    Subject to the terms of conditions of the Warrant Agreement, the Acquiror Warrants will be exercisable after giving effect to the Merger for one share of Acquiror Class A Common Stock at an exercise price of eleven Dollars fifty cents ($11.50) per share. As of the date of this Agreement, 13,800,000 Acquiror Public Warrants and 6,686,667 Acquiror Private Placement Warrants are issued and outstanding (the "Outstanding Acquiror Warrants"). The Acquiror Warrants are not exercisable until the later of (x) January 15, 2022 and (y) thirty (30) days after the Closing. All Outstanding Acquiror Warrants (i) have been duly authorized and validly issued and constitute valid and binding obligations of Acquiror, enforceable against Acquiror in accordance with their terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity; (ii) have been offered, sold and issued in compliance with applicable Law, including federal and state securities Laws, and all requirements set forth in (1) Acquiror's Governing Documents and (2) any other applicable Contracts governing the issuance of such securities; and (iii) are not subject to, nor have they been issued in violation of, any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of any applicable Law, Acquiror's Governing Documents or any Contract to which Acquiror is a party or otherwise bound. Except for the Subscription Agreements, the Forward Purchase Agreements, Acquiror's Governing Documents and this Agreement, there are no outstanding Contracts of Acquiror to repurchase, redeem or otherwise acquire any shares of capital stock or other equity securities of Acquiror.

(c)    The Outstanding Acquiror Shares and Outstanding Acquiror Warrants constitute all of the issued and outstanding Acquiror Securities as of the date of this Agreement. Acquiror has not (x) granted any outstanding options, stock appreciation rights, warrants, rights or other securities convertible into or exchangeable or exercisable for Acquiror Securities or the value of which is determined by reference to any Acquiror Securities or (y) entered into any commitments or agreements providing for the issuance of additional shares or the sale of treasury shares, and there are no Contracts or other commitments of any kind which may obligate Acquiror to issue, purchase, redeem or otherwise acquire any of its Acquiror Securities, other than (i) redemption rights with respect to the Acquiror IPO Shares prior to or in connection with the Closing as set forth in Acquiror's Governing Documents, (ii) the potential forfeiture of certain Acquiror Securities to Acquiror by the Sponsor pursuant to the Sponsor Support Agreement, (iii) any Working Capital Loans that may be incurred, and any Acquiror Working Capital Warrants that may be issued, by Acquiror prior to Closing, (iv) the issuance of Acquiror Pre-Transaction Common Stock (or, following the Closing, Acquiror Class A Common Stock) upon the exercise of any Acquiror Warrants, (v) the issuance of Acquiror Securities pursuant to the Subscription Agreements and the Forward Purchase Agreements, and (vi) the issuance of the Aggregate Merger Consideration pursuant to this Agreement.

(d)    The Aggregate Merger Consideration, when issued in accordance with the terms hereof, shall be duly authorized and validly issued, fully paid and non-assessable and issued in compliance with all applicable state and federal securities Laws and not subject to, and not issued in violation of, any Lien, purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of applicable Law, Acquiror's Governing Documents, or any Contract to which Acquiror is a party or otherwise bound.

(e)    On or prior to the date of this Agreement, Acquiror has entered into Forward Purchase Agreements with the FPA Investors and Subscription Agreements with PIPE Investors, true and correct copies of which have been provided to the Company on or prior to the date of this Agreement, pursuant to which, and on the terms and subject to the conditions of which, such FPA Investors and PIPE Investors have agreed, in connection with the transactions contemplated hereby, to purchase from Acquiror, shares of Acquiror Class A Common Stock and (with respect to the Forward Purchase Agreements) Acquiror Warrants, for a combined FPA Investment Amount and PIPE Investment Amount of at least $200,000,000 (such amount, the "Minimum PIPE Investment Amount"). On or prior

A-40

to the date of this Agreement, Acquiror has identified to the Company each of the PIPE Investors that are not also existing stockholders of the Company (or has caused the identification of each such PIPE Investor to the Company) and, to the knowledge of Acquiror, the Company has not exercised its right to reasonably object to any such PIPE Investor as of the date of this Agreement. Such Forward Purchase Agreements and Subscription Agreements are in full force and effect with respect to, and binding on, Acquiror and, to the knowledge of Acquiror, on each FPA Investor or PIPE Investor party thereto, in accordance with their terms.

(f)  Acquiror has no Subsidiaries apart from Merger Sub, and does not own, directly or indirectly, any equity interests or other interests or investments (whether equity or debt) in any Person, whether incorporated or unincorporated. Acquiror is not party to any Contract that obligates Acquiror to invest money in, loan money to or make any capital contribution to any other Person.

Section 5.13. Brokers' Fees.   Except fees described on Section 5.13 of the Acquiror Disclosure Letter, no broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other commission in connection with the transactions contemplated hereby based upon arrangements made by Acquiror or any of its Affiliates.

Section 5.14. Indebtedness.   Neither Acquiror nor Merger Sub has any Indebtedness, other than Working Capital Loans (none of which are outstanding as of the date hereof).

Section 5.15. Taxes.

(a)  All material Tax Returns required to be filed by or with respect to Acquiror or Merger Sub have been timely filed (taking into account any applicable extensions), all such Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects.

(b)  All material Taxes due and payable by Acquiror and Merger Sub (whether or not shown on any Tax Return) have been paid.

(c)  The Acquiror and its Subsidiaries have withheld from amounts owing to any employee, creditor or other Person all material Taxes required by Law to be withheld, paid over to the proper Governmental Authority in a timely manner all such withheld amounts required to have been so paid over and otherwise complied in all material respects with all applicable withholding and related reporting requirements.

(d)  There are no Liens for any material amount of Taxes (other than Permitted Liens) upon the property or assets of Acquiror or Merger Sub.

(e)  No claim, assessment, deficiency or proposed adjustment for any material amount of Tax has been asserted or assessed in writing by any Governmental Authority against Acquiror or Merger Sub that remains unpaid.

(f)  There are no ongoing or pending Legal Proceedings with respect to any material Taxes of Acquiror or Merger Sub and there are no waivers, extensions or requests for any waivers or extensions of any statute of limitations currently in effect with respect to any material Taxes of Acquiror or Merger Sub.

(g)  Neither the Acquiror nor Merger Sub is a party to any Tax indemnification or Tax sharing or similar agreement (other than any such agreement solely between the Acquiror and/or Merger Sub and customary commercial contracts not primarily related to Taxes that were entered into with persons who are not Affiliates or equity owners of Acquiror).

(h)  Neither the Acquiror nor Merger Sub has been a party to any transaction treated by the parties as a distribution of stock qualifying for tax-free treatment under Section 355 of the Code in the two (2) years prior to the date of this Agreement.

(i)  Neither the Acquiror nor Merger Sub (i) has any material liability for Taxes of any other Person (other than the Acquiror or Merger Sub) under Treasury Regulation Section 1.1502-6 or any similar provision of state, local or foreign Tax Law or as a transferee or successor or by contract (other

A-41

TABLE OF CONTENTS

than customary commercial contracts (or Contracts entered into in the ordinary course of business) not primarily related to Taxes) or (ii) has within the last thirty-six (36) months been a member of an affiliated, consolidated, combined or unitary group filing for U.S. federal, state or local income Tax purposes, other than a group the common parent of which was or is Acquiror or Merger Sub.

(j)   No written claim has been made by any Governmental Authority where the Acquiror or Merger Sub does not file Tax Returns that it is or may be subject to taxation in that jurisdiction.

(k)   Neither Acquiror nor Merger Sub has participated in a "listed transaction" within the meaning of Treasury Regulation 1.6011-4(b)(2).

(l)   Neither the Acquiror nor Merger Sub will be required to include any material amount in taxable income, exclude any material item of deduction or loss from taxable income, for any taxable period (or portion thereof) beginning after the Closing Date as a result of any (i) installment sale or open transaction disposition made on or prior to the Closing Date, (ii) prepaid amount received or deferred revenue recognized prior to the Closing outside the ordinary course of business, (iii) change in method of accounting for a taxable period ending on or prior to the Closing Date made or requested prior to the Closing, (iv) "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or foreign Law) executed prior to the Closing, or (v) any election pursuant to Section 965(h) of the Code.

(m)   Acquiror and Merger Sub have not taken any action, nor to the knowledge of Acquiror are there any facts or circumstances, that would reasonably be expected to prevent the Merger from qualifying for the Intended Tax Treatment.

Section 5.16. Business Activities.

(a)   Since formation, neither Acquiror or Merger Sub have conducted any business activities other than activities related to Acquiror's initial public offering or directed toward the accomplishment of a Business Combination. Except as set forth in Acquiror's Governing Documents or as otherwise contemplated by this Agreement or the Ancillary Agreements and the transactions contemplated hereby and thereby, there is no agreement, commitment, or Governmental Order binding upon Acquiror or Merger Sub or to which Acquiror or Merger Sub is a party which has or would reasonably be expected to have the effect of prohibiting or impairing any business practice of Acquiror or Merger Sub or any acquisition of property by Acquiror or Merger Sub or the conduct of business by Acquiror or Merger Sub as currently conducted or as contemplated to be conducted as of the Closing, other than such effects, individually or in the aggregate, which have not been and would not reasonably be expected to be material to Acquiror or Merger Sub.

(b)   Except for Merger Sub and the transactions contemplated by this Agreement and the Ancillary Agreements, Acquiror does not own or have a right to acquire, directly or indirectly, any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other entity. Except for this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby, Acquiror has no material interests, rights, obligations or liabilities with respect to, and is not party to, bound by or has its assets or property subject to, in each case whether directly or indirectly, any Contract or transaction which is, or would reasonably be interpreted as constituting, a Business Combination. Except for the transactions contemplated by this Agreement and the Ancillary Agreements, Merger Sub does not own or have a right to acquire, directly or indirectly, any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or other entity.

(c)   Merger Sub was formed solely for the purpose of effecting the transactions contemplated by this Agreement and has not engaged in any business activities or conducted any operations other than in connection with the transactions contemplated hereby and has no, and at all times prior to the Effective Time, except as expressly contemplated by this Agreement, the Ancillary Agreements and the other documents and transactions contemplated hereby and thereby, will have no, assets, liabilities or obligations of any kind or nature whatsoever other than those incident to its formation.

A-42

(d)   As of the date hereof and except for this Agreement, the Ancillary Agreements and the other documents and transactions contemplated hereby and thereby (including with respect to expenses and fees incurred in connection therewith), neither Acquiror nor Merger Sub are party to any Contract with any other Person that would require payments by Acquiror or any of its Subsidiaries after the date hereof in excess of $100,000 in the aggregate with respect to any individual Contract, other than Working Capital Loans or as set forth in Section 5.16 of the Acquiror Disclosure Letter. As of the date hereof, there are no amounts outstanding under any Working Capital Loans.

Section 5.17. <u>Stock Market Quotation</u>.   As of the date hereof, the Acquiror Pre-Transaction Common Stock is registered pursuant to Section 12(b) of the Exchange Act and is listed for trading on the NYSE under the symbol "NGAB". As of the date hereof, the Acquiror Public Warrants are registered pursuant to Section 12(b) of the Exchange Act and are listed for trading on the NYSE under the symbol "NGAB WS". As of the Closing, after giving effect to the transactions contemplated by this Agreement (and by the other agreements contemplated hereby) to occur prior to the Closing, the Acquiror Common Stock and the Acquiror Public Warrants will be registered pursuant to Section 12(b) of the Exchange Act and listed for trading on the NYSE or Nasdaq. Acquiror is in compliance with the rules of the NYSE or Nasdaq, as applicable, and there is no Action or proceeding pending or, to the knowledge of Acquiror, threatened against Acquiror by the NYSE, Nasdaq or the SEC with respect to any intention by such entity to deregister the Acquiror Pre-Transaction Common Stock or Acquiror Warrants or terminate the listing of Acquiror Pre-Transaction Common Stock or Acquiror Warrants on the NYSE or Nasdaq, as applicable. None of Acquiror, Merger Sub or their respective Affiliates has taken any action in an attempt to terminate the registration of the Acquiror Pre-Transaction Common Stock or Acquiror Warrants under the Exchange Act except as contemplated by this Agreement.

Section 5.18. <u>Registration Statement, Proxy Statement and Proxy Statement/Registration Statement</u>.   Subject to the last sentence of this Section 5.18, (a) on the effective date of the Registration Statement, the Registration Statement, and when first filed in accordance with Rule 424(b) and/or filed pursuant to Section 14A, the Proxy Statement and the Proxy Statement/Registration Statement (or any amendment or supplement thereto), shall comply in all material respects with the applicable requirements of the Securities Act and the Exchange Act; (b) on the effective date of the Registration Statement, the Registration Statement will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading; and (c) on the date of any filing pursuant to Rule 424(b) and/or Section 14A, the date the Proxy Statement/ Registration Statement and the Proxy Statement, as applicable, is first mailed to the Acquiror Shareholders and certain of the Company's stockholders, as applicable, and at the time of the Acquiror Shareholders' Meeting, the Proxy Statement/Registration Statement and the Proxy Statement, as applicable (together with any amendments or supplements thereto) will not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, Notwithstanding the foregoing or any other provision hereof, Acquiror makes no representations or warranties as to the information contained in or omitted from the Registration Statement, Proxy Statement or the Proxy Statement/Registration Statement in reliance upon and in conformity with information furnished in writing to Acquiror by or on behalf of the Company specifically for inclusion in the Registration Statement, Proxy Statement or the Proxy Statement/Registration Statement.

Section 5.19. <u>No Additional Representation or Warranties</u>.   Except as provided in this <u>Article V</u>, neither Acquiror nor Merger Sub nor any of their respective Affiliates, nor any of their respective directors, managers, officers, employees, stockholders, partners, members or representatives has made, or is making, any representation or warranty whatsoever to the Company or its Affiliates and no such party shall be liable in respect of the accuracy or completeness of any information provided to the Company or its Affiliates. Without limiting the foregoing, the Company acknowledges that the Company and its advisors have made their own investigation of Acquiror and Merger Sub and, except as provided in this <u>Article V</u>, are not relying on any representation or warranty whatsoever as to the condition, merchantability, suitability or fitness for a particular purpose or trade as to any of the assets of Acquiror or Merger Sub, the prospects (financial or otherwise) or the viability or likelihood of success of the business of Acquiror, Merger Sub and their respective Subsidiaries as conducted after the Closing, as contained in any materials provided by Acquiror,

A-43

TABLE OF CONTENTS

Merger Sub or any of their Affiliates or any of their respective directors, officers, employees, shareholders, partners, members or representatives or otherwise.

## ARTICLE VI

## COVENANTS OF THE COMPANY

Section 6.1. <u>Conduct of Business</u>.   From the date of this Agreement through the earlier of the Closing and the valid termination of this Agreement pursuant to <u>Article X</u> (the "<u>Interim Period</u>"), the Company shall, and shall cause its Subsidiaries to, except as otherwise contemplated by this Agreement or the Ancillary Agreements, as required by Law, as consented to by Acquiror in writing (which consent shall not be unreasonably conditioned, withheld, delayed or denied) or as set forth in the Company's business plan and/or budget previously made available to Acquiror (together, the "<u>Company Plan and Budget</u>"), use reasonable best efforts to operate the business of the Company in the ordinary course of business. Without limiting the generality of the foregoing, except as set forth on <u>Section 6.1</u> of the Company Disclosure Letter, as consented to by Acquiror in writing (which consent shall not be unreasonably conditioned, withheld, delayed or denied) or as set forth in the Company Plan and Budget, the Company shall not, and the Company shall cause its Subsidiaries not to, except as otherwise contemplated by this Agreement or the Ancillary Agreements or required by Law:

(a)   change or amend the Governing Documents of the Company or any of the Company's Subsidiaries in any manner that would (i) increase the Aggregate Merger Consideration, (ii) impose or modify the terms of any Company Transaction Liability (excluding those described in subsection (ii) of the definition thereof), or (iii) impose or modify the terms of any obligation, liability, restriction or requirement that would be binding on the Surviving Corporation, as a vested right in contract or otherwise, upon or following the Effective Time;

(b)   make or declare any dividend or distribution to the stockholders of the Company or make any other distributions in respect of any of the Company Capital Stock or equity interests;

(c)   split, combine, reclassify, recapitalize or otherwise amend any terms of any shares or series of the Company's or any of its Subsidiaries' capital stock or equity interests, except for any such transaction by a wholly owned Subsidiary of the Company that remains a wholly owned Subsidiary of the Company after consummation of such transaction;

(d)   purchase, repurchase, redeem or otherwise acquire any issued and outstanding share capital, outstanding shares of capital stock, membership interests or other equity interests of the Company or its Subsidiaries, except for (i) the acquisition by the Company or any of its Subsidiaries of any shares of capital stock, membership interests or other equity interests (other than Company Awards) of the Company or its Subsidiaries in connection with the forfeiture or cancellation of such interests and (ii) transactions between the Company and any wholly owned Subsidiary of the Company or between wholly owned Subsidiaries of the Company;

(e)   enter into, modify in any material respect or terminate (other than expiration in accordance with its terms) any Contract of a type required to be listed on <u>Section 4.12(a)</u> or <u>Section 4.16</u> of the Company Disclosure Letter, or any Real Property Lease, in each case, other than (i) renewals of existing Contracts in the ordinary course of business, (ii) as required by Law or (iii) Contracts of the type set forth on <u>Section 6.1(e)</u> of the Company Disclosure Letter;

(f)   sell, assign, transfer, convey, lease or otherwise dispose of any material tangible assets or properties of the Company or its Subsidiaries, except for (i) sales of inventory to customers in the ordinary course of business, (ii) dispositions of obsolete or worthless equipment and (iii) transactions among the Company and its wholly owned Subsidiaries or among its wholly owned Subsidiaries;

(g)   acquire any ownership interest in any real property;

(h)   except as otherwise required by Law, existing Company Benefit Plans or the Contracts listed on <u>Section 4.12</u> of the Company Disclosure Letter or otherwise in the ordinary course of business, (i) grant any material severance, retention, change in control or termination pay with respect to any

A-44

employee of the Company or its Subsidiaries whose employment or similar Contract is listed on Section 4.12(a)(vi) of the Company Disclosure Letter, (ii) make any change in the key senior management structure of the Company or any of the Company's Subsidiaries, including the hiring of additional executive officers or the termination of existing executive officers, other than terminations for cause or due to death or disability or hiring or promotions to fill positions due to voluntary resignations or other vacancies, (iii) terminate, adopt, enter into or materially amend any material Company Benefit Plan, (iv) materially increase the base cash compensation of any employee, officer, director or other individual service provider, or (v) amend or waive any material performance or vesting criteria or to accelerate the time of payment or vesting of any material compensation or benefit payable by the Company or any of the Company's Subsidiaries;

(i)   acquire by merger or consolidation with, or merge or consolidate with, or purchase substantially all or a material portion of the assets of, any corporation, partnership, association, joint venture or other business organization or division thereof;

(j)   (i) issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company or any Subsidiary of the Company or otherwise incur or assume any Indebtedness, other than Indebtedness among the Company and its wholly owned Subsidiaries, or (ii) guarantee any Indebtedness of another Person (other than the Company and its wholly owned Subsidiaries);

(k)   (i) make or change any material election in respect of material Taxes, (ii) materially amend, modify or otherwise change any filed material Tax Return, (iii) adopt or request permission of any taxing authority to change any accounting method in respect of material Taxes, (iv) enter into any closing agreement in respect of material Taxes, (v) settle any claim or assessment in respect of material Taxes, (vi) knowingly surrender or allow to expire any right to claim a refund of material Taxes or (vii) consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of material Taxes, except in the ordinary course of business;

(l)   take any action, or knowingly fail to take any action, where such action or failure to act could reasonably be expected to prevent the Merger from qualifying for the Intended Tax Treatment;

(m)   (i) issue any additional shares of Company Capital Stock or securities exercisable for or convertible into Company Capital Stock, other than the issuance of Company Common Stock upon the exercise or settlement of Company Options or Restricted Stock Unit Awards in the ordinary course of business under the Company Incentive Plan and the applicable award agreement, in each case, outstanding on the date of this Agreement in accordance with their terms as in effect as of the date of this Agreement, or (ii) grant any additional Company Awards or other equity or equity-based compensation, other than the grant of Company Awards in accordance with the Company Incentive Plan, (A) in the ordinary course of business, to the extent, in such amounts, and upon terms consistent with past practice, (B) required by the terms of any Company Benefit Plan or (C) to the extent necessary or appropriate in connection with new hires or promotions (as determined by the Company in good faith);

(n)   adopt a plan of, or otherwise enter into or effect a, complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization of the Company or its Subsidiaries (other than the Merger);

(o)   waive, release, settle, compromise or otherwise resolve any inquiry, investigation, claim, Action, litigation or other Legal Proceedings, except in the ordinary course of business or where such waivers, releases, settlements or compromises involve only the payment of monetary damages in an amount less than $1,000,000 in the aggregate;

(p)   grant to, or agree to grant to, any Person rights to any Intellectual Property that is material to the Company and its Subsidiaries, or dispose of, abandon or permit to lapse any rights to any Intellectual Property that is material to the Company and its Subsidiaries, except for the expiration of Company Registered Intellectual Property in accordance with the applicable statutory term (or in the case of domain names, applicable registration period) or in the reasonable exercise of the Company's or any of its Subsidiaries' business judgment as to the costs and benefits of maintaining the item;

A-45

(q)   enter into or extend any collective bargaining agreement or similar labor agreement, other than as required by applicable Law, or recognize or certify any labor union, labor organization, or group of employees of the Company or its Subsidiaries as the bargaining representative for any employees of the Company or its Subsidiaries; or

(r)   enter into any agreement to do any action prohibited under this Section 6.1.

Notwithstanding anything to the contrary in this Agreement, after the date hereof, the Company and its Subsidiaries may take actions that are outside of the ordinary course of business or not in accordance with past practice (A) to the extent reasonably necessary to protect the health and safety of the Company's or its Subsidiaries' employees or (B) reasonably in response to any applicable Law, directive, guideline or recommendation arising out of, or otherwise related to, COVID-19 (including any COVID-19 Measure), and such actions shall not serve as a basis for Acquiror to terminate this Agreement or assert that the Company has violated any covenant or agreement in this Agreement or that any of the conditions set forth in Section 9.2 have not been satisfied.

Section 6.2. Inspection.   Subject to confidentiality obligations that may be applicable to information furnished to the Company or any of the Company's Subsidiaries by third parties that may be in the Company's or any of its Subsidiaries' possession from time to time, and except for any information that is subject to attorney-client privilege (provided that, to the extent possible, the parties shall cooperate in good faith to permit disclosure of such information in a manner that preserves such privilege or compliance with such confidentiality obligation), and to the extent permitted by applicable Law, (a) the Company shall, and shall cause its Subsidiaries to, afford to Acquiror and its accountants, counsel and other representatives reasonable access during the Interim Period (including for the purpose of coordinating transition planning for employees), during normal business hours and with reasonable advance notice, in such manner as to not materially interfere with the ordinary course of business of the Company and its Subsidiaries, to all of their respective properties, books, Contracts, commitments, Tax Returns, records and appropriate officers and employees of the Company and its Subsidiaries, and shall furnish such representatives with all financial and operating data and other information concerning the affairs of the Company and its Subsidiaries as such representatives may reasonably request; provided, that (A) such access shall not include any unreasonably invasive or intrusive investigations or any other testing, sampling or analysis of any properties, facilities or equipment of the Company or its Subsidiaries without the prior written consent of the Company, and (B) remote access may be provided by the Company and its Subsidiaries in lieu of physical access in response to COVID-19 to the extent reasonably necessary (1) to protect the health and safety of such officers and employees or (2) in order to comply with any applicable COVID-19 Measures, and (b) the Company shall, and shall cause its Subsidiaries to, provide to Acquiror and, if applicable, its accountants, counsel or other representatives, (x) such information and such other materials and resources relating to any Legal Proceeding initiated, pending or threatened during the Interim Period, or to the compliance and risk management operations and activities of the Company and its Subsidiaries during the Interim Period, in each case, as Acquiror or such representative may reasonably request, (y) prompt written notice of any material status updates in connection with any such Legal Proceedings or otherwise relating to any compliance and risk management matters or decisions of the Company or its Subsidiaries, and (z) copies of any communications sent or received by the Company or its Subsidiaries in connection with such Legal Proceedings, matters and decisions (and, if any such communications occurred orally, the Company shall, and shall cause its Subsidiaries to, memorialize such communications in writing to Acquiror). All information obtained by Acquiror, Merger Sub or their respective representatives pursuant to this Section 6.2 shall be subject to the Confidentiality Agreement.

Section 6.3. Preparation and Delivery of Additional Company Financial Statements.

(a)   The Company shall act in good faith to deliver to Acquiror, as soon as reasonably practicable following the date hereof, the unaudited consolidated balance sheets and statements of operations, comprehensive loss, stockholders' equity, and cash flows of the Company and its Subsidiaries as of and for the three-month period ending March 31, 2021 (the "Q1 Interim Financial Statements"), which comply with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act applicable to a registrant; provided, that upon delivery of such

A-46

Q1 Interim Financial Statements, the representations and warranties set forth in Section 4.8 shall be deemed to apply to the Q1 Interim Financial Statements with the same force and effect as if made as of the date of this Agreement.

(b)   If the Effective Time has not occurred prior to August 12, 2021, as soon as reasonably practicable following August 12, 2021, the Company shall deliver to Acquiror the unaudited condensed consolidated balance sheets and statements of operations and comprehensive loss, stockholders' deficit, and cash flow of the Company and its Subsidiaries as of and for the three- and six-month period ended June 30, 2021 (the "Q2 Interim Financial Statements"), which comply with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act applicable to a registrant; provided, that upon delivery of such Q2 Interim Financial Statements, the representations and warranties set forth in Section 4.8 shall be deemed to apply to the Q2 Interim Financial Statements in the same manner as the Q1 Interim Financial Statements, *mutatis mutandis*, with the same force and effect as if made as of the date of this Agreement.

(c)   If the Effective Time has not occurred prior to November 12, 2021, as soon as reasonably practicable following November 12, 2021, the Company shall deliver to Acquiror the unaudited condensed consolidated balance sheets and statements of operations and comprehensive loss, stockholders' deficit, and cash flow of the Company and its Subsidiaries as of and for the three- and nine-month period ended September 30, 2021 (the "Q3 Interim Financial Statements"), which comply with the applicable accounting requirements and with the rules and regulations of the SEC, the Exchange Act and the Securities Act applicable to a registrant; provided, that upon delivery of such Q3 Interim Financial Statements, the representations and warranties set forth in Section 4.8 shall be deemed to apply to the Q3 Interim Financial Statements in the same manner as the Q1 Interim Financial Statements, *mutatis mutandis*, with the same force and effect as if made as of the date of this Agreement.

Section 6.4. Affiliate Agreements.   All Affiliate Agreements set forth on Section 6.4 of the Company Disclosure Letter shall be terminated or settled at or prior to the Closing without further liability to Acquiror, the Company or any of the Company's Subsidiaries, in each case, except as otherwise set forth on Section 6.4 of the Company Disclosure Letter.

Section 6.5. Acquisition Proposals.   From the date hereof until the Closing Date or, if earlier, the termination of this Agreement in accordance with Article X, the Company and its Subsidiaries shall not, and the Company shall instruct and use its reasonable best efforts to cause its representatives not to, (i) continue or initiate any negotiations with any Person with respect to, or provide any non-public information or data concerning the Company or any of the Company's Subsidiaries to any Person relating to, an Acquisition Proposal or afford to any Person access to the business, properties, assets or personnel of the Company or any of the Company's Subsidiaries in connection with an Acquisition Proposal, (ii) enter into any acquisition agreement, merger agreement or similar definitive agreement, or any letter of intent, memorandum of understanding or agreement in principle, or any other agreement relating to an Acquisition Proposal, (iii) grant any waiver, amendment or release under any confidentiality agreement or the anti-takeover laws of any state, or (iv) otherwise knowingly facilitate any such inquiries, proposals, discussions, or negotiations or any effort or attempt by any Person to make an Acquisition Proposal. From and after the date hereof, the Company shall, and shall instruct its officers and directors to, and shall instruct and cause its representatives, its Subsidiaries and their respective representatives to, immediately cease and terminate all discussions and negotiations with any Persons (other than Acquiror, Merger Sub and their representatives) that may be ongoing with respect to any Acquisition Proposal.

**ARTICLE VII**

**COVENANTS OF ACQUIROR**

Section 7.1. Employee Matters.

(a)   Equity Plan.   Prior to the Closing Date, but subject to Acquiror Shareholder Approval thereof, Acquiror shall approve and adopt (i) an incentive equity plan in the form attached hereto as Exhibit D (with such changes as may be agreed in writing by Acquiror and the Company prior to Acquiror Shareholder Approval thereof) (the "Incentive Equity Plan") and (ii) the form employee stock

A-47

purchase plan attached hereto as Exhibit E (with such changes as may be agreed in writing by Acquiror and the Company prior to Acquiror Shareholder Approval thereof) (the "ESPP").

(b)  No Third-Party Beneficiaries.  Notwithstanding anything herein to the contrary, each of the parties to this Agreement acknowledges and agrees that all provisions contained in this Section 7.1 are included for the sole benefit of Acquiror and the Company, and that nothing in this Agreement, whether express or implied, (i) shall be construed to establish, amend, or modify any employee benefit plan, program, agreement or arrangement, (ii) shall limit the right of Acquiror, the Company or their respective Affiliates to amend, terminate or otherwise modify any Company Benefit Plan or other employee benefit plan, agreement or other arrangement following the Closing Date, or (iii) shall confer upon any Person who is not a party to this Agreement (including any equityholder, any current or former director, manager, officer, employee or independent contractor of the Company, or any participant in any Company Benefit Plan or other employee benefit plan, agreement or other arrangement (or any dependent or beneficiary thereof)), any right to continued or resumed employment or recall, any right to compensation or benefits, or any third-party beneficiary or other right of any kind or nature whatsoever.

Section 7.2. Trust Account Proceeds and Related Available Equity.

(a)  The parties to this Agreement do not have any intention as of the Effective Time to use, or to cause to be used, any amount of Available Acquiror Cash to effect any repurchase, redemption or other acquisition of outstanding shares of Acquiror Common Stock within the six (6)-month period after the Closing, other than as may be required by any Acquiror Share Redemptions or with respect to Dissenting Shares.

(b)  Upon satisfaction or waiver of the conditions set forth in Article IX and provision of notice thereof to the Trustee (which notice Acquiror shall provide to the Trustee in accordance with the terms of the Trust Agreement), (i) in accordance with and pursuant to the Trust Agreement, at the Closing, Acquiror (a) shall cause any documents, opinions and notices required to be delivered to the Trustee pursuant to the Trust Agreement to be so delivered and (b) shall use its reasonable best efforts to cause the Trustee to, and the Trustee shall thereupon be obligated to (1) pay as and when due all amounts payable to Acquiror Shareholders pursuant to the Acquiror Share Redemptions, and (2) pay all remaining amounts then available in the Trust Account to Acquiror for immediate use, subject to this Agreement and the Trust Agreement, and (ii) thereafter, the Trust Account shall terminate, except as otherwise provided therein.

Section 7.3. Listing.  From the date hereof through the Effective Time, Acquiror shall take all actions necessary to ensure Acquiror remains listed as a public company on the NYSE. Notwithstanding the foregoing, at least three (3) Business Days prior to the initial filing of the Proxy Statement/Registration Statement with the SEC pursuant to Section 8.2(a), Acquiror will take such action as necessary to delist the Acquiror Pre-Transaction Common Stock and Acquiror Warrants from the NYSE effective upon the Effective Time, and shall prepare and submit to Nasdaq Capital Market ("Nasdaq") a listing application, in accordance with Nasdaq rules, covering all shares of Acquiror Common Stock and all Acquiror Warrants, and shall take all actions necessary to obtain approval for the listing of the Acquiror Common Stock and Acquiror Warrants on Nasdaq from and after the Effective Time, and the Company shall reasonably cooperate with Acquiror with respect to such listing; provided, however, that if requested by the Company in writing no later than fifteen (15) Business Days prior to the Closing Date, in lieu of the foregoing Acquiror shall prepare and submit to NYSE a listing application, if required under NYSE rules, covering the shares of Acquiror Common Stock issuable in the Merger and shall take all actions necessary to obtain approval for the listing of such shares of Acquiror Common Stock, and the Company shall reasonably cooperate with Acquiror with respect to such listing.

Section 7.4. No Solicitation by Acquiror.  From the date hereof until the Closing Date or, if earlier, the termination of this Agreement in accordance with Article X, Acquiror shall not, and shall cause its Subsidiaries not to, and Acquiror shall instruct its and their representatives not to, (i) make any proposal or offer that constitutes a Business Combination Proposal, (ii) continue or initiate any discussions or negotiations with any Person with respect to a Business Combination Proposal or (iii) enter into any acquisition agreement, business combination agreement, merger agreement or similar definitive agreement,

A-48

TABLE OF CONTENTS

or any letter of intent, memorandum of understanding or agreement in principle, or any other agreement relating to a Business Combination Proposal, in each case, other than to or with the Company and its respective representatives. From and after the date hereof, Acquiror shall, and shall instruct its officers and directors to, and Acquiror shall instruct and cause its representatives, its Subsidiaries and their respective representatives to, immediately cease and terminate all discussions and negotiations with any Persons that may be ongoing with respect to a Business Combination Proposal (other than the Company and its representatives). From and after the date hereof, Acquiror shall, and shall instruct its officers and directors to, and shall instruct and cause its representatives, its Subsidiaries (including Merger Sub) and their respective representatives to, immediately cease and terminate all discussions and negotiations with any Persons (other than the Company and its representatives) that may be ongoing with respect to any Business Combination Proposal.

Section 7.5. Acquiror Conduct of Business.

(a)   During the Interim Period, Acquiror shall, and shall cause Merger Sub to, except as contemplated by this Agreement (including as contemplated by the FPA Investment or PIPE Investment) or as consented to by the Company in writing (which consent shall not be unreasonably conditioned, withheld, delayed or denied), operate its business in the ordinary course of business. Without limiting the generality of the foregoing, except as consented to by the Company in writing (which consent shall not be unreasonably conditioned, withheld, delayed or denied), Acquiror shall not, and Acquiror shall cause Merger Sub not to, except as otherwise contemplated by this Agreement (including as contemplated by the FPA Investment or the PIPE Investment) or the Ancillary Agreements or as required by Law:

(i)   seek any approval from the Acquiror Shareholders to change, modify or amend the Trust Agreement or the Governing Documents of Acquiror or Merger Sub, except as contemplated by the Transaction Proposals;

(ii)   (x) make or declare any dividend or distribution to the shareholders of Acquiror or make any other distributions in respect of any of Acquiror's capital stock or any Merger Sub Capital Stock, share capital or equity interests, (y) split, combine, reclassify or otherwise amend any terms of any shares or series of Acquiror's capital stock or any Merger Sub Capital Stock or equity interests, or (z) purchase, repurchase, redeem or otherwise acquire any issued and outstanding share capital, outstanding shares of capital stock, share capital or membership interests, warrants or other equity interests of Acquiror or Merger Sub, other than a redemption of shares of Acquiror Pre-Transaction Common Stock made as part of the Acquiror Share Redemptions;

(iii)   (A) make or change any material election in respect of material Taxes, (B) materially amend, modify or otherwise change any filed material Tax Return, (C) adopt or request permission of any taxing authority to change any accounting method in respect of material Taxes, (D) enter into any closing agreement in respect of material Taxes or enter into any Tax sharing or similar agreement, (E) settle any claim or assessment in respect of material Taxes, (F) knowingly surrender or allow to expire any right to claim a refund of material Taxes; or (G) consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of material Taxes;

(iv)   take any action, or knowingly fail to take any action, where such action or failure to act could reasonably be expected to prevent the Merger from qualifying for the Intended Tax Treatment;

(v)   other than as expressly required by the Sponsor Support Agreement, enter into, renew or amend in any material respect, (A) any transaction or Contract with an Affiliate of Acquiror or Merger Sub (including, for the avoidance of doubt, (x) the Sponsor, (y) Northern Genesis Capital II LLC and (z) any Person in which the Sponsor has a direct or indirect legal, contractual or beneficial ownership interest of five percent (5%) or greater) or (B) any transaction or Contract with any counterparty to a Forward Purchase Agreement, to the extent related in any respect to Acquiror;

(vi)   incur or assume any Indebtedness or guarantee any Indebtedness of another Person, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company or any of the Company's Subsidiaries or guarantee any debt securities of another Person,

A-49

other than (A) Working Capital Loans and (B) any indebtedness for borrowed money or guarantee (x) incurred in the ordinary course of business and in an aggregate amount not to exceed $100,000, or (y) incurred between Acquiror and Merger Sub;

(vii)   incur, guarantee or otherwise become liable for (whether directly, contingently or otherwise) any Indebtedness or otherwise knowingly and purposefully incur, guarantee or otherwise become liable for (whether directly, contingently or otherwise) any other material liabilities, debts or obligations, other than fees and expenses for professional services incurred in support of the transactions contemplated by this Agreement and the Ancillary Agreements or in support of the ordinary course operations of Acquiror (which the parties agree shall include any Indebtedness in respect of any Working Capital Loan);

(viii)   (A) issue any Acquiror Securities or securities exercisable for or convertible into Acquiror Securities, other than the issuance of the Aggregate Merger Consideration, the incurrence of Working Capital Loans and issuance of Acquiror Working Capital Warrants to Sponsor, and the issuance of Acquiror Securities pursuant to the Subscription Agreements and the Forward Purchase Agreements, (B) grant any options or other equity-based awards with respect to Acquiror Securities not outstanding on the date hereof, or (C) amend, modify or waive any of the material terms or rights set forth in any Acquiror Warrant or the Warrant Agreement, including any amendment, modification or reduction of the warrant price set forth therein; or

(ix)   enter into any agreement to do any action prohibited under this Section 7.5.

(b)   During the Interim Period, Acquiror shall, and shall cause its Subsidiaries (including Merger Sub) to, comply with, and continue performing under, as applicable, Acquiror's Governing Documents, the Trust Agreement and all other agreements or Contracts to which Acquiror or its Subsidiaries may be a party.

Section 7.6. Post-Closing Directors and Officers of Acquiror.   Subject to the terms of the Acquiror's Governing Documents, Acquiror shall take all such action within its power as may be necessary or appropriate such that immediately following the Effective Time:

(a)   the Board of Directors of Acquiror shall consist of up to seven (7) directors, which shall initially include:

(i)   one (1) director nominee to be mutually agreed by the Sponsor and the Company;

(ii)   one (1) director nominee (the "NG Representative") to be (A) designated by Acquiror pursuant to written notice to be delivered to the Company as soon as reasonably practicable following the date of this Agreement and (B) reasonably acceptable to the Company; and

(iii)   up to five (5) director nominees to be designated by the Company pursuant to written notice to Acquiror as soon as reasonably practicable following the date of this Agreement; and

(b)   the initial officers of Acquiror and their initial officer positions shall be as set forth on Section 7.6 of the Company Disclosure Letter, who shall serve in such capacity in accordance with the terms of Acquiror's Governing Documents following the Effective Time.

Section 7.7. Indemnification and Insurance.

(a)   From and after the Effective Time, Acquiror agrees that it shall indemnify and hold harmless each present and former director and officer of the (x) Company and each of its Subsidiaries (the "Company Indemnified Parties") and (y) Acquiror and each of its Subsidiaries (the "Acquiror Indemnified Parties" together with the Company Indemnified Parties, the "D&O Indemnified Parties") against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages or liabilities incurred in connection with any Legal Proceeding, whether civil, criminal, administrative or investigative, arising out of or pertaining to matters existing or occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time, to the fullest extent that the Company, Acquiror or their respective Subsidiaries, as the case may be, would have been permitted under applicable Law and their respective Governing Documents in effect on the date

A-50

TABLE OF CONTENTS

of this Agreement to indemnify such D&O Indemnified Parties (including the advancing of expenses as incurred to the fullest extent permitted under applicable Law). Without limiting the foregoing, Acquiror shall, and shall cause its Subsidiaries to, (i) maintain for a period of not less than six (6) years from the Effective Time provisions in its Governing Documents concerning the indemnification and exoneration (including provisions relating to expense advancement) of Acquiror's and its Subsidiaries' former and current officers, directors, employees, and agents that are no less favorable to those Persons than the provisions of the Governing Documents of the Company, Acquiror or their respective Subsidiaries, as applicable, in each case, as of the date of this Agreement, and (ii) not amend, repeal or otherwise modify such provisions in any respect that would adversely affect the rights of those Persons thereunder, in each case, except as required by Law.

(b)   For a period of six (6) years from the Effective Time, Acquiror shall maintain in effect directors' and officers' liability insurance covering those Persons who are currently covered by Acquiror's, the Company's or their respective Subsidiaries' directors' and officers' liability insurance policies (true, correct and complete copies of which have been heretofore made available to Acquiror or its agents or representatives) on terms not less favorable than the terms of such current insurance coverage, except that in no event shall Acquiror be required to pay an annual premium for such insurance in excess of three hundred percent (300%) of the aggregate annual premium payable by Acquiror or the Company, as applicable, for such insurance policy for the year ended December 31, 2020; provided, however, that (i) Acquiror may cause coverage to be extended under the current directors' and officers' liability insurance by obtaining a six (6) year "tail" policy containing terms not materially less favorable than the terms of such current insurance coverage with respect to claims existing or occurring at or prior to the Effective Time and (ii) if any claim is asserted or made within such six (6) year period, any insurance required to be maintained under this Section 7.7 shall be continued in respect of such claim until the final disposition thereof.

(c)   Notwithstanding anything contained in this Agreement to the contrary, this Section 7.7 shall survive the consummation of the Merger indefinitely and shall be binding, jointly and severally, on Acquiror and all successors and assigns of Acquiror. In the event that Acquiror or any of its successors or assigns consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, Acquiror shall ensure that proper provision shall be made so that the successors, assigns and/or transferees of Acquiror shall succeed to the obligations set forth in this Section 7.7.

(d)   On the Closing Date, Acquiror shall enter into customary indemnification agreements reasonably satisfactory to each of the Company and Acquiror with the post-Closing directors and officers of Acquiror, which indemnification agreements shall continue to be effective following the Closing.

Section 7.8. Acquiror Public Filings.   From the date hereof through the Effective Time, Acquiror will keep current and timely file all reports required to be filed or furnished with the SEC and otherwise comply in all material respects with its reporting obligations under applicable Laws.

Section 7.9. PIPE Subscriptions; Forward Purchase.   Unless otherwise approved in writing by the Company (which approval shall not be unreasonably withheld, conditioned or delayed), and except for any of the following actions that would not increase conditionality or impose any new obligation on the Company or Acquiror, reduce the Minimum PIPE Investment Amount or the FPA Investment Amount or the subscription amount under any Subscription Agreement or Forward Purchase Agreement or reduce or impair the rights of Acquiror under any Subscription Agreement or Forward Purchase Agreement, Acquiror shall not permit any amendment or modification to be made to, or permit any waiver (in whole or in part) of, or provide consent to modify (including consent to terminate) any provision or remedy under, or permit any replacements of, any of the Subscription Agreements or any of the Forward Purchase Agreements, in each case, other than any assignment or transfer contemplated therein or expressly permitted thereby (without any further amendment, modification or waiver to such assignment or transfer provision); provided, that, in the case of any such assignment or transfer, the party to such Subscription Agreement or any Forward Purchase Agreement that on the date hereof is obligated thereunder to purchase shares of Acquiror Pre-Transaction Common Stock remains bound by its obligations with respect thereto in the event that the

A-51

transferee or assignee, as applicable, does not comply with its obligations to consummate the purchase of shares of Acquiror Pre-Transaction Common Stock contemplated thereby. Subject to the immediately preceding sentence and in the event that all conditions in the Subscription Agreements and the Forward Purchase Agreements have been satisfied, Acquiror shall use its reasonable best efforts to take, or to cause to be taken, all actions required, necessary or that it otherwise deems to be proper or advisable to consummate the transactions contemplated by the Subscription Agreements and the Forward Purchase Agreements on the terms described therein, including using its reasonable best efforts to enforce its rights under the Subscription Agreements to cause the PIPE Investors to pay to (or as directed by) Acquiror the applicable purchase price under each PIPE Investor's applicable Subscription Agreement in accordance with its terms and under each Forward Purchase Agreement to cause the purchasers thereunder to pay to (or as directed by) Acquiror the applicable purchase price under such Forward Purchase Agreement in accordance with its terms.

Section 7.10. <u>Stockholder Litigation</u>.   In the event that any litigation related to this Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby is brought, or, to the knowledge of Acquiror, threatened in writing, against Acquiror or the Board of Directors of Acquiror by any of Acquiror's stockholders prior to the Closing, Acquiror shall promptly notify the Company of any such litigation and keep the Company reasonably informed with respect to the status thereof. Acquiror shall provide the Company the opportunity to participate in (subject to a customary joint defense agreement), but not control, the defense of any such litigation, shall give due consideration to the Company's advice with respect to such litigation and shall not settle any such litigation without prior written consent of the Company, such consent not to be unreasonably withheld, conditioned or delayed.

Section 7.11. <u>Amendments to Acquiror Governing Documents</u>.   On the Closing Date, Acquiror shall amend and restate, effective as of immediately prior to the Effective Time, its certificate of incorporation and bylaws, respectively, in the forms of (a) the Second Amended and Restated Certificate of Incorporation of Acquiror, in the form attached as <u>Exhibit A</u> hereto (with such changes as may be agreed in writing by Acquiror and the Company) (the "<u>Acquiror Second A&R Charter</u>"), and (b) the Amended and Restated Bylaws of Acquiror, in the form attached as <u>Exhibit B</u> hereto (with such changes as may be agreed in writing by Acquiror and the Company) (the "<u>Acquiror A&R Bylaws</u>").

## ARTICLE VIII

## JOINT COVENANTS

Section 8.1. <u>HSR Act; Other Filings</u>.

(a)   In connection with the transactions contemplated hereby, each of the Company and Acquiror shall (and, to the extent required, shall cause its Affiliates to) comply promptly, but in no event later than ten (10) Business Days after the date hereof, with the notification and reporting requirements of the HSR Act. Each of the Company and Acquiror shall substantially comply with any Antitrust Information or Document Requests.

(b)   Each of the Company and Acquiror shall (and, to the extent required, shall cause its Affiliates to) request early termination (if available) of any waiting period under the HSR Act and exercise its reasonable best efforts to (i) obtain termination or expiration of the waiting period under the HSR Act and (ii) prevent the entry, in any Legal Proceeding brought by an Antitrust Authority or any other Person, of any Governmental Order which would prohibit, make unlawful or delay the consummation of the transactions contemplated hereby.

(c)   Acquiror shall cooperate in good faith with Governmental Authorities and undertake promptly any and all action required to complete lawfully the transactions contemplated hereby as soon as practicable (but in any event prior to the Agreement End Date) and any and all action necessary or advisable to avoid, prevent, eliminate or remove the actual or threatened commencement of any proceeding in any forum by or on behalf of any Governmental Authority or the issuance of any Governmental Order that would delay, enjoin, prevent, restrain or otherwise prohibit the consummation of the Merger, including, with the Company's prior written consent (which consent shall not be unreasonably withheld, conditioned, delayed or denied), (i) proffering and consenting and/or agreeing

to a Governmental Order or other agreement providing for (A) the sale, licensing or other disposition, or the holding separate, of particular assets, categories of assets or lines of business of the Company or Acquiror or (B) the termination, amendment or assignment of existing relationships and contractual rights and obligations of the Company or Acquiror and (ii) promptly effecting the disposition, licensing or holding separate of assets or lines of business or the termination, amendment or assignment of existing relationships and contractual rights, in each case, at such time as may be necessary to permit the lawful consummation of the transactions contemplated hereby on or prior to the Agreement End Date.

(d)   With respect to each of the above filings, and any other requests, inquiries, Actions or other proceedings by or from Governmental Authorities, each of the Company and Acquiror shall (and, to the extent required, shall cause its controlled Affiliates to) (i) diligently and expeditiously defend and use reasonable best efforts to obtain any necessary clearance, approval, consent, or Governmental Authorization under Laws prescribed or enforceable by any Governmental Authority for the transactions contemplated by this Agreement and to resolve any objections as may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement; and (ii) cooperate fully with each other in the defense of such matters. To the extent not prohibited by Law, the Company shall promptly furnish to Acquiror, and Acquiror shall promptly furnish to the Company, copies of any notices or written communications received by such party or any of its Affiliates from any third party or any Governmental Authority with respect to the transactions contemplated hereby, and each party shall permit counsel to the other parties an opportunity to review in advance, and each party shall consider in good faith the views of such counsel in connection with, any proposed written communications by such party and/or its Affiliates to any Governmental Authority concerning the transactions contemplated hereby; provided, that none of the parties shall extend any waiting period or comparable period under the HSR Act or enter into any agreement with any Governmental Authority without the written consent of the other parties. To the extent not prohibited by Law, the Company agrees to provide Acquiror and its counsel, and Acquiror agrees to provide the Company and its counsel, the opportunity, on reasonable advance notice, to participate in any substantive meetings or discussions, either in person or by telephone, between such party and/or any of its Affiliates, agents or advisors, on the one hand, and any Governmental Authority, on the other hand, concerning or in connection with the transactions contemplated hereby.

(e)   Each of the Company, on the one hand, and Acquiror, on the other, shall be responsible for and pay one-half of the filing fees payable to the Antitrust Authorities in connection with the transactions contemplated hereby.

Section 8.2. Preparation of Proxy Statement/Registration Statement; Shareholders' Meeting and Approvals.

(a)   Registration Statement and Prospectus.

(i)   As promptly as practicable after the execution of this Agreement, (x) Acquiror and the Company shall jointly prepare, and Acquiror shall file with the SEC, mutually acceptable materials which shall include the proxy statement to be filed with the SEC as part of the Registration Statement and sent to the Acquiror Shareholders relating to the Acquiror Shareholders' Meeting (such proxy statement, together with any amendments or supplements thereto, the "Proxy Statement"), and (y) Acquiror shall prepare (with the Company's reasonable cooperation (including causing its Subsidiaries and representatives to cooperate)) and file with the SEC the Registration Statement, in which the Proxy Statement will be included as a prospectus (the "Proxy Statement/Registration Statement"), in connection with the registration under the Securities Act of the shares of Acquiror Common Stock that constitute the Aggregate Merger Consideration (collectively, the "Registration Statement Securities"). Each of Acquiror and the Company shall use its reasonable best efforts to cause the Proxy Statement/Registration Statement to comply with the rules and regulations promulgated by the SEC, to have the Registration Statement declared effective under the Securities Act as promptly as practicable after such filing and to keep the Registration Statement effective as long as is necessary to consummate the transactions contemplated hereby. Acquiror also agrees to use its reasonable best efforts to obtain all necessary state securities law or "Blue Sky" permits and approvals required to carry out the transactions contemplated hereby,

A-53

TABLE OF CONTENTS

and the Company shall furnish all information concerning the Company, its Subsidiaries and any of their respective members or stockholders as may be reasonably requested in connection with any such action. Each of Acquiror and the Company agrees to furnish to the other party all information concerning itself, its Subsidiaries, officers, directors, managers, stockholders, and other equityholders and information regarding such other matters as may be reasonably necessary or advisable or as may be reasonably requested in connection with the Proxy Statement/ Registration Statement, a Current Report on Form 8-K pursuant to the Exchange Act in connection with the transactions contemplated by this Agreement, or any other statement, filing, notice or application made by or on behalf of Acquiror, the Company or their respective Subsidiaries to any regulatory authority (including the NYSE or Nasdaq, as applicable) in connection with the Merger and the other transactions contemplated hereby (the "Offer Documents"). Acquiror will cause the Proxy Statement/Registration Statement to be mailed to the Acquiror Shareholders in each case promptly after the Registration Statement is declared effective under the Securities Act.

(ii)   To the extent not prohibited by Law, Acquiror will advise the Company, reasonably promptly after Acquiror receives notice thereof, of the time when the Proxy Statement/ Registration Statement has become effective or any supplement or amendment has been filed, of the issuance of any stop order or the suspension of the qualification of the Acquiror Common Stock for offering or sale in any jurisdiction, of the initiation or written threat of any proceeding for any such purpose, or of any request by the SEC for the amendment or supplement of the Proxy Statement/Registration Statement or for additional information. To the extent not prohibited by Law, the Company and their counsel shall be given a reasonable opportunity to review and comment on the Proxy Statement/Registration Statement and any Offer Document each time before any such document is filed with the SEC, and Acquiror shall give reasonable and good faith consideration to any comments made by the Company and its counsel. To the extent not prohibited by Law, Acquiror shall provide the Company and their counsel with (i) any comments or other communications, whether written or oral, that Acquiror or its counsel may receive from time to time from the SEC or its staff with respect to the Proxy Statement/Registration Statement or Offer Documents promptly after receipt of those comments or other communications and (ii) a reasonable opportunity to participate in the response of Acquiror to those comments and to provide comments on that response (to which reasonable and good faith consideration shall be given), including by participating with the Company or its counsel in any discussions or meetings with the SEC.

(iii)   Each of Acquiror and the Company shall ensure that none of the information supplied by or on its behalf for inclusion or incorporation by reference in (A) the Registration Statement will, at the time the Registration Statement is filed with the SEC, at each time at which it is amended and at the time it becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading or (B) the Proxy Statement will, at the date it is first mailed to the Acquiror Shareholders and at the time of the Acquiror Shareholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

(iv)   If at any time prior to the Effective Time any information relating to the Company, Acquiror or any of their respective Subsidiaries, Affiliates, directors or officers is discovered by the Company or Acquiror, which information is required to be set forth in an amendment or supplement to the Proxy Statement or the Registration Statement so that neither of such documents would include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, with respect to the Proxy Statement, in light of the circumstances under which they were made, not misleading, the party that discovers such information shall promptly notify the other parties and an appropriate amendment or supplement describing such information shall be promptly filed with the SEC and, to the extent required by Law, disseminated to the Acquiror Shareholders.

(v)   The Registration Statement, to the extent permitted by applicable rules and regulations of the SEC, also will register the resale of the shares of Acquiror Common Stock that constitute

A-54

the Aggregate Merger Consideration, other than certain equity securities issuable under the Incentive Equity Plan that are based on Acquiror Common Stock and constitute a portion of the Aggregate Merger Consideration, which shall instead be registered pursuant to an effective registration statement on Form S-8 (or other applicable form, including Form S-1 or Form S-3) in accordance with Section 7.1(a).

(b)   Acquiror Shareholder Approval.

(i)   Acquiror shall as promptly as practicable after the Registration Statement is declared effective under the Securities Act, (A) cause the Proxy Statement to be disseminated to Acquiror Shareholders in compliance with applicable Law, (B) duly give notice of, and convene and hold, a meeting of its shareholders (the "Acquiror Shareholders' Meeting") in accordance with Acquiror's Governing Documents and Section 710 of the NYSE Listing Rules or Nasdaq Listing Rule 5620(b), as applicable, for a date no later than thirty (30) Business Days following the date the Registration Statement is declared effective, and (C) solicit proxies from the holders of Acquiror Pre-Transaction Common Stock to vote in favor of each of the Transaction Proposals.

(ii)   Acquiror shall, through its Board of Directors, recommend to its shareholders the (A) amendment and restatement of Acquiror's Governing Documents, in the respective forms of the Acquiror Second A&R Charter and the Acquiror A&R Bylaws (as may be subsequently amended by mutual written agreement of the Company and Acquiror at any time before the effectiveness of the Registration Statement) at the Closing, including approval of the change of Acquiror's name to "Embark Technology, Inc.", and any separate or unbundled proposals as are required to implement the foregoing (the proposal in this clause (A), the "Charter Proposal"), (B) the adoption and approval of this Agreement in accordance with applicable Law and exchange rules and regulations, (C) approval of the issuance of shares of Acquiror Common Stock in connection with the Merger, (D) approval of the issuance of more than one percent (1%) of Acquiror's outstanding common stock to a "related party" pursuant to the rules of the NYSE or Nasdaq, as applicable, as contemplated by the Subscription Agreements with the applicable PIPE Investors, (E) the election of directors effective as of the Closing as contemplated by Section 7.6, (F) adoption and approval of any other proposals as the SEC (or staff member thereof) may indicate are necessary in its comments to the Registration Statement or correspondence related thereto, (G) approval of the adoption by Acquiror of the equity plans described in Section 7.1, (H) adoption and approval of any other proposals as reasonably agreed by Acquiror and the Company to be necessary or appropriate in connection with the transactions contemplated hereby, and (I) adjournment of the Acquiror Shareholders' Meeting, if necessary, to permit further solicitation of proxies because there are not sufficient votes to approve and adopt any of the foregoing (such proposals in (A) through (I), together, the "Transaction Proposals"), and include such recommendation in the Proxy Statement.

(iii)   The Board of Directors of Acquiror shall not withdraw, amend, qualify or modify its recommendation to the shareholders of Acquiror that they vote in favor of the Transaction Proposals (together with any withdrawal, amendment, qualification or modification of its recommendation to the shareholders of Acquiror described in the Recitals hereto, a "Modification in Recommendation"), except to the extent that the Board of Directors of Acquiror shall have determined in good faith, after consultation with its outside legal counsel, that, an Intervening Event has occurred prior to the Acquiror Shareholders' Meeting and, in response to such Intervening Event, a failure to make a Modification in Recommendation would violate its fiduciary duties under applicable Law; provided, that the Board of Directors of Acquiror will not be entitled to make, or agree or resolve to make, a Modification in Recommendation until (A) Acquiror delivers to the Company a written notice (an "Intervening Event Notice") advising the Company that the Board of Directors of Acquiror proposes to take such action and containing the material facts underlying such determination that an Intervening Event has occurred, (B) until 5:00 p.m., Eastern Time, on the fifth Business Day immediately following the day on which Acquiror delivered the Intervening Event Notice (such period from the time the Intervening Event Notice is provided until 5:00 p.m. Eastern Time on the fifth Business Day immediately following the day on which Acquiror delivered the Intervening Event Notice (it being understood that any material development

A-55

with respect to an Intervening Event shall require a new notice but with an additional three-Business Day (instead of five-Business Day) period from the date of such notice), the "Intervening Event Notice Period"), Acquiror and its representatives shall have negotiated in good faith with the Company and its representatives regarding any revisions or adjustments proposed by the Company during the Intervening Event Notice Period to the terms and conditions of this Agreement as would enable Acquiror to proceed with its recommendation of this Agreement and the transactions contemplated hereby and not make such Modification in Recommendation, and (C) if the Company requested negotiations in accordance with the foregoing clause (B), Acquiror may make a Modification in Recommendation only if the Board of Directors of Acquiror, after considering in good faith any terms revisions or adjustments to the terms and conditions of this Agreement that the Company shall have, prior to the expiration of the five-Business Day period, offered in writing in a manner that would form a binding Contract if accepted by Acquiror (and the other applicable parties hereto), reaffirms in good faith (after consultation with its outside legal counsel) that the failure to make a Modification in Recommendation would violate its fiduciary duties under applicable Law. For the avoidance of doubt, a Modification in Recommendation will not affect Acquiror's obligations pursuant to this Section 8.02 (other than as set forth in the immediately preceding sentence) or elsewhere in this Agreement. To the fullest extent permitted by applicable Law (A) Acquiror's obligations to establish a record date for, duly call, give notice of, convene and hold the Acquiror Shareholders' Meeting shall not be affected by any Modification in Recommendation, (B) Acquiror agrees to establish a record date for, duly call, give notice of, convene and hold the Acquiror Shareholders' Meeting and submit for approval the Transaction Proposals and (C) Acquiror agrees that if the Acquiror Shareholder Approval with respect to all Transaction Proposals shall not have been obtained at any such Acquiror Shareholders' Meeting, then Acquiror shall promptly continue to take all such necessary actions, including the actions required by this Section 8.2(b), and hold additional Acquiror Shareholders' Meetings in order to obtain the Acquiror Shareholder Approval of all Transaction Proposals.

(iv)    Acquiror may only, and to the extent necessary to obtain the Acquiror Shareholder Approval Acquiror shall, adjourn the Acquiror Shareholders' Meeting (A) to solicit additional proxies for the purpose of obtaining the Acquiror Shareholder Approval, (B) for the absence of a quorum or (C) to allow reasonable additional time for the filing or mailing of any supplemental or amended disclosure that Acquiror has determined in good faith after consultation with outside legal counsel is required under applicable Law and for such supplemental or amended disclosure to be disseminated and reviewed by Acquiror Shareholders prior to the Acquiror Shareholders' Meeting; provided, that the Acquiror Shareholders' Meeting (x) may not be adjourned to a date that is more than fifteen (15) days after the date for which the Acquiror Shareholders' Meeting was originally scheduled (excluding any adjournments required by applicable Law) and (y) shall not be held later than three (3) Business Days prior to the Agreement End Date.

(v)    Acquiror agrees that it shall provide the holders of shares of Acquiror IPO Shares the opportunity to elect redemption of such Acquiror IPO Shares in connection with (but prior to) the Acquiror Shareholders' Meeting, as required by Acquiror's Governing Documents.

(c)    Company Stockholder Approvals.    Upon the terms set forth in this Agreement, the Company shall (i) use its reasonable best efforts to solicit and obtain the Company Stockholder Approvals in the form of an irrevocable written consent (the "Written Consent") of the Requisite Company Stockholders (pursuant to the Company Holders Support Agreement) promptly following the time at which the Registration Statement shall have been declared effective under the Securities Act and delivered or otherwise made available to stockholders, or (ii) in the event the Company is not able to obtain the Written Consent, the Company shall duly convene a meeting of the stockholders of the Company for the purpose of voting solely upon the adoption of this Agreement, the other agreements contemplated hereby and the transactions contemplated hereby and thereby, including the Merger, as soon as reasonably practicable after the Registration Statement is declared effective. The Company shall obtain the Company Stockholder Approvals at such meeting of the stockholders of the Company and shall take all other action necessary or advisable to secure the Company Stockholder Approvals as soon as reasonably practicable after the Registration Statement is declared effective.

A-56

TABLE OF CONTENTS

Section 8.3. <u>Support of Transaction</u>.   Without limiting any covenant contained in <u>Article VI</u> or <u>Article VII</u>, Acquiror and the Company shall each, and each shall cause its Subsidiaries to, (a) use reasonable best efforts to obtain all material consents and approvals of third parties that any of Acquiror, the Company or their respective Affiliates are required to obtain in order to consummate the Merger, and (b) take such other action as may be reasonably necessary or as another party hereto may reasonably request to satisfy the conditions of <u>Article IX</u> or otherwise to comply with this Agreement and to consummate the transactions contemplated hereby as soon as practicable.

Section 8.4. <u>Tax Matters</u>.

All transfer, documentary, sales, use, real property, stamp, registration and other similar Taxes, fees and costs (including any associated penalties and interest) ("<u>Transfer Taxes</u>") incurred in connection with this Agreement shall constitute Company Transaction Expenses. For U.S. federal and state income Tax purposes, the parties hereto acknowledge and agree that the Merger will constitute a "reverse acquisition" as described in Treasury Regulations Section 1.1502-75(d)(3), and to refrain from taking any position inconsistent with the foregoing for U.S. federal, state and other relevant Tax purposes, unless otherwise required pursuant to a determination within the meaning of Section 1313(a) of the Code.

Section 8.5. <u>Section 16 Matters</u>.   Prior to the Effective Time, each of the Company and Acquiror shall take all such steps as may be required (to the extent permitted under applicable Law) to cause any dispositions of shares of the Company Capital Stock or acquisitions of shares of Acquiror Pre-Transaction Common Stock (including, in each case, securities deliverable upon exercise, vesting or settlement of any derivative securities) resulting from the transactions contemplated hereby by each individual who may become subject to the reporting requirements of Section 16(a) of the Exchange Act in connection with the transactions contemplated hereby to be exempt under Rule B-3 promulgated under the Exchange Act.

Section 8.6. <u>Cooperation; Consultation</u>.   From the date of the announcement of this Agreement or the transactions contemplated hereby (pursuant to any applicable public communication made in compliance with <u>Section 11.12</u>) until the Closing Date, Acquiror shall use its reasonable best efforts to, and shall instruct its financial advisors to, keep the Company and its financial advisors reasonably informed with respect to the FPA Investment and PIPE Investment and the rotation of the shares of Acquiror Pre-Transaction Common Stock during such period, including by (i) providing regular updates and (ii) consulting and cooperating with, and considering in good faith any feedback from, the Company or its financial advisors with respect to such matters.

**ARTICLE IX**

**CONDITIONS TO OBLIGATIONS**

Section 9.1. <u>Conditions to Obligations of Acquiror, Merger Sub, and the Company</u>.   The obligations of Acquiror, Merger Sub, and the Company to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following conditions, any one or more of which may be waived in writing by all of such parties:

(a)  the Acquiror Shareholder Approval shall have been obtained with respect to all Transaction Proposals;

(b)  the Company Stockholder Approvals shall have been obtained;

(c)  the Registration Statement shall have become effective under the Securities Act and no stop order suspending the effectiveness of the Registration Statement shall have been issued and no proceedings for that purpose shall have been initiated or threatened by the SEC and not withdrawn;

(d)  the waiting period or periods under the HSR Act applicable to the transactions contemplated by this Agreement and the Ancillary Agreements shall have expired or been terminated;

(e)  there shall not be in force any Governmental Order enjoining or prohibiting the consummation of the Merger; <u>provided</u>, that the Governmental Authority issuing such Governmental Order has jurisdiction over the parties hereto with respect to the transactions contemplated hereby;

A-57

TABLE OF CONTENTS

(f)   Acquiror shall have at least $5,000,001 of net tangible assets after giving effect to the FPA Investment and PIPE Investment (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act); and

(g)   the shares of Acquiror Common Stock to be issued in connection with the Merger shall have been approved for listing on the Nasdaq or, if requested by the Company pursuant to Section 7.3, NYSE.

Section 9.2. <u>Conditions to Obligations of Acquiror and Merger Sub</u>.   The obligations of Acquiror and Merger Sub to consummate, or cause to be consummated, the Merger are subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by Acquiror and Merger Sub:

(a)   each of the representations and warranties of the Company contained in this Agreement (disregarding any qualifications and exceptions contained therein relating to materiality, material adverse effect and Company Material Adverse Effect or any similar qualification or exception) shall be true and correct as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct at and as of such date, except for, in each case, inaccuracies or omissions that would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect; and

(b)   each of the covenants of the Company to be performed as of or prior to the Closing shall have been performed in all material respects or, in the event of any failure to so perform, such breach shall have been cured by the Company.

Section 9.3. <u>Conditions to the Obligations of the Company</u>.   The obligation of the Company to consummate, or cause to be consummated, the Merger is subject to the satisfaction of the following additional conditions, any one or more of which may be waived in writing by the Company:

(a)   (i) The representations and warranties of Acquiror contained in Section 5.12 shall be true and correct in all but *de minimis* respects as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all but *de minimis* respects at and as of such date, except for changes after the date of this Agreement which are contemplated or expressly permitted by this Agreement and (ii) each of the representations and warranties of Acquiror contained in this Agreement (other than Section 5.12) (disregarding any qualifications and exceptions contained therein relating to materiality, material adverse effect or any similar qualification or exception) shall be true and correct in all material respects, in each case as of the Closing Date, except with respect to such representations and warranties which speak as to an earlier date, which representations and warranties shall be true and correct in all material respects at and as of such date;

(b)   each of the covenants of Acquiror to be performed as of or prior to the Closing shall have been performed in all material respects or, in the event of any failure to so perform, such breach shall have been cured by Acquiror;

(c)   the Acquiror Second A&R Charter shall have been filed with the Secretary of State of the State of Delaware and Acquiror shall have adopted the Acquiror A&R Bylaws; and

(d)   the Available Acquiror Cash shall be no less than the Minimum Available Acquiror Cash Amount; provided, that, the parties agree that this condition may not be waived unless the Board of Directors of the Company has approved such waiver after the Company's management has expressed its belief, in its sole discretion, that, following the Closing, the Company will have enough cash to fund the Company through commercialization of its business.

**ARTICLE X**

**TERMINATION/EFFECTIVENESS**

Section 10.1. <u>Termination</u>.   This Agreement may be terminated and the transactions contemplated hereby abandoned:

(a)   by written consent of the Company and Acquiror;

(b)   by the Company or Acquiror if any Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which has become final and nonappealable

A-58

TABLE OF CONTENTS

and has the effect of making consummation of the Merger illegal or otherwise preventing or prohibiting consummation of the Merger;

(c)   by the Company if there has been a Modification in Recommendation;

(d)   prior to the Closing by written notice to the Company from Acquiror if (i) there is any breach of any representation, warranty, covenant or agreement on the part of the Company set forth in this Agreement, such that the conditions specified in Section 9.2(a) or Section 9.2(b) would not be satisfied at the Closing (a "Terminating Company Breach"), except that, if such Terminating Company Breach is curable by the Company through the exercise of its reasonable best efforts, then, for a period of up to thirty (30) days after receipt by the Company of notice from Acquiror of such breach, but only as long as the Company continues to use its respective reasonable best efforts to cure such Terminating Company Breach (the "Company Cure Period"), such termination shall not be effective, and such termination shall become effective only if the Terminating Company Breach is not cured within the Company Cure Period, or (ii) the Closing has not occurred on or before the date that is (A) one fifty (150) days after the date of this Agreement plus (B) to the extent the Registration Statement has not been declared effective on or prior to the date which is one hundred twenty (120) days following the date of this Agreement, the lesser of (x) thirty (30) days and (y) a number of days equal to the number of days after the date of this Agreement on which the Registration Statement is declared effective minus one hundred twenty (120) days (such date, the "Agreement End Date"), unless Acquiror is in material breach hereof;

(e)   by Acquiror if the Company Stockholder Approvals shall not have been obtained within five (5) Business Days after the Registration Statement has been declared effective by the SEC and delivered or otherwise made available to stockholders; or

(f)   prior to the Closing, by written notice to Acquiror from the Company if (i) there is any breach of any representation, warranty, covenant or agreement on the part of Acquiror or Merger Sub set forth in this Agreement, such that the conditions specified in Section 9.3(a) or Section 9.3(b) would not be satisfied at the Closing (a "Terminating Acquiror Breach"), except that, if any such Terminating Acquiror Breach is curable by Acquiror through the exercise of its reasonable best efforts, then, for a period of up to thirty (30) days after receipt by Acquiror of notice from the Company of such breach, but only as long as Acquiror continues to exercise such reasonable best efforts to cure such Terminating Acquiror Breach (the "Acquiror Cure Period"), such termination shall not be effective, and such termination shall become effective only if the Terminating Acquiror Breach is not cured within the Acquiror Cure Period or (ii) the Closing has not occurred on or before the Agreement End Date, unless the Company is in material breach hereof.

Section 10.2. Effect of Termination.   In the event of the termination of this Agreement pursuant to Section 10.1, this Agreement shall forthwith become void and have no effect, without any liability on the part of any party hereto or its respective Affiliates, officers, directors or stockholders, other than liability of the Company, Acquiror or Merger Sub, as the case may be, for any willful and material breach of this Agreement occurring prior to such termination, except that the provisions of this Section 10.2 and Article XI and the Confidentiality Agreement shall survive any termination of this Agreement.

## ARTICLE XI

## MISCELLANEOUS

Section 11.1. Trust Account Waiver.   The Company understands that Acquiror has established a trust account containing the proceeds of its initial public offering and certain private placements occurring simultaneously with such initial public offering (collectively, with interest accrued from time to time thereon, the "Trust Account") initially in an amount of approximately $414,000,000, which is for the sole benefit of Acquiror's public stockholders until the consummation by Acquiror of an initial business combination and redemption of all Acquiror IPO Shares that any such public stockholder may elect to have redeemed in connection therewith. For and in consideration of Acquiror entering into this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company hereby agrees that it does not now and shall not at any time hereafter have any right, title, interest or claim

A-59

of any kind in or to any monies in the Trust Account or distributions therefrom, or make any claim against the Trust Account, with respect to claims arising out of or relating to this Agreement, any Ancillary Agreement, or the transactions contemplated hereby or thereby, regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (any and all such claims are collectively referred to hereafter as the "Trust Claims"). The Company hereby irrevocably waives any Trust Claims it may have against the Trust Account (including any distributions therefrom) now or in the future as a result of, or arising out of, this Agreement and will not seek recourse against the Trust Account (including any distributions therefrom) for Trust Claims arising out of this Agreement; provided, that (i) nothing herein shall serve to limit or prohibit the Company's right to pursue a claim against Acquiror for legal relief against assets held outside the Trust Account, or for specific performance or other non-monetary equitable relief, and (ii) nothing herein shall serve to limit or prohibit any claims that the Company may have in the future against Acquiror's assets or funds that are not held in the Trust Account (including any funds that have been released from the Trust Account to Acquiror and any assets that have been purchased or acquired by Acquiror with any such funds). The Company agrees and acknowledges that such irrevocable waiver is material to this Agreement and specifically relied upon by Acquiror to induce it to enter into this Agreement with the Company, and the Company further intends and understands such waiver to be valid, binding and enforceable under applicable law.

Section 11.2. Waiver.   Any party to this Agreement may, at any time prior to the Closing, by action taken by its Board of Directors or other officers or Persons thereunto duly authorized, (a) extend the time for the performance of the obligations or acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties (of another party hereto) that are contained in this Agreement or (c) waive compliance by the other parties hereto with any of the agreements or conditions contained in this Agreement, but such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party granting such extension or waiver.

Section 11.3. Notices.   All notices and other communications among the parties shall be in writing and shall be deemed to have been duly given (i) when delivered in person, (ii) when delivered after posting in the United States mail having been sent registered or certified mail return receipt requested, postage prepaid, (iii) when delivered by FedEx or other nationally recognized overnight delivery service, or (iv) when delivered by email (in each case in this clause (iv), solely if receipt is confirmed, but excluding any automated reply, such as an out-of-office notification), addressed as follows:

(a)   If to Acquiror or Merger Sub prior to the Closing, to:

Northern Genesis Acquisition Corp. II
4801 Main Street, Suite 1000
Kansas City, MO 64112
Attention:   Ian Robertson
             Ken Manget
Email:       Ian.Robertson@northerngenesis.com
             Ken.Manget@northerngenesis.com

with copies to (which shall not constitute notice):

Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Attention: James G. Goettsch
Rebecca Taylor
Email: jim.goettsch@huschblackwell.com
rebecca.taylor@huschblackwell.com

(b)   If to the Company prior to the Closing, or to any Party after the Effective Time, to:

Embark Trucks Inc.
424 Townsend Street
San Francisco, CA 94107

A-60

Attention:    Alex Rodrigues
                    Siddhartha Venkatesan
Email:        alex@embarktrucks.com
                    sid@embarktrucks.com

with copies to (which shall not constitute notice):

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attention:    Justin G. Hamill
                    Marc A. Granger
Email:        justin.hamill@lw.com
                    marc.granger@lw.com

or to such other address or addresses as the parties may from time to time designate in writing. Copies delivered solely to outside counsel shall not constitute notice.

Section 11.4. <u>Assignment</u>.    No party hereto shall assign this Agreement or any part hereof without the prior written consent of the other parties and any such transfer without prior written consent shall be void. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

Section 11.5. <u>Rights of Third Parties</u>.    Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the parties hereto, any right or remedies under or by reason of this Agreement; <u>provided</u>, <u>however</u>, that (a) the D&O Indemnified Parties are intended third-party beneficiaries of, and may enforce, <u>Section 7.7</u> and this <u>Section 11.5(a)</u>, and any amendment thereof or of any other provision of this Agreement, in any case following the Closing, shall not be effective to adversely affect the rights of any such Person except to the extent that such Person has expressly agreed thereto in writing; and (b) the past, present and future directors, managers, officers, employees, incorporators, members, partners, stockholders, Affiliates, agents, attorneys, advisors and representatives of the parties, and any Affiliate of any of the foregoing (and their successors, heirs and representatives), are intended third-party beneficiaries of, and may enforce, <u>Section 11.16</u> and this <u>Section 11.5(b)</u>, and any amendment thereof or of any other provision of this Agreement, in any case following the Closing, shall not be effective to adversely affect the rights of any such Person except to the extent that such Person has expressly agreed thereto in writing.

Section 11.6. <u>Expenses</u>.    Except as otherwise set forth in this Agreement, each party hereto shall be responsible for and pay its own expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of its legal counsel, financial advisers and accountants; <u>provided</u>, that if the Closing shall occur, Acquiror shall (x) pay or cause to be paid, the Unpaid Company Transaction Liabilities, and (y) pay or cause to be paid, any Outstanding Acquiror Expenses, in each of case (x) and (y), in accordance with <u>Section 2.4(c)</u>. For the avoidance of doubt, any payments to be made (or to cause to be made) by Acquiror pursuant to this <u>Section 11.6</u> shall be paid upon consummation of the Merger and release of proceeds from the Trust Account.

Section 11.7. <u>Governing Law</u>.    This Agreement, and all claims or causes of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to principles or rules of conflict of Laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

Section 11.8. <u>Headings; Counterparts</u>.    The headings in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 11.9. <u>Company and Acquiror Disclosure Letters</u>.    The Company Disclosure Letter and the Acquiror Disclosure Letter (including, in each case, any section thereof) referenced herein are a part of this

A-61

Agreement as if fully set forth herein. All references herein to the Company Disclosure Letter and/or the Acquiror Disclosure Letter (including, in each case, any section thereof) shall be deemed references to such parts of this Agreement, unless the context shall otherwise require. Any disclosure made by a party in the applicable Disclosure Letter, or any section thereof, with reference to any section of this Agreement or section of the applicable Disclosure Letter shall be deemed to be a disclosure with respect to such other applicable sections of this Agreement or sections of applicable Disclosure Letter if it is reasonably apparent on the face of such disclosure that such disclosure is responsive to such other section of this Agreement or section of the applicable Disclosure Letter. Certain information set forth in the Disclosure Letters is included solely for informational purposes and may not be required to be disclosed pursuant to this Agreement. The disclosure of any information shall not be deemed to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made in this Agreement, nor shall such information be deemed to establish a standard of materiality.

Section 11.10. Entire Agreement.    (i) This Agreement (together with the Company Disclosure Letter and the Acquiror Disclosure Letter), (ii) the Sponsor Support Agreement and Company Holders Support Agreement, and (iii) the Confidentiality Agreement, dated as of March 22, 2021, between Acquiror and the Company (the "Confidentiality Agreement")(clauses (ii)-(iii), collectively, the "Ancillary Agreements"), constitute the entire agreement among the parties to this Agreement relating to the transactions contemplated hereby and supersede any other agreements, whether written or oral, that may have been made or entered into by or among any of the parties hereto or any of their respective Subsidiaries relating to the transactions contemplated hereby. No representations, warranties, covenants, understandings, agreements, oral or otherwise, relating to the transactions contemplated hereby exist between such parties except as expressly set forth in this Agreement and the Ancillary Agreements.

Section 11.11. Amendments.    This Agreement may be amended or modified in whole or in part, only by a duly authorized agreement in writing executed in the same manner as this Agreement and which makes reference to this Agreement.

Section 11.12. Publicity.

(a)   All press releases or other public communications relating to the transactions contemplated hereby, and the method of the release for publication thereof, shall prior to the Closing be subject to the prior mutual approval of Acquiror and the Company, which approval shall not be unreasonably withheld by any party; provided, that no party shall be required to obtain consent pursuant to this Section 11.12(a) to the extent any proposed release or statement is substantially equivalent to the information that has previously been made public without breach of the obligation under this Section 11.12(a).

(b)   The restriction in Section 11.12(a) shall not apply to the extent the public announcement is required by applicable securities Law, any Governmental Authority or stock exchange rule; provided, however, that in such an event, the party making the announcement shall use its commercially reasonable efforts to consult with the other party in advance as to its form, content and timing. Disclosures resulting from the parties' efforts to obtain approval or early termination under the HSR Act and to make any relating filing shall be deemed not to violate this Section 11.12.

Section 11.13. Severability.    If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the parties.

Section 11.14. Jurisdiction; Waiver of Jury Trial.

(a)   Any proceeding or Action based upon, arising out of or related to this Agreement or the transactions contemplated hereby must be brought in the Court of Chancery of the State of Delaware (or, to the extent such court does not have subject matter jurisdiction, the Superior Court of the State of

A-62

TABLE OF CONTENTS

Delaware), or, if it has or can acquire jurisdiction, in the United States District Court for the District of Delaware, and each of the parties irrevocably (i) submits to the exclusive jurisdiction of each such court in any such proceeding or Action, (ii) waives any objection it may now or hereafter have to personal jurisdiction, venue or to convenience of forum, (iii) agrees that all claims in respect of the proceeding or Action shall be heard and determined only in any such court, and (iv) agrees not to bring any proceeding or Action arising out of or relating to this Agreement or the transactions contemplated hereby in any other court. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by Law or to commence Legal Proceedings or otherwise proceed against any other party in any other jurisdiction, in each case, to enforce judgments obtained in any Action, suit or proceeding brought pursuant to this Section 11.14.

(b)    EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 11.15. Enforcement.    The parties hereto agree that irreparable damage could occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specific enforcement of the terms and provisions of this Agreement, in addition to any other remedy to which any party is entitled at law or in equity. In the event that any Action shall be brought in equity to enforce the provisions of this Agreement, no party shall allege, and each party hereby waives the defense, that there is an adequate remedy at law, and each party agrees to waive any requirement for the securing or posting of any bond in connection therewith.

Section 11.16. Non-Recourse.    Except in the case of claims against a Person in respect of such Person's actual fraud:

(a)    this Agreement may be enforced only against, and any claim or cause of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby may be brought only against, the Company, Acquiror and Merger Sub as named parties hereto; and

(b)    except to the extent a named party hereto, no Person (including (i) any past, present or future director, officer, employee, incorporator, member, partner, stockholder, agent, attorney, advisor or representative or Affiliate of the Company, Acquiror or Merger Sub and (ii) any past, present or future director, officer, employee, incorporator, member, partner, stockholder, agent, attorney, advisor or representative or Affiliate of any of the foregoing) shall have any liability (whether in Contract, tort, equity or otherwise) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of any one or more of the Company, Acquiror or Merger Sub under this Agreement or for any claim based on, arising out of, or related to this Agreement or the transactions contemplated hereby, except to the extent of the specific obligations expressly under taken by such Person in a separate written agreement.

Section 11.17. Non-Survival of Representations, Warranties and Covenants.    Except (x) as otherwise contemplated by Section 10.2 or (y) in the case of claims against a Person in respect of such Person's actual fraud, none of the representations, warranties, covenants, obligations or other agreements in this Agreement or in any certificate, statement or instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations, warranties, covenants, obligations, agreements and other provisions, shall survive the Closing, and all of the representations, warranties, covenants, obligations or other agreements in this Agreement shall terminate and expire upon the occurrence of the Effective Time (and there shall be no liability after the Closing in respect thereof), except for (a) those covenants and agreements contained herein that by their terms expressly apply in whole or in part after the Closing and then only with respect to any breaches occurring after the Closing and (b) this Article XI.

A-63

TABLE OF CONTENTS

Section 11.18. <u>Conflicts and Privilege</u>.

(a)  Acquiror and the Company, on behalf of their respective successors and assigns (including, after the Closing, the Surviving Corporation), hereby agree that, in the event a dispute with respect to this Agreement or the transactions contemplated hereby arises after the Closing between or among (x) the Sponsor, the stockholders or holders of other equity interests of Acquiror or the Sponsor and/or any of their respective directors, members, partners, officers, employees or Affiliates (other than the Surviving Corporation) (collectively, the "<u>NG Group</u>"), on the one hand, and (y) the Surviving Corporation and/or any member of the Embark Group, on the other hand, any legal counsel, including Husch Blackwell LLP ("<u>Husch Blackwell</u>"), that represented Acquiror and/or the Sponsor prior to the Closing may represent the Sponsor and/or any other member of the NG Group in such dispute even though the interests of such Persons may be directly adverse to the Surviving Corporation, and even though such counsel may have represented Acquiror in a matter substantially related to such dispute, or may be handling ongoing matters for the Surviving Corporation and/or the Sponsor. Acquiror and the Company, on behalf of their respective successors and assigns (including, after the Closing, the Surviving Corporation), further agree that, as to all legally privileged communications prior to the Closing (made in connection with the negotiation, preparation, execution, delivery and performance under, or any dispute or Action arising out of or relating to, this Agreement, any Ancillary Agreements or the transactions contemplated hereby or thereby) between or among Acquiror, the Sponsor and/or any other member of the NG Group, on the one hand, and Husch Blackwell, on the other hand, the attorney/client privilege and the expectation of client confidence shall survive the Merger and belong to the NG Group after the Closing, and shall not pass to or be claimed or controlled by the Surviving Corporation. Notwithstanding the foregoing, any privileged communications or information shared by the Company prior to the Closing with Acquiror or the Sponsor under a common interest agreement shall remain the privileged communications or information of the Surviving Corporation.

(b)  Acquiror and the Company, on behalf of their respective successors and assigns (including, after the Closing, the Surviving Corporation), hereby agree that, in the event a dispute with respect to this Agreement or the transactions contemplated hereby arises after the Closing between or among (x) the stockholders or holders of other equity interests of the Company and any of their respective directors, members, partners, officers, employees or Affiliates (other than the Surviving Corporation) (collectively, the "<u>Embark Group</u>"), on the one hand, and (y) the Surviving Corporation and/or any member of the NG Group, on the other hand, any legal counsel, including Latham & Watkins LLP ("<u>Latham</u>") that represented the Company prior to the Closing may represent any member of the Embark Group in such dispute even though the interests of such Persons may be directly adverse to the Surviving Corporation, and even though such counsel may have represented Acquiror and/or the Company in a matter substantially related to such dispute, or may be handling ongoing matters for the Surviving Corporation. Acquiror and the Company, on behalf of their respective successors and assigns (including, after the Closing, the Surviving Corporation), further agree that, as to all legally privileged communications prior to the Closing (made in connection with the negotiation, preparation, execution, delivery and performance under, or any dispute or Action arising out of or relating to, this Agreement, any Ancillary Agreements or the transactions contemplated hereby or thereby) between or among the Company and/or any member of the Embark Group, on the one hand, and Latham, on the other hand, the attorney/client privilege and the expectation of client confidence shall survive the Merger and belong to the Embark Group after the Closing, and shall not pass to or be claimed or controlled by the Surviving Corporation. Notwithstanding the foregoing, any privileged communications or information shared by Acquiror prior to the Closing with the Company under a common interest agreement shall remain the privileged communications or information of the Surviving Corporation.

[Remainder of page intentionally left blank]

A-64

TABLE OF CONTENTS

IN WITNESS WHEREOF the parties have hereunto caused this Agreement to be duly executed as of the date first above written.

**NORTHERN GENESIS ACQUISITION CORP. II**

By: /s/ Ian Robertson
       Name: Ian Robertson
       Title: Chief Executive Officer

**NGAB MERGER SUB INC.**

By: /s/ Ian Robertson
       Name: Ian Robertson
       Title: President

**EMBARK TRUCKS INC.**

By: /s/ Alex Rodrigues
       Name: Alex Rodrigues
       Title: Chief Executive Officer

[*Signature Page to Agreement and Plan of Merger*]