Pages 1-36

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

TYLER HARDY and DANNY           ) Case No.  22-cv-02090-JSC
ROCHEFORT, Individually and On  )
Behalf of All Others Similarly  ) San Francisco, California
Situated,                       ) Courtroom 8, 19th Floor
                                ) Thursday, March 23, 2023
            Plaintiffs,         )
                                )
        v.                      )
                                )
EMBARK TECHNOLOGY, INC., f/k/a  )
NORTHERN GENESIS ACQUISITION    )
CORP. II, IAN ROBERTSON, KEN    )
MANGET, CHRISTOPHER JARRATT,    )
PAUL DALGLISH, ROBERT SCHAEFER, )
BRAD SPARKES, ALEX RODRIGUES,   )
and RICHARD HAWWA,              )
                                )
            Defendants.         )
_____)


                TRANSCRIPT OF MOTION HEARING
        BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY
              UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For Plaintiffs:            BRENDA SZYDLO, ESQ.
                          Pomerantz LLP
                          600 Third Avenue, 20th Floor
                          New York, New York 10016
                          (212) 661-1100

For Defendants:           KEVIN P. MUCK, ESQ.
                          MADEEHA DEAN, ESQ.
                          Wilmer Cutler Pickering Hale
                          and Dorr LLP
                          One Front Street, Suite 3500
                          San Francisco, California 94111
                          (628) 235-1000


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

2

APPEARANCES:   (Cont'd.)

Transcription Service:          Peggy Schuerger
                                Ad Hoc Reporting
                                2220 Otay Lakes Road, Suite 502-85
                                Chula Vista, California 91915
                                (619) 236-9325

3

SAN FRANCISCO, CALIFORNIA  THURSDAY, MARCH 23, 2023  10:24 A.M.

--oOo--

**TRANSCRIBER NOTE:  The hearing was recorded on one channel, so voices trailed off and were not able to be transcribed.  There were also parts of the audio where there was no audible recording. The transcript was prepared to the best of this transcriber's ability.**

THE CLERK:  Calling Civil Action 22-cv-2090, Hardy v. Embark Technology.

THE COURT:  Okay.

MS. SZYDLO:  Brenda Szydlo, Pomerantz, for Plaintiff.

THE COURT:  All right.  Good morning.

MS. SZYDLO:  Good morning.

MR. MUCK:  Good morning, Your Honor.  Kevin Muck of Wilmer Hale for the Defendants.

MS. DEAN:  Good morning, Your Honor.  Madeeha Dean on behalf of the Defendants.

THE COURT:  Good morning.  Okay.  This is on for Defendants' motion to dismiss the amended complaint, which was a little bit different from your original complaint, probably the biggest pivot I have ever seen, but you've got to take the allegations as they are and we'll address them.

So to begin with, though, I need to raise something with Plaintiffs' opposition and the footnotes.  So as you know, because you're *pro hac vice*, the Local Rules require the text, including

4

footnotes, to be 12 point or larger.  Your footnotes are not quite 10.  They're voluminous.  They probably, if you had actually complied with the Local Rule, would have added several pages to your brief, which would put you over the briefing schedule. They're impossible to read.

MS. SZYDLO:  My apologies, Your Honor.  I was unaware.

THE COURT:  Unaware of what?

MS. SZYDLO:  That my font -- that the footnotes were offending the Rule.

THE COURT:  Okay.  But you're supposed to -- you're admitted *pro hac vice* and you certify that you're going to be familiar with the Rules; right?  So I accept your apology.  I'm striking the footnotes.  I mean, to be honest, I just find it impossible -- it's actually not good advocacy.  It's very hard for the judges or the law clerks to follow them, to read them.  But also, by sticking to the page limit, it forces you to really focus.  It makes your arguments better.  But, anyway, you shouldn't put anything in the footnotes that matters anyway.  So I just want you to know I'm not going to address them and I'm going to strike them.  Okay?

All right.  So let's start then -- I think let's start with sort of the main issue which is whether the Plaintiffs have pled an actionable misstatement.  As I understand it, we're really talking about the June 2021 financial statements, all of them except not the balances, right, not the balances.  Okay.  I got

that.  And basically what your argument is is that because the June 2021 financial statements are based upon I'll say Embark -- I know they weren't Embark at the time -- Embark classifying approximately ten percent of the Class A common shares of permanent equity rather than temporary equity for data and underlined those decisions in the financial statements are false.

MS. SZYDLO:  Yes.  It's strictly within the respect that --

THE COURT:  Right.

MS. SZYDLO:  -- (indiscernible) all the other --

THE COURT:  Right, but it all emanates from the -- the classifying ten percent of permanent rather than temporary.

MS. SZYDLO:  Purely based on a custom that was not proper.

THE COURT: Well, a custom that was not proper, and they subsequently admitted was an error.

MS. SZYDLO:  In August, before the proxy (inaudible).

THE COURT:  Yes, because the proxy itself then said, We are now classifying all of them as a hundred percent temporary, but they didn't restate the financial statements as of June 2021, the three and six months that were attached to the registration program.

MS. SZYDLO:  That is correct, Your Honor.

THE COURT:  All right.  So I guess what I'm struggling with is why the decision which this all emanates from, the

classified ten percent permanent, isn't an opinion within *Omni* or *City of Dearborn*?

MS. SZYDLO:  I'm happy to address that, Your Honor. Defendants argue that Plaintiffs' claims turned on the exercise of accounting software and therefore analyzes challenges to opinion statements because subject to special requirements that they contend Plaintiffs cannot satisfy, that they are wrong.  The company acknowledged by their released statements that it failed to follow GAAP, and such failure, rather than an exercise of the common shares because its financial statements --

THE COURT:  Wait.  I'm going to stop you there.  They admitted it was an error.  But *Omni* and *Dearborn* recognized that an opinion can be wrong.  An opinion can be wrong, so that they admitted it was an error.  It was an error in judgment, not a change in judgment.  I mean, it wasn't a change in judgment.  But -- and maybe to this day they would still say they were right. But they admitted -- and I can draw the inference -- that it was an error, that at the time it was made, it was an erroneous interpretation of AS 480 blah, blah, blah.

MS. SZYDLO:  No.  It was not an erroneous interpretation.  They went from a custom and did not follow GAAP. There was no option to follow this -- you have to follow GAAP. They just threw their hands up in the air and said, Well, we've got to live up to our charter that says we have to have five million shares in order to do this merger.  We can't exist --

THE COURT: Okay. So can you point to me where in the GAAP, in the ASC, it says clearly, unequivocally that they had no -- there was no discretion, no judgment in it. Where in it would I find that because I didn't see that cited in your brief.

MS. SZYDLO: They already went through the analysis and said that, as you say, that these are all shares that should be counted as temporary.

THE COURT: Yes.

MS. SZYDLO: They followed the -- they were intending to follow GAAP and then all of a sudden they said, Well, we're going to follow custom and that they were --

THE COURT: Okay. So your complaint also alleges -- and maybe it's in the article that you attached, but that I can consider because you refer to it, the Marcum article -- that this has been the custom for ten years.

MS. SZYDLO: And in June of 202- --

THE COURT: One.

MS. SZYDLO: -- 1, the SEC says, Hey, folks, you're not following GAAP. And so a number of SPACs -- that was the name of the sort of accounting -- had to change the accounting. And they say in August, We recognize we -- we had to do this. So we changed it. But they didn't say we're changing this because the SEC spoke up and said we're not following GAAP. Hey, everyone, let's follow GAAP. They changed it -- they said, We're going to make this change here because of forward purchase agreement. So

they were clear -- they said -- they called it a change in value, but that was incorrect.  Defendants contend that GAAP sometimes requires judgment, and that is true.  But not here.  In this case, Defendants did not have a choice between different actions under Generally-Accepted --

THE COURT:  Why not?  What is it because that's what I'm saying.  Can you please show me --

MS. SZYDLO:  Yes.

THE COURT:  -- in it and what -- do you have it attached to yours?

MR. MUCK:  The full text of 480, Your Honor?

THE COURT:  Yeah.

MR. MUCK:  No.  I believe the Plaintiffs did --

THE COURT:  I have it here.

MR. MUCK:  -- provide it with their opposition.

MS. SZYDLO:  Paragraph 71 of my complaint says, "Since SPACs are SEC registrants, they must consider the possibility that shares issued in the legal form of equity may require classification as temporary equity instruments under ASC 480-S99-3A if they are redeemable at:  (1) a fixed or determinable price on a fixed or determinable date, (2) the option of the holder, or (3) upon the occurrence of an event that is not solely within the control of the issuer.

So in this case --

THE COURT:  Why does it allege "may require"?

MS. SZYDLO:  What?

THE COURT:  It says "may require," not "require."  It says "may require."  That's what your allegation says.

MS. SZYDLO:  That's just the language, "may require classification" --

THE COURT:  That's the language that you need to consider that.  But they --

MS. SZYDLO:  Exactly.

THE COURT:  Wait, wait.  You just told me that they are correct that sometimes when you apply GAAP, it requires accounting judgment -- and you have to say that because the Supreme Court has actually --

MS. SZYDLO:  Yes.

THE COURT:  -- said that.

MS. SZYDLO:  Yes.

THE COURT:  And here, you're saying -- you're alleging in your complaint "may require."  That in itself purports an inference.  The only inference actually is of accounting judgment.  So now I'm saying show me the actual AS 480 where in it I could look to and say, There was no accounting judgment here.  This was -- this was just thumbing their nose at it.

MS. SZYDLO:  The June financial statement that we followed this rule and we've made this determination and then they pick a portion of it and follow custom until June.  Then they say, We've made -- we're doing this differently here.  We're following

10

this rule.  We're following this rule.  And then they don't.  They don't bring the change.  All they -- the balance sheet and the other parts of the financial --

THE COURT:  Okay.  So now I'm a little confused.  So that sounds like a different -- one is --

THE COURT:  So then they didn't restate it.  They didn't -- once they changed it and said, We're now classifying them  as a hundred percent temporary.

MS. SZYDLO:  In June, for their June -- yes.

THE COURT:  They didn't restate their June financial statement.

MS. SZYDLO:  No.

THE COURT:  Okay.

MS. SZYDLO:  They used the same numbers from the prior order.

THE COURT:  Okay.  So -- which means what?

MS. SZYDLO:  So instead of saying, Let's make a restatement here and make this clear, they didn't -- they had to deal with the numbers from the prior order.  So they said, We have to make a change here.  And we're going to call this forward purchase agreements.  We're making a change here because of forward purchase agreements.

THE COURT:  I don't know what you're talking about, I have to tell you.  So let's just stop and focus on the misstatement.  Okay?

11

So the -- the misstatement is the June 2021 --

MS. SZYDLO:  Yes.

THE COURT:  Right?  And we're talking about whether it's opinion or not.

MS. SZYDLO:  Yes.

THE COURT:  And is that a different misstatement now you're saying because they didn't reclassi- -- because they didn't issue a restatement?  Are you alleging that?

MS. SZYDLO:  So in paragraph 89 of my complaint, I set forth all the numbers that are incorrect.

THE COURT:  Yes.  I understand that.

MS. SZYDLO:  And they're material.

THE COURT:  And I can -- I can draw those inferences.

MS. SZYDLO:  Okay.

THE COURT:  Okay?  I can draw those inferences.

MS. SZYDLO:  Yes.

THE COURT:  I accept that.

MS. SZYDLO:  So in June, for the June financial statements, they should have issued a restatement.

THE COURT:  Okay.  So you're alleging then that that was not -- that's just -- at that point, even if -- which you don't agree with.  I understand -- even if their initial decision to classify it at ten percent as permanent, it could arguably be an opinion and, therefore, we have to apply a more difficult standard; correct?

12

MS. SZYDLO:  I didn't argue that it was an opinion.  It was just wrong.  It was just filing a custom.

THE COURT:  I understand your argument.  But even with that, you'd said once they themselves acknowledged the error, --

MS. SZYDLO:  Yes.

THE COURT:  -- then there's -- they can't say it's just an opinion at that point because at that point, their opinion actually is it needs to be a hundred percent temporary.  By failing to restate the June 2021, that -- then it's no longer an opin- -- there's no argument that it's an opinion?

MS. SZYDLO:  Exactly, and all the numbers are wrong on everything except the balance sheet.  And so in this case, Defendants did not have a choice between different options under Generally-Accepted Accounting Principles.  The choice was between following GAAP or following a non-GAAP industry practice --

THE COURT:  So, no, no, no.  Wait, wait, wait.  Now we're talking about the restatement because now what you're saying that they didn't restate and they didn't have -- that was an opinion.  They had to restate.  Where is that alleged in your complaint?  What paragraph? -- that they had to restate -- and by the way, what rule governs when a company decides to restate or not?

MS. SZYDLO:  ASC 250 which is in my declaration.

THE COURT:  Okay.  But is it in your complaint?

MS. SZYDLO:  I'm not sure if it says the word -- you

have to restate.

THE COURT: Yeah. I don't think that was a theory that was --

MS. SZYDLO: But -- yes. It says on paragraph 83, "The SEC required formal restatements." So of SPACs like this one as well as others.

THE COURT: And they required it because-- they required it when, how, through what?

MS. SZYDLO: Apparently through --

THE COURT: No, not apparently. This is your complaint. What are you alleging?

MS. SZYDLO: I'm alleging that the SEC called a number of these SPACs that they had to issue restatements.

THE COURT: And where is that in the complaint?

MS. SZYDLO: I said in paragraph 83, "SPACs and their auditors initially tried to fix their misclassification of redeemable share with what was referred to as small-R revisions, which are minor corrections that get disclosed in the next period's financial statements, but the SEC required formal restatements."

THE COURT: Okay. Based on what?

MS. SZYDLO: Based on this error because --

THE COURT: No, no, no. What required the formal restatement?

MS. SZYDLO: The materiality of this -- of these errors.

14

I mean --

THE COURT:  And where does that come from?

MS. SZYDLO:  Why is it material?

THE COURT:  No.  Like what is it?  What are we looking at that I can say there was no opinion that was involved in it, that they had no choice, that they had to restate in August 2021 when they made the decision, Uh, we were wrong -- I can draw that inference.  We were wrong.  It needs to be a hundred percent temporary.  Now, your argument is that they had to restate in August 2021.  Therefore, in October 2021, when the registration, the definitive one, was issued, it was false -- and there's no argument that it was an opinion because they didn't have any choice.

MS. SZYDLO:  Just the change in accounting principles, and that is ASC 250-10-20 in the glossary.  It says that, A change from an accounting principle that is not generally accepted to one -- that is generally accepted is a correction of an error.  And this is all in the glossary and it talks about restatement.

And if you look at my declaration, if you look at page -- ECF page 7 of my declaration exhibit -- correction of an error in previously-issued financial statements.  You could go to 23 --

THE COURT:  Do you have a case that holds a failure to issue a restatement makes everything in the statement a false statement of fact and it's not an opinion?

15

MS. SZYDLO: No, but this is a situation where, as I said, it's the correction -- ASC 250-10-20 says that when you're making a change from an accounting principle that is not generally accepted, which is this custom, to one that is generally accepted, is the correction of an error and that has to be restated under the rules -- correction of an error in previously-issued financial statements.

THE COURT: Where did you allege that prior to June 2021, when the SEC started making noise about it, that it wasn't generally accepted? Because your complaint alleges that it was in June 2021 that the SEC started raising this issue.

MS. SZYDLO: And we started saying that -- we made allegations about what the SEC was saying, that they said that, You're not following GAAP and we need everyone to -- from this point on to make sure that you're -- you're following GAAP. And those allegations are in my complaint.

THE COURT: All right. Mr. Muck, let's start with -- I think we have two potential misstatements here all emanating from the June 2021 statement, the first being the decision to -- to classify ten percent as permanent and the second being the decision not to issue a restatement.

MR. MUCK: All right, Your Honor. So with respect to the first, I think we discussed in our papers the reasons why this was an exercise of judgment. The way that this company initially accounted for these shares was consistent with the way other

16

companies have.  And --

THE COURT:  Can I ask you something?

MR. MUCK:  Sure.

THE COURT:  I don't know why, since I draw inferences in the Plaintiffs' favor, that gets you there.  It's like when -- you know, like we always told our children:  If everyone jumps off the cliff, do you follow them?  Right?

MR. MUCK:  Well, and it's not that by itself, Your Honor, but that's an important fact.  But what the critical fact is is that ASC 480 specifically talks about considerations that need to be taken into account in making a determination on a particular situation whether or not shares should be classified as either permanent or temporary.  This is virtually identical to the situation that Judge Seeborg faced in the *Skills* case.

THE COURT:  True, except he didn't give us very much in that one.

MR. MUCK:  He did not.  He did not, but Judge Gilliam's decision in *Hunt v. Bloom Energy* I think does go into this in a lot more detail.  It's not the same issue, but it's very similar.  And what Judge Gilliam said in that case is that if we're dealing with a provision of GAAP that doesn't set forth clear, objective standards but, rather, it requires an issuer to consider various factors based on the facts and circumstances peculiar to it, then that is generally going to be a situation in which accounting judgment is implicated and, therefore, we have an opinion.

17

I think that's very clearly the case with respect to the initial determination. And the reason why common practice is relevant, Your Honor, is because you have, by Plaintiffs' admission, all of these other issues and their auditors making a determination that this was an acceptable way of interpreting ASC 480, and the SEC saying absolutely nothing about this until apparently the allegation is actually July of 2021. And even then, it's the SEC having discussions, according to the Plaintiffs, with particular issues. Notably, not a single communication is alleged with respect to this issuer in this case. But nonetheless, the SEC was clearly, over the summer and into the fall of 2021, talking to issuers and making clear that in most, if not all, of these circumstances, it did not agree with the way that that accounting judgment was being exercised.

That's fine. So -- but I think it's very clear when you look at the cases -- and, again, I think that the *Bloom Energy* case from Judge Gilliam is especially instructive, this was an exercise of accounting checking.

THE COURT: I think actually Judge Kaplan's is a little bit more on point because there it also is financial statements --

MR. MUCK: Yes.

THE COURT: -- like we have here in which accounting principles were applied to arrive at the data --

MR. MUCK: Right.

THE COURT: -- which is alleged to be false. Right?

MR. MUCK:  Correct.  That's correct.  And, again, in that date and time with the end classification.  Yes.  And, again, in that case, similar situation to what Judge Gilliam talked about which is you don't have a clear black-and-white objective standard to determine.  It requires some judgment.

THE COURT:  Can you -- I mean, I can see the argument, right -- you go right back to the last -- Oh, it's the slippery slope and are you saying that, therefore, a financial statement is always an opinion?

MR. MUCK:  No, absolutely not.  And Plaintiffs have cited some cases where courts have said this is not a matter where any judgment was required.  There are some black-and-white areas where clearly courts have appropriately said, No, that's not an opinion.  This isn't one of them.  It wasn't one of them with respect to the initial determination and it wasn't with respect to the decision as to whether a full-blown restatement was required.

And for that, Your Honor, I would point to then, for the same paragraph that Plaintiffs' counsel pointed to, 83, which talks about the fact that "Auditors initially made the determination that a full restatement wasn't necessary."

And the Plaintiffs have also relied heavily upon that Marcum article that Your Honor mentioned earlier.  That makes the same point.  The date of that Marcum article, interestingly, is October 19th, the day after the registration statement was declared effective by the SEC.  And what does Marcum say?  Marcum

says that if you're going to make a reclassification of these shares, you also need to make a decision whether or not it's material and whether or not a restatement is required. And that is going to require again a facts and circumstances analysis.

So for the very same reasons that the initial determination required accounting judgment and it's an opinion, so, too, was the decision that was made that a full restatement wasn't required at that time. The company acknowledged that it was now treating all of these shares as temporary equity, none as permanent equity. It did not determine that a full restatement was necessary. It ultimately did at the end of November but, as Your Honor has seen from the materials in the record, we cited news article that talked about the fact that a number of companies went through exactly the same exercise.

THE COURT: Well, I don't know that I can compare those news articles.

MR. MUCK: Well, I think it's -- except, Your Honor, I think it's relevant to the issue that the Plaintiffs themselves have put into their complaint with respect to this Marcum article because --

THE COURT: Well, it may be relevant. I don't know that on a 12(b)(6) I can consider that.

MR. MUCK: Fair enough.

THE COURT: It may very well be relevant.

MR. MUCK: Fair enough, Your Honor.

20

THE COURT:  I think I can consider the Marcum article.

MR. MUCK:  Yes, because it's incorporated by reference.

THE COURT:  Correct.  Okay.

MS. SZYDLO:  So in the August financial statement for the June order, I was trying to explain earlier that Defendants -- very misleading.  The disclosures that Defendants point towards misleading because the proxy statement prospectus mischaracterized the correction of accounting errors as a change in value of redeemable shares due to the impact of forward purchase agreements.

THE COURT: Well, I read that in your brief and I didn't know what you were talking about.  Can you point to me in the complaint where you make that allegation, that it was misleading because of the change in the way they characterized it?

MS. SZYDLO:  I can't, Your Honor.

THE COURT:  Because it's not in there, so let's not talk about it.

MS. SZYDLO:  They point to disclosures saying that things aren't material.  And --

THE COURT:  I know, but in terms of whether your complaint states a claim, I need to look at the claims that your complaint states, and your complaint, as you just -- I appreciate that -- candidly admitted, doesn't allege that misrepresentation.

MS. SZYDLO:  I'm just trying to say that the disclosure that's in here doesn't take away from the materiality of their

error.

THE COURT:  Okay.  I think that's a different --

MS. SZYDLO:  Okay.

THE COURT:  We're not -- we're not focusing --

MS. SZYDLO:  Okay.

THE COURT:  -- on the materiality right now.  I don't -- I mean, there certainly is -- I mean, you've alleged -- another issue is you alleged materiality of why investors -- which makes sense -- would want to know about the ten percent versus -- I think their materiality argument is given that the prospectus, the definitive one -- at least starting in August -- said we are characterizing them as a hundred percent temporary and that the balance sheet was correct, why would an investor care about the unrestated (indiscernible)?  But let's put materiality aside.  I'm not sure I -- that if I draw inferences in your favor, I could find --

MS. SZYDLO:  Well, investors -- the integrity of the company's financial statement is always important to investors, Your Honor.  And beyond the quantitatively material errors and eventual corrections, such errors will qualitatively be material to investors for a number of reasons.

The company was itself under the impression that it could only complete a merger and continue to exist as a public company if public shares are not redeemed that would cause its net tangible assets to be less than five million following such

22

redemption.

THE COURT:  Because it was a no charter.

MS. SZYDLO:  It was a no charter.  So it's especially -- if the entire premise for facilitating this fact was undermined by the improper accounting, you could understand why this would be very important to investors.

THE COURT:  That's a different -- I don't know if they were or not.  But they're not saying that the temporary versus permanent wasn't material.  I don't think they can anyway if they are.  But they're not saying that.  I agree with you.  That is -- but what they're saying is by the time you get to August, they admitted, We don't have that five million in equity anymore because a hundred percent is now being classified as temporary and, therefore, why would an investor care if the June 2021 financial statements are premised on our old accounting?  However, I don't -- I wouldn't rule based on that materiality.  I think that's not -- drawing all inferences in your favor, that would be hard to say that that can't be material.  I don't know.  I don't know enough; right?  I don't know how investors look at --

MS. SZYDLO:  I was going to say that Lindsay McCord, Chief Accountant in the Division of Corporate Finance at the SEC, stated in December 2021 that "some investors consider a registrant's history of discovering and correcting accounting errors as an indicator of the reliability of current financial results.  So misstatements of stockholders' equity, one of the

critical early-stage measures for a once blank-check company attempting to be publicly traded, can create an inference of unreliable financial reporting." And I think investors would care whether it's a small-R revision restatement or whether it's a full-blown.

THE COURT: All right. I think I understand -- is there anything else you wanted to say, Mr. Muck, on that?

MR. MUCK: No, Your Honor.

THE COURT: So let's talk a little bit about the statutory standing.

MS. SZYDLO: I neglected to say one more thing --

THE COURT: Sure.

MS. SZYDLO: -- if I could about this opinion. Again, there was never any choice. They were always supposed to follow GAAP. They did the --

THE COURT: You mean, GAAP required them to file a restatement?

MS. SZYDLO: No. I'm trying to say that with respect to Section 480, that that all focused on opinion. But they did the analysis and then -- because of custom, not because of GAAP -- they said a small portion have to be --

THE COURT: Wait. They did -- so that's different. Because, of course, even if it was opinion, if you could allege that they did the analysis and concluded that it should be a hundred percent temporary but they nonetheless classified ten

24

percent as permanent, well, then even if it's an opinion, you would still then satisfy the *Omni* burden.  But you haven't alleged that.

MS. SZYDLO:  They say in those financial statements that they follow 480, and that -- and that -- let's see --

THE COURT:  No.  I understand.  Your argument is that it's so clear that they must have -- that they must have known it was a hundred -- it should have been a hundred percent temporary.

MS. SZYDLO:  Their statement is, We follow this rule, that all of our -- and --

THE COURT:  No.  I understand you said they say they follow the rule and, therefore, the rule is so clear when they say they follow the rule, they must have known that it was -- should have been a hundred percent temporary.

MS. SZYDLO: It's -- their accounting policies disclosed in the -- at F-25, I think it says something more than that, Your Honor.

THE COURT:  Well, F-26 is when they said they changed it; right?  Yeah.

MS. SZYDLO:  (Indiscernible.)

THE COURT:  Yeah.

MS. SZYDLO:  And -- and yet everything except the balance sheet was still incorrect.

THE COURT:  Oh, no.  I understand that's what we're talking about.  Okay.  All right.  I got that.  All right.  So

let's talk about statutory standing.  I think this is -- and this is not my bailiwick.  There's a registration statement and there's registration fees that are paid; right?  Can you tell me where that is?

MR. MUCK:  Where in the record, Your Honor?

THE COURT:  Yeah.  I want to look at it.

MR. MUCK:  It is --

THE COURT:  Oh, Exhibit N.3.

MR. MUCK:  N, Your Honor.

THE COURT:  Yeah, at ECF 3.  And it lists the registration fees.

MR. MUCK:  Yes.  Exactly.

THE COURT:  Okay.  Are any of those the shares that were issued in January 2021?

MR. MUCK:  No.

THE COURT:  Okay.  Do you contend that any of those are the shares that were issued in 2021?

MS. SZYDLO:  I contend that all the shares are newly-issued shares because --

THE COURT:  That --

MS. SZYDLO:  -- because the language in their --

THE COURT:  I'm not getting your argument.  I read your complaint.  I had a different question from the decider that you can answer or not.  If you don't want to, then I'll know the answer.

26

MS. SZYDLO:  I didn't -- can you repeat the question?

THE COURT:  If you look at Exhibit N, --

MS. SZYDLO:  Uh-huh.

THE COURT:  -- which is the registration statement --

MS. SZYDLO:  Yes.

THE COURT:  -- from October 8th, 2021, there -- it lists the securities to be registered -- title of each class of securities to be registered and the fees that are paid, are any of those Class A -- the class being Class A -- shares that were registered and sold in January 2021?

MS. SZYDLO:  I don't know.

THE COURT:  Okay.  You don't know.  So you're not alleging that they are?

MS. SZYDLO:  I'm alleging that -- that all newly-issued shares would be issued.

THE COURT:  Okay.  As an officer of the court, all right, as an officer of the court -- and you know how to read these things and you know these things, how they work -- as an officer of the court, are you telling me that Mr. Hardy could allege in good faith and subject to Rule 11, that those three classes of shares, each class of securities to be registered, included the shares that were registered and sold in January 2021?

(Pause.)

MS. SZYDLO:  What document is that?

THE COURT:  It's Document 36-15 -- ECF 3.

(Inaudible.)

THE COURT:  Oh, okay.  It's page -- well, it's Exhibit N.  It's the second page.  It says the calculation of registration fee and then it says title of each class of securities to be registered.

(Pause.)

THE COURT:  You don't see the ones that were issued in January?

(Inaudible.)

THE COURT:  Okay.  All right.  So Mr. Muck, can you plea tell me how I can, from these things, how I know what you've asserted in your papers but it's not included there?  I know you're saying the prospectus they say was -- I understand that.  And Section 11 says what it says.

MR. MUCK:  Correct.

THE COURT:  Which is you have to purchase shares that were issued pursuant to that registration statement, so how do I know that they were not issued pursuant to this registration statement?

MR. MUCK:  Well, let me just back up, Your Honor.  It's actually under *Century Aluminum*, the Ninth Circuit has said it is Plaintiffs' obligation to show that it is not, that the Plaintiff has to exclude the possibility that he bought shares that were preexisting.  So it's the Plaintiffs' burden to show Your Honor to demonstrate that some portion of those shares were in fact used to

exchange what had been previously traded and, therefore, he got some of the -- I need my glasses here -- some of the --

THE COURT: Well, it would have to be --

MR. MUCK: -- 92 million shares.

THE COURT: Well, it would have to be all of them from January 2021 --

MR. MUCK: Correct.

THE COURT: -- for newly-issued pursuant to the registration statement, but the Plaintiff does point to language --

MR. MUCK: Yes.

THE COURT: -- that says they'll be newly-issued. So there's an inference to be drawn there. You point to language that says they'll be reclassified. I just have a conflict in that.

MR. MUCK: So, Your Honor, if the Plaintiffs report -- if the Plaintiffs -- first of all, we think the Plaintiffs is misreading by taking one snippet out of context and ignoring everything else. But if the Plaintiffs were correct, they would be able to identify within Footnotes 1 or 2 a category of shares that were being issued pursuant to this registration statement that said, These are going to be used to exchange shares that were previously traded since January 15th of 2021. There is nothing that suggests that.

THE COURT: Okay. You're just saying this portion which

is incorporated by reference --

MR. MUCK:  Correct.

THE COURT:  -- establishes that it was -- that they were not -- see, I just don't even know how it works.

MR. MUCK:  Correct.

THE COURT:  That's what I didn't know.  And so when it's referring to, for example, in Footnote 2 the Class A common stock of Embark Technology being registered, that means Embark Technology prior to the merger, so it's the truck company?

MR. MUCK:  Well, it's the -- it's the -- it's the post-merger entity.  So these are new shares of the post-merger entity that are being registered for specific purposes.  One is to pay people who were shareholders of the old trucking company.

THE COURT:  Okay.

MR. MUCK:  They get shares of this new company for their old one.  In addition, there would be PIPE investors that were investing, so they have to issue shares so that those people get their shares, and then there are other requirements that are laid out here.

THE COURT:  Right.

MR. MUCK:  Traversion of restricted --

THE COURT:  You're saying nowhere on here does it say, We're taking Genesis --

MR. MUCK:  Northern Genesis.

THE COURT:  -- Northern Genesis shares from January 2021

and reissuing them pursuant to this registration statement. There's no fee that's being paid for. That's what you're saying?

MR. MUCK: Correct. And those could not have been traded unless new shares were issued pursuant to this registration statement and that sort of exchange had occurred.

MS. SZYDLO: In the Ninth Circuit in *In re Century Aluminum* said that "Section 11 standing is possible if the complaint alleges facts in which the court can infer that Plaintiff's situation is different." And Plaintiff Hardy contends that such is the case here. And recent Ninth Circuit case law supports his argument that the complaint adequately alleges that standing --

THE COURT: But in that case, there was only one offer.

MS. SZYDLO: There was one registration statement. Some of the shares were registered. Some were unregistered. But they all emanated from that registration -- single registration statement. They're talking about (indiscernible) --

THE COURT: Yeah.

MS. SZYDLO: Yes. That's true.

THE COURT: We have two registration statements, one in January 2021 --

MS. SZYDLO: Yes.

THE COURT: -- and one in October 2021.

MS. SZYDLO: But here, the registration statement became effective on October 18th, 2021, and the next day Northern Genesis

31

-- a SPAC solely formed for the purpose of effecting a merger -- filed a proxy statement which is part of the registration statement and Plaintiff Hardy alleged that, "as per the proxy statement, public stockholders would receive 414 million in the form of 41,400,000 newly-issued shares of Embark Class A common stock assuming no redemption as part of the merger at closing.

THE COURT:   Were they newly-issued pursuant to the October registration statement?

MS. SZYDLO:  It said "newly-issued shares" and --

THE COURT:  But don't you, under Section 11, have to -- have to allege that they were newly-issued pursuant to that registration statement?

MS. SZYDLO:  Well, we did, but that's -- I'm just reading to you the language of it and it says "newly-issued shares."  And so "such party has alleged facts excluding the possibility that the Embark shares be acquired after the merger came from the pool of previously-issued shares.  As a direct result of the challenged registration statement and merger, the entire pool of previously-issued Northern Genesis shares held by public stockholders became newly-issued public shares of Embark. And any person who acquired public shares of Embark Technology could do so only because of the effectiveness of their registration statement at issue here."

THE COURT: Okay.  So let -- so I'm trying to figure out the argument.  Are you saying that they were newly issued pursuant

32

to the registration statement, or are you saying that but for the merger, they would still have more than Genesis shares and now they have Embark?

MS. SZYDLO:  I'm saying that -- that the registration statement led one to believe that they were getting newly-issued shares as a result of this --

THE COURT:  It doesn't matter if they led one to believe.  The question is -- Section 11 says what it says.  Is were those shares issued pursuant to -- by that registration statement?

MS. SZYDLO:  So that's the argument, is that I say yes and he says no, but in this instance, it's really a distinction without -- without a difference.  Because even if they were not newly issued and just renamed or reclassified, as he argues, as my adversary argues, the result would be the same under *Slack* because Hardy could not have purchased Embark Technology, Inc. shares without the issuance of the challenged registration statement, and Embark Technology, Inc. shares did not exist prior to the merger. Prior to the merger, the shares were called Northern Genesis Acquisition Corp. II shares.

THE COURT:  Okay.  That was the same.  The second argument was the same -- but for the merger, he would have -- there would have only been Northern --

MS. SZYDLO:  Yes.

THE COURT:  -- Genesis shares.

MS. SZYDLO:  Yes.

THE COURT:  So, therefore, it falls within Section 11.

MS. SZYDLO:  Yes.

THE COURT:  So I understand that argument.  What about -- what about that?

MR. MUCK:  Your Honor, that's -- there's absolutely no support for that proposition.  It's completely contrary to Section 11.  It's contrary to *Century Aluminum*.  And there's no authority that says by virtue of changing the name of a stock, that somehow that is now treated as a newly-issued share of stock.

If the merger had not gone through, those share were still on the market and Mr. Hardy still could have purchased those very same shares.

THE COURT:  For a certain amount of time.  After a while, they would expire and they'd all have to be --

MR. MUCK:  Eventually.  But on November 15th, 2021, if he did buy those shares, they could have been purchased.

THE COURT:  They were within the 12 months.

MS. SZYDLO:  That's the difference here that we're dealing with a SPAC that would not -- it exists only for purposes of this merger.  So this is a peculiar situation.  This is not like every other Section 11 case.  And *Slack* provides support for this argument.

THE COURT:  I mean, it's not that you can't find someone with standing.  You could get someone who was an Embark Technology

shareholder; right?  They would be a direct purchaser.  Right?  So it's not -- it's not as if the -- Mr. Muck's interpretation means it can never be challenged.  The loss of shareholders, you can challenge, just not after-market purchasers.  But anyone who put any of those PIPE purchasers, any of the Embark Technology shareholders, right, they would have standing.

MS. SZYDLO:  Yes, but, again, remember that this is not a regular merger between companies and just stocks being renamed and various registration statements and offers.  That's not the situation here.  This is a SPAC --

THE COURT:  Why does that matter?

MS. SZYDLO:  It's a blank-check company.  It was only formed to do this merger.

THE COURT:  And?

MS. SZYDLO:  And if it doesn't do the merger, it has to go away.

THE COURT:  And so what does that have to do with what Section 11 is saying?

MS. SZYDLO:  Because it's a distinction without a difference in this context.

THE COURT:  All right.  So I understand the argument.  Well, there is -- it's more than renaming them; right?  It also moves them to a different exchange?

MS. SZYDLO:  Yes.

THE COURT:  From the New York Times -- New York Times

-- New York Stock Exchange to the NASDAQ?

MS. SZYDLO:  Yes.

MR. MUCK:  But there's absolutely no authority, Your Honor, that says that that has any effect either.

THE COURT: Okay.  I don't know.  So if that's normally done, you don't get a new registration --

MR. MUCK:  Correct.  You don't.  That just tells you where, if you want to buy or sell, what exchange you're going to do that with.

Ultimately what I would come back to, Your Honor, is what the Ninth Circuit said in *Century Aluminum* which is this tracing requirement is admittedly harsh, but that's the price that shareholders pay if they want to bring suit under a statute that is essentially a strict liability statute.

MS. SZYDLO:  By the way, I'd like to add the fact that it says newly issued in one place and reclassified in other places really shows how screwed up this registration is.

THE COURT:  Okay.  All right.  Great.  Well, thank you for the argument.  It was very helpful.  I'll take the matter under submission.

MR. MUCK:  Thank you, Your Honor.

MS. SZYDLO:  Thank you, Your Honor.

//

//

//

36

(Proceedings adjourned at 11:09 a.m.)


        I, Peggy Schuerger, certify that the foregoing is a correct transcript from the official electronic sound recording provided to me of the proceedings in the above-entitled matter.


_____*Peggy Schuerger*_____        _March 30, 2023_____
Signature of Approved Transcriber        Date

Peggy Schuerger_____
*Ad Hoc Reporting*
Approved Transcription Provider
for the U.S. District Court,
Northern District of California