# Exhibit A

Slack Technologies, LLC v. Pirani, 143 S.Ct. 1433 (2023)

2023 Daily Journal D.A.R. 5145

143 S.Ct. 1433
Supreme Court of the United States.

SLACK TECHNOLOGIES, LLC, fka Slack Technologies, Inc., et al., Petitioners

v.

Fiyyaz PIRANI

No. 22-200
|
Argued April 17, 2023
|
Decided June 1, 2023

**Synopsis**

**Background:** Shareholder brought putative class action against issuer of common stock and others, alleging, among other things, that registration statement issuer filed for specified number of registered shares offered in direct listing was materially false or misleading in violation of Securities Act of 1933. The United States District Court for the Northern District of California, Susan Illston, J., 445 F.Supp.3d 367, denied issuer's motion to dismiss for failure to state a claim, but certified ruling for interlocutory appeal, 2020 WL 7061035. Issuer appealed. The United States Court of Appeals for the Ninth Circuit, Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation, 13 F.4th 940, affirmed. Certiorari was granted.

**[Holding:]** In a unanimous opinion, the Supreme Court, Justice Gorsuch, held that to bring Securities Act claim for false or misleading registration statement, shareholder needed shares traceable to challenged statement.

Opinion of Court of Appeals vacated; remanded.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion to Dismiss for Failure to State a Claim.

West Headnotes (8)

**[1]   Securities Regulation** ⌐ Purpose
**Securities Regulation** ⌐ Construction and operation in general

The Securities Act of 1933 is narrower than the Securities Exchange Act of 1934 and is focused primarily on the regulation of new offerings. Securities Act of 1933 § 1, 15 U.S.C.A. § 77a et seq.; Securities Exchange Act of 1934 § 1, 15 U.S.C.A. § 78a et seq.

**[2]  Securities Regulation ☞ Scienter, Intent, Knowledge, Negligence or Recklessness**

To prevail under the provision of the Securities Exchange Act of 1934 allowing suits in connection with the purchase or sale of any security, whether registered or not, a plaintiff must prove that any material misleading statement or omission was made with scienter, that is, with intent to deceive, manipulate, or defraud. Securities Exchange Act of 1934 § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[3]  Federal Courts ☞ Review of federal district courts**

Shareholder's argument that common-stock issuer was required to register all shares it sold in its direct listing with Securities and Exchange Commission (SEC) was not properly before Supreme Court on certiorari review of affirmance of district court's denial of issuer's motion to dismiss for failure to state a claim shareholder's putative class action for materially false or misleading registration statement in violation of Securities Act of 1933, where shareholder raised argument for first time before Supreme Court after issuer filed certiorari petition on separate question of whether shareholder was required to plead he purchased shares covered by registration statement, and parties previously litigated under premise that issuer was not required to register all shares. Securities Act of 1933 §§ 2, 4, 5, 11, 15 U.S.C.A. §§ 77b(a)(8), 77d(a)(2), 77e, 77k(a).

**[4]  Statutes ☞ Relative and qualifying terms and provisions, and their relation to antecedents**

The word "such," as may modify a noun in a statute, usually refers to something that has already been described or that is implied or intelligible from the context or circumstances.

**[5]  Federal Civil Procedure ☞ Stockholders, investors, and depositors**
**Securities Regulation ☞ Persons entitled to sue or recover**

In order to support his putative class claim against issuer, which had offered both registered and unregistered shares via direct listing, for violation of section of Securities Act of 1933 authorizing plaintiffs to bring claims based on material misstatement or omission in registration statement when a plaintiff had acquired "such security," shareholder was

2023 Daily Journal D.A.R. 5145

required to plead that he acquired shares traceable to allegedly defective registration statement. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a).

**[6]    Securities Regulation** 🔑 Persons entitled to sue or recover

The term "such security," in the Securities Act provision stating that if a registration statement has a material misstatement or omission, a "person acquiring such security" may bring a claim against certain parties, means a security issued pursuant to the allegedly misleading registration statement; the phrase "the registration statement," with the definite article, references the allegedly defective registration statement, the Act modifies nouns with the word "such" to focus on a particular thing or statement, and reading "such security" narrowly is consistent with the provisions deeming a registration statement "effective only as to the securities specified therein" and limiting an underwriter's liability for a defective registration statement to the value of the registered shares. Securities Act of 1933 §§ 6, 11, 🚩15 U.S.C.A. §§ 77f(a), 77k(a), 77k(e).

**[7]    Statutes** 🔑 Purpose;  policy behind or supporting statute

When construing a statute, the Supreme Court does not presume that any result consistent with one party's account of the statute's overarching goal must be the law.

**[8]    Securities Regulation** 🔑 Persons entitled to sue or recover

In enacting the Securities Act of 1933, Congress did not obviously intend to create broad liability for falsehoods and misleading omissions, as might have supported reading the term "such security" in the provision conferring a cause of action for misstatements and omissions in a registration statement upon a plaintiff who acquires "such security" to mean any security bearing some specified relationship to a defective registration statement, not just a security issued under that statement; it is equally possible that Congress, in enacting the Securities Act along with the Securities Exchange Act of 1934, sought a balanced liability regime that allows a narrow class of claims to proceed on lesser proof but requires a higher standard of proof to sustain a broader set of claims. Securities Act of 1933 § 11, 15 U.S.C.A. § 77k(a); Securities Exchange Act of 1934 § 1, 15 U.S.C.A. § 78a et seq.

**\*1435** *Syllabus* [*]

[*]    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

This case arises from a public offering of securities governed by the Securities Act of 1933, and the issue presented is what a public buyer must allege to state a claim under § 11 of the Act. The 1933 Act requires a company to register the securities it intends to offer to the public with the Securities and Exchange Commission. See, *e.g.,* 15 U.S.C. §§ 77b(a)(8), 77e; see also § 77d. As part of that process, a company must prepare a registration statement that includes detailed information about the firm's business and financial health so prospective buyers may fairly assess whether to invest. See, *e.g.,* §§ 77f, 77g, 77aa. The law imposes strict liability on issuing companies when their registration statements contain material misstatements or misleading omissions. In this case, Slack Technologies—a technology company that offers a platform for instant messaging —conducted a direct listing to sell its shares to the public on the New York Stock Exchange in 2019. As part of that process, Slack filed a registration statement for a specified number of registered shares it intended to offer in its direct listing. Under the direct listing process, holders of preexisting unregistered shares in Slack were free to sell them to the public right away. Slack's direct listing offered for purchase 118 million registered shares and 165 million unregistered shares. Fiyyaz Pirani bought 30,000 Slack shares on the day Slack went public, and later bought 220,000 additional shares. When the stock price dropped, Mr. Pirani filed a class-action lawsuit against Slack alleging, as relevant here, that Slack had violated § 11 of the 1933 Act by filing a materially misleading registration statement. Slack moved to dismiss, arguing that the complaint failed to state a claim under § 11 because Mr. Pirani had not alleged that he purchased shares traceable to the allegedly misleading registration statement, leaving open the possibility that he purchased shares not registered by means of the registration statement. The district court denied the motion to dismiss but certified its ruling for interlocutory appeal. The Ninth Circuit accepted the appeal and a divided panel affirmed.

*Held*: Section 11 of the 1933 Act requires a plaintiff to plead and prove that he purchased securities registered under a materially misleading registration statement. The relevant language of § 11(a) authorizes an individual to sue for a material misstatement or omission in a registration statement when the individual has acquired "such security." Slack argues the term "such security" refers to a security issued pursuant to the allegedly misleading registration statement; Mr. Pirani says that the term may encompass a security not registered under an allegedly misleading registration statement. While the word "such" usually refers to something that has already been described, there is no clear referent in § 11(a) defining what "such security" means. As a result, the Court must ascertain the statute's critical referent "from the context or circumstances."

2023 Daily Journal D.A.R. 5145

Context provides several clues. First, the statute imposes liability for false statements or misleading omissions in "*the* registration statement." § 77k (emphasis added). The statute uses the definite article to reference the particular registration statement alleged to be misleading, and in this way seems to suggest the plaintiff must "acquir[e] such security" under that document's terms. *Ibid*. In addition, the statute repeatedly uses the word "such" to narrow the law's focus—for example, referring to "such part" of the registration statement that contains a misstatement or misleading omission—suggesting that when it comes to "such security," the law speaks to a security registered under the particular registration statement alleged to contain a falsehood or misleading omission. Section 6 of the statute indicates that a registration statement is "effective" for "only ... the securities specified therein," which is also hard to square with Mr. Pirani's reading. Damages caps in the statute also make less sense with Mr. Pirani's account of the statute. Collectively, these contextual clues persuade the Court that Slack's reading of the law is the better one. While direct listings like the one here are new, the Court's conclusion is not. The majority of courts have for years held that § 11(a) liability extends only to shares that are traceable to an allegedly defective registration.

Resisting this conclusion, Mr. Pirani argues that the Court should read the phrase "such security" to include not only securities registered under a defective registration statement but also other securities that bear some sort of minimal relationship to a defective registration statement. Mr. Pirani contends that but for the existence of Slack's registration statement for the registered shares, its unregistered shares would not have been eligible for sale to the public. But Mr. Pirani does not explain what the limits of his rule would be, how the Court might derive them from § 11, or how any of this can be squared with the various contextual clues identified which suggest that liability runs with registered shares alone. Mr. Pirani argues that if Congress wanted liability under § 11(a) to attach only to securities issued pursuant to a particular registration statement, it could have borrowed language from § 5 to achieve that result. On its own terms, that argument also shows that Congress could have written § 11(a) to explain more clearly that liability attaches to "any security" or "any security" bearing some specified relationship to a registration statement. Finally, Mr. Pirani argues that adopting a broader reading of "such security" would expand liability for falsehoods and misleading omissions and thus better accomplish the purpose of the 1933 Act. The Court cannot endorse that sort of reasoning. Nor is Mr. Pirani's account of the law's purpose altogether obvious; an alternate inference in the opposite direction is at least equally plausible. In any event, the Court's function is to discern and apply existing law. The Court concludes that the better reading of § 11 requires a plaintiff to plead and prove that he purchased shares traceable to the allegedly defective registration statement, and remands for the Ninth Circuit to consider that question in the first instance. Pp. 1439 – 1442.

⚑ 13 F.4th 940, vacated and remanded.

GORSUCH, J., delivered the opinion for a unanimous Court.

**Attorneys and Law Firms**

Thomas G. Hungar, Washington, DC, for Petitioners.

Kevin K. Russell, Bethesda, MD, for Respondent.

Michael D. Celio, Matthew S. Kahn, Michael J. Kahn, Daniel R. Adler, Matt Aidan Getz, Gibson, Dunn & Crutcher LLP, San Francisco, CA, Thomas G. Hungar, Counsel of Record, Jacob T. Spencer, Gibson, Dunn & Crutcher LLP, Washington, DC, for Petitioners.

Lawrence P. Eagel, Bragae Eagel & Squire, P.C., New York, NY, Melissa A. Fortunato, Marion C. Passmore, Bragar Eagel & Squire, P.C., San Francisco, CA, Thomas C. Goldstein, Kevin K. Russell, Counsel of Record, Erica Oleszczuk Evans, Goldstein & Russell, P.C., Bethesda, MD, for Respondent.

**Opinion**

Justice GORSUCH delivered the opinion of the Court.

**\*1437** This case concerns the meaning of one provision of the federal securities laws. For many years, lower federal courts have held that liability under § 11 of the Securities Act of 1933 attaches only when a buyer can trace the shares he has purchased to a false or misleading registration statement. Recently, the Ninth Circuit parted ways with these decisions, holding that a plaintiff may sometimes recover under § 11 even when the shares he owns are not traceable to a defective registration statement. The question we face is which of these approaches best conforms to the statute's terms.

I

**[1]** Together, the Securities Act of 1933, 48 Stat. 74, 15 U.S.C. § 77a *et seq.,* and the Securities Exchange Act of 1934, 48 Stat. 881, 15 U.S.C. § 78a *et seq.,* form the backbone of American securities law. The first is " 'narrower' " and focused " 'primarily' " on the regulation of new offerings. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 572, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 752, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). Generally speaking, the 1933 Act requires a company to register the securities it intends to offer to the public with the Securities and Exchange Commission (SEC). See, *e.g.,* 15 U.S.C. §§ 77b(a)(8), 77e; see also § 77d. As part of that process, a company must

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 6

prepare a registration statement that includes detailed information about the firm's business and financial health so prospective buyers may fairly assess whether to invest. See, *e.g.,* §§ 77f, 77g, 77aa. The law imposes strict liability on issuing companies when their registration statements contain material misstatements or misleading omissions. § 77k; see also *Herman & MacLean v. Huddleston*, 459 U.S. 375, 380, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

 [2]   The 1934 Act sweeps more broadly. Among other things, it requires publicly traded companies to provide ongoing disclosures and regulates trading on secondary markets. See, *e.g.,* §§ 78m, 78*o*; T.  **\*1438**  Hazen, Federal Securities Law 99–102 (4th ed. 2022) (Hazen). This law's main liability provision sweeps more broadly too. It allows suits in connection with the purchase or sale of "any security," whether registered or not. § 78j(b); see also 17 C.F.R. § 240.10b–5 (2022); *Herman & MacLean*, 459 U.S. at 382, 103 S.Ct. 683. But to prevail under this provision, a plaintiff must prove that any material misleading statement or omission was made "with scienter, *i.e.*, with intent to deceive, manipulate, or defraud." *Id.*, at 382, 103 S.Ct. 683.

This case arises from a public offering governed by the 1933 Act. Typically, when a company goes public it issues new shares pursuant to a registration statement. That registration statement is filed with the SEC and made available to the public. Investment banks underwrite the offering, usually by buying these new registered shares at a negotiated price and then selling them to investors at a higher price. In this way, underwriters often carry the risk of loss should they fail to sell the shares at a profit. See 1 L. Loss, J. Seligman, & T. Paredes, Securities Regulation 738–748 (6th ed. 2019); Hazen 32–33.

Of course, a company's early investors and employees may own preexisting shares. Often, too, these shares are not subject to registration requirements. See, *e.g.,* 15 U.S.C. § 77d(a)(2) (exempting, among other things, transactions "not involving any public offering"); 17 C.F.R. § 230.144(a)(3)(i) (recognizing as exempt certain securities "acquired directly ... from the issuer ... in a transaction or chain of transactions not involving any public offering"); Hazen 60–61. To prevent the stock price from falling once public trading begins, underwriters may require insiders to consent to a "lockup agreement"—a commitment to hold their unregistered shares for a period of time before selling them on the new public market. See 1 J. Bartlett, Equity Finance: Venture Capital, Buyouts, Restructurings and Reorganizations § 14.8, p. 333 (2d ed. 1995).

Initial public offerings (IPOs) are an effective way of raising capital, but they also have drawbacks. Among other things, they can involve significant transaction costs. Nor is raising capital the only reason firms might wish to go public; some may simply wish to afford their shareholders (whether investors, employees, or others) the convenience of being able to sell their existing shares on a public exchange. See 73 Fed. Reg. 54442 (2008). Several years ago, a number of companies approached the New York Stock Exchange (NYSE) about the possibility of selling shares publicly

on that exchange without an IPO. *Ibid.* Ultimately, the NYSE proposed rules to facilitate and regulate these "direct listings," which the SEC approved with modifications. 83 Fed. Reg. 5650 (2018).

Slack is a technology company that offers a platform for instant messaging. It conducted a direct listing on the NYSE in 2019. 🚩*Pirani v. Slack Technologies, Inc.*, 13 F.4th 940, 944, 947 (C.A.9 2021). As part of that process, Slack filed a registration statement for a specified number of registered shares it intended to offer in its direct listing. 🚩*Pirani v. Slack Technologies, Inc.*, 445 F.Supp.3d 367, 373 (ND Cal. 2020). But because Slack employed a direct listing rather than an IPO, there was no underwriter and no lockup agreement. 🚩13 F.4th at 951 (MILLER, J., dissenting). Accordingly, holders of preexisting unregistered shares were free to sell them to the public right away. See 🚩*ibid.* All told, Slack's direct listing offered for purchase 118 million registered shares and 165 million unregistered shares.

Fiyyaz Pirani bought 30,000 Slack shares on the day Slack went public. He **\*1439** bought 220,000 additional shares over the next few months. When the stock price later dropped, Mr. Pirani filed a class-action lawsuit against Slack. In that suit, he alleged that Slack had violated §§ 11 and 12 of the 1933 Act by filing a materially misleading registration statement. 🚩*Ibid.*

Slack moved to dismiss the complaint for failure to state a claim. Sections 11 and 12, Slack argued, authorize suit only for those who hold shares issued pursuant to a false or misleading registration statement. And this feature of the law, the company said, was dispositive in this case because Mr. Pirani had not alleged that he purchased shares traceable to the allegedly misleading registration statement. For all anyone could tell, he may have purchased unregistered shares unconnected to the registration statement and its representations about the firm's business and financial health. Of course, Slack would go on to acknowledge that the 1934 Act allows investors to recover for fraud in the sale of unregistered shares upon proof of scienter. But, the company emphasized, Mr. Pirani had not sought to sue under that law.

 **[3]** Ultimately, the district court denied the motion to dismiss but certified its ruling for interlocutory appeal. 🚩445 F.Supp.3d at 381, 384–385. The Ninth Circuit accepted the appeal and a divided panel affirmed. 🚩13 F.4th at 945, 950. In dissent, Judge Miller argued that §§ 11 and 12 of the 1933 Act require a plaintiff to plead and prove that he purchased securities registered under a materially misleading registration statement, something Mr. Pirani had not done. 🚩*Id.*, at 951–952. Judge Miller pointed out that a long line of lower court cases have interpreted § 11 as applying only to shares purchased pursuant to a registration statement. 🚩*Id.*, at 952. Because the Ninth Circuit's decision created a split of authority in the courts of appeals about § 11's scope, we granted certiorari. 598 U. S. ——, 143 S.Ct. 542, 214 L.Ed.2d 311 (2022). [1]

2023 Daily Journal D.A.R. 5145

[1] The parties have litigated this case on the premise that Slack was not required to register all of the shares sold in its direct listing. For the first time before this Court, Mr. Pirani challenges that premise, suggesting that it was incumbent on Slack to register all the securities sold in its direct listings on the NYSE. Brief for Respondent 11–12, n. 7. As he acknowledges, however, this issue is not properly presented for decision, *ibid.*, and so we do not pass upon it.

## II

We begin with the relevant language of § 11(a) of the 1933 Act. It provides:

> "In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [certain enumerated parties]." 15 U.S.C. § 77k(a).

The statute authorizes an individual to sue for a material misstatement or omission in a registration statement when he has acquired "such security." The question we face is what this means. Does the term "such security" refer to a security issued pursuant to the allegedly misleading registration statement? Or can the term also sometimes encompass a security that was not issued pursuant to the allegedly misleading registration statement? Slack advances the first interpretation; Mr. Pirani defends the second.

 [4] Immediately, we face a bit of a challenge. The word "such" usually refers **\*1440** to something that has already been "described" or that is "implied or intelligible from the context or circumstances." Concise Oxford Dictionary of Current English 1218 (1931); see also Webster's New International Dictionary 2518 (2d ed. 1954). But there is no clear referent in § 11(a) telling us what "such security" means. As a result, we must ascertain the statute's critical referent "from the context or circumstances."

 [5]  [6]  As it turns out, context provides several clues. For one thing, the statute imposes liability for false statements or misleading omissions in "*the* registration statement." § 77k (emphasis added). Not just a registration statement or any registration statement. The statute uses the definite article to reference the particular registration statement alleged to be misleading, and in this way seems to suggest the plaintiff must "acquir[e] such security" under that document's terms. *Ibid*.

For another thing, the statute repeatedly uses the word "such" to narrow the law's focus. The statute directs us to "such part" of the registration statement that contains a misstatement or misleading omission. It speaks of "such acquisition" when a person has acquired securities pursuant to the registration statement. And it points to "such untruth or omission" found in the registration statement. Each time, the law trains our view on particular things or statements. All of which suggests that, when it comes to "such security," the law speaks to a security registered under the particular registration statement alleged to contain a falsehood or misleading omission.

Other provisions in the 1933 Act follow suit. Under § 5, for example, "[u]nless a registration statement is in effect as to a security," it is unlawful "to sell such security." § 77e(a). Here, the term "such security" clearly refers to shares subject to registration. Meanwhile, § 6 provides that a "registration statement shall be deemed effective only as to the securities specified therein as proposed to be offered." § 77f(a). It's an instruction that would seem hard to square with Mr. Pirani's broader reading of § 11(a)—after all, adopting that reading would give the registration statement effect (in the sense of creating liability) for securities that are not "specified" in the registration statement "as proposed to be offered."

Beyond these clues lies still another. Section 11(e) caps damages against an underwriter in a § 11 suit to the "total price at which the securities underwritten by him and distributed to the public were offered to the public." § 77k(e). This provision thus ties the maximum available recovery to the value of the registered shares alone. It's another feature that makes little sense on Mr. Pirani's account, for if § 11(a) liability extended beyond registered shares presumably available damages would too. See *Barnes v. Osofsky*, 373 F.2d 269, 272 (C.A.2 1967); Brief for SEC as *Amicus Curiae* in *Barnes* v. *Osofsky*, No. 30867 etc. (CA2), pp. 4–5.

Collectively, these contextual clues persuade us that Slack's reading of the law is the better one. Nor is anything we say here particularly novel. For while direct listings are new, the question how far § 11(a) liability extends is not. More than half a century ago, Judge Friendly addressed the question in an opinion for the Second Circuit in *Barnes* and concluded that "the narrower reading" we adopt today is the more "natural" one. 373 F.2d at 271, 273. Since *Barnes*, every court of appeals to consider the issue has reached the same conclusion: To bring a claim under § 11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or **\*1441** misleading.[2] Until this decision, even the Ninth Circuit seemed to take the same view. *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080, and n. 4 (1999).

[2]    See, *e.g.,* *In re Ariad Pharmaceuticals, Inc. Securities Litigation*, 842 F.3d 744, 755–756 (C.A.1 2016); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 873 (C.A.5 2003); *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 976–977 (C.A.8 2002); *Joseph v. Wiles*, 223 F.3d

1155, 1159 (C.A.10 2000), abrogated on other grounds, ⚑*California Public Employees' Retirement System v. ANZ Securities, Inc.*, 582 U.S. 497, 137 S.Ct. 2042, 198 L.Ed.2d 584 (2017); ⚑*APA Excelsior III L. P. v. Premiere Technologies, Inc.*, 476 F.3d 1261, 1271 (C.A.11 2007).

Resisting this conclusion, Mr. Pirani argues that we should read the phrase "such security" to include not only securities traceable to a defective registration statement. We should also read the phrase to include other securities that bear some sort of minimal relationship to a defective registration statement. And, he argues, a reading like that would allow his case to proceed because, but for the existence of Slack's registration statement for the registered shares, its unregistered shares would not have been eligible for sale to the public. Brief for Respondent 22–23. Beyond assuring us that the rule he proposes would save his case, however, Mr. Pirani does not offer much more. He does not explain what the limits of his rule would be, how we might derive them from § 11, or how any of this can be squared with the various contextual clues we have encountered suggesting that liability runs with registered shares alone.

Perhaps the closest Mr. Pirani comes to answering these questions comes when he directs us to § 5. If Congress wanted liability under § 11(a) to attach only to securities issued pursuant to a particular registration statement, he observes, it could have simply borrowed similar language from § 5. That provision, he stresses, speaks of "any security with respect to which a registration statement has been filed." ⚑§ 77e(b)(1). But even taken on its own terms, this argument does not prove much. If Mr. Pirani's example shows that Congress could have written § 11(a) to explain more clearly that liability attaches only to securities issued pursuant to a particular registration statement, it also shows that Congress could have written § 11(a) to explain more clearly that liability attaches to "any security" or "any security" bearing some specified relationship to a registration statement. That Congress could have been clearer, no one disputes. But none of this proves it adopted anything like the rule Mr. Pirani proposes.

 **[7]**  **[8]**  Finally, Mr. Pirani argues from policy and purpose. Adopting a broader reading of "such security" would, he says, expand liability for falsehoods and misleading omissions and thus better accomplish the purpose of the 1933 Act. We cannot endorse this line of reasoning. This Court does not "presume ... that any result consistent with [one party's] account of the statute's overarching goal must be the law." ⚑*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89, 137 S.Ct. 1718, 198 L.Ed.2d 177 (2017). Nor, for that matter, is Mr. Pirani's account of the law's purpose altogether obvious. As we have seen, the 1933 Act is "limited in scope." ⚑*Herman & MacLean*, 459 U.S. at 382, 103 S.Ct. 683. Its main liability provision imposes strict liability on issuers for material falsehoods or misleading omissions in the registration statement. ⚑*Ibid.* Meanwhile, the 1934 Act requires ongoing disclosures for publicly traded companies and its main liability provision allows suits involving any sale of a security but only on proof of scienter. ⚑*Ibid.*; Hazen 99–100. Given

this design, it seems equally possible that Congress sought a balanced liability regime that allows a narrow class of claims to **\*1442** proceed on lesser proof but requires a higher standard of proof to sustain a broader set of claims.

### III

Naturally, Congress remains free to revise the securities laws at any time, whether to address the rise of direct listings or any other development. Our only function lies in discerning and applying the law as we find it. And because we think the better reading of the particular provision before us requires a plaintiff to plead and prove that he purchased shares traceable to the allegedly defective registration statement, we vacate the Ninth Circuit's judgment holding otherwise. Whether Mr. Pirani's pleadings can satisfy § 11(a) as properly construed, we leave for that court to decide in the first instance on remand. [3]

[3]    As we noted at the outset, the parties do not just spar over the best interpretation of § 11 and its application to this case. They do the same when it comes to § 12. See Part I, *supra*. But we have no need to reach the merits of that particular dispute. The Ninth Circuit said that its decision to permit Mr. Pirani's § 12 claim to proceed "follow[ed] from" its analysis of his § 11 claim. ⚑13 F.4th 940, 949 (2021). And because we find that court's § 11 analysis flawed, we think the best course is to vacate its judgment with respect to Mr. Pirani's § 12 claim as well for reconsideration in the light of our holding today about the meaning of § 11. In doing so, we express no views about the proper interpretation of § 12 or its application to this case. Nor do we endorse the Ninth Circuit's apparent belief that § 11 and § 12 necessarily travel together, but instead caution that the two provisions contain distinct language that warrants careful consideration.

*It is so ordered.*

## All Citations

143 S.Ct. 1433, 2023 Daily Journal D.A.R. 5145

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.