UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYLER HARDY, et al.,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>EMBARK TECHNOLOGY, INC., et al.,<br><br>　　　　　Defendants. | Case No. 3:22-cv-02090-JSC<br><br>**ORDER RE: MOTION FOR FINAL APPROVAL; MOTION FOR ATTORNEY'S FEES AND COSTS**<br><br>Re: Dkt. Nos. 95, 101 |

Plaintiffs filed this putative securities class action alleging claims under Sections 11 and 15 of the Securities Act of 1933 and Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 on behalf of individuals who purchased stock in Embark Technologies Inc., or its predecessor Northern Genesis Acquisition Corp. II. While Defendants' motion to dismiss was pending, the parties reached an agreement to resolve Plaintiffs' claims, and on September 26, 2023, the Court granted Plaintiffs' unopposed motion for preliminary approval of the class action settlement. (Dkt. No. 91.[1]) Plaintiffs' motion for final approval of the settlement is now pending before the Court. (Dkt. No. 101.) Having carefully considered Plaintiffs' motion, supplemental submissions, and the relevant legal authority, and having the benefit of oral argument March 14, 2024, the Court GRANTS Plaintiffs' motion for final approval and GRANTS IN PART and DENIES IN PART Plaintiffs' motion for attorneys' fees and costs.

//

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

# THE SETTLEMENT AGREEMENT

## A.   The Settlement Class

The settlement calls for two classes: an Exchange Act class and a Securities Act class, collectively referred to as the Settlement Class.  (Dkt. No. 102 at ¶ 23.)  The Exchange Act class is defined as

> all persons and entities that beneficially owned and/or held the Company's common stock as of October 6, 2021, the record date, and were eligible to vote at the Company's November 9, 2021 special meeting with respect to the Business Combination between the Company and privately held Legacy Embark, completed on or about November 10, 2021, and were damaged thereby.

(Dkt. No. 82-1, the Amended Stipulation and Agreement of Settlement, at ¶ 1(cc)(i) ("the Settlement Agreement").) The Exchange Act class period is defined as the period from October 6, 2021 through November 10, 2021. (*Id.*)

The Securities Act class is defined as

> all persons and entities who purchased or otherwise acquired Embark common stock pursuant or traceable to the July 2, 2021 registration statement, including all amendments thereto, issued in connection with the November 2021 Business Combination between the Company and Legacy Embark, including shares of Embark common stock purchased in the open market during the period November 11, 2021 through December 13, 2021, both dates inclusive, (the "Securities Act Class Period") and were damaged thereby.

(*Id.* at ¶ 1(cc)(ii).)

## B.   Payment Terms

The Settlement Agreement required Embark establish a Settlement Fund of $2.5 million in an escrow account maintained by Huntington National Bank within 5 days of preliminary approval. (Dkt. No. 82 -1 at ¶¶ 1(ii), (gg).) The parties have agreed to the following deductions from the Settlement Fund: "(i) any taxes; (ii) any Notice and Administration Costs; and (iii) any attorneys' fees, litigation expenses, and awards of reasonable costs and expenses to Plaintiffs awarded by the Court." (*Id.* at ¶ 1(o).) The amount remaining after these deductions, the "Net Settlement Amount," will be divided among the Settlement Class Members in pro rata shares "based on their respective alleged economic losses as a result of the alleged misconduct" pursuant to the "Plan of Allocation." (Dkt. No. 81 at 13.).

Plaintiffs' supplemental motion for preliminary approval elaborated on the deductions from the Settlement Fund to yield the Net Settlement Amount:

1. Attorneys' fees up to $835,000 (33.4% of the Settlement Amount) (Dkt. No. 81 at 18);

2. Litigation expenses of up to $140,000 (*Id*. at 19);

3. Individual service awards of $2,500 for the Class Representatives (*Id*.);

4. Settlement Administration costs of an estimated $333,859 (*Id*. at 19-20); and

5. Taxes which includes "(i) all federal, state, and/or local taxes of any kind on any income earned by the Settlement Fund; and (ii) the reasonable and necessary costs and expenses incurred in connection with determining the amount of, and paying, any taxes owed by the Net Settlement Fund (including, without limitation, the reasonable and necessary costs and expenses of tax attorneys and accountants)." (Dkt. No. 82-1 at ¶ 1(ll).) The Settlement Administrator, however, estimated no taxes will be paid out of the Settlement Fund. (Dkt. No. 82-20 at ¶ 4.)

### C.     Scope of Release

Any Settlement Class Member who did not submit a timely request for exclusion releases:

> all claims, rights, liabilities, demands, damages, losses, and causes of action of every nature and description, including Unknown Claims, whether contingent or absolute, mature or unmature, discoverable or undiscoverable, liquidated or unliquidated, accrued or unaccrued, including those that are concealed or hidden, regardless of legal or equitable theory, whether arising under federal, state, common or foreign law, whether direct or indirect, that Plaintiffs or any other member(s) of the Settlement Class asserted or could have asserted in any forum that are based on, related to, or arising out of any claims, allegations, statements, representations, omissions, facts, transactions, occurrences or other matters that are or could have been the subject of the Action, whether known or unknown, relating to or arising from the purchase, acquisition, sale, disposition or holding of Northern Genesis and/or Embark common stock during the Exchange Act Class Period and/or the Securities Act Class Period.

(Dkt. No. 82-1 at ¶ 1(ee).)

### D.     Objections and Request for Exclusion

SCS received three requests for exclusion and one objection to the request for attorney's fees and costs.  (Dkt. No. 102-1 at ¶¶ 9-10; Exs. A, B.)

### DISCUSSION

The approval of a settlement is a multi-step process. At the preliminary approval stage, the

3

court should grant such approval only if it is justified by the parties' showing that the court will likely be able to (1) "certify the class for purposes of judgment on the proposal" and (2) "approve the proposal under Rule 23(e)(2)." Fed. R. Civ P. 23(e)(B). If the court preliminarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class will be notified, and a final fairness hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Rule 23. *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

At the second stage, "after notice is given to putative class members, the Court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v. Tr. Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must finally determine whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

## I. CLASS CERTIFICATION

Final approval of a class action settlement requires, as a threshold matter, an assessment of whether the class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019–1022 (9th Cir. 1998). Because no facts that would affect these requirements have changed since the Court preliminarily approved the class on September 26, 2023, this Order incorporates by reference the Court's prior analysis under Rules 23(a) and (b) as set forth in the Order granting preliminary approval. (Dkt. No. 91 at 6-9.)

## II. ADEQUACY OF NOTICE

Under Federal Rule of Civil Procedure 23(e), the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The notice must "clearly and concisely state in plain, easily understood language" the nature of the action, the class definition, and the class members' right to exclude themselves from the class. Fed. R. Civ. P.

4

1  23(c)(2)(B); *see also Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir.
2  2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient
3  detail to alert those with adverse viewpoints to investigate and to come forward and be heard.")
4  (cleaned up). Although Rule 23 requires reasonable efforts be made to reach all class members, it
5  does not require that each class member actually receive notice. *See Silber v. Mabon*, 18 F.3d
6  1449, 1454 (9th Cir. 1994) (noting the standard for class notice is "best practicable" notice, not
7  "actually received" notice).

8        The Court finds the notice plan previously approved by the Court, as implemented by the Settlement Administrator, Strategic Claims Services (SCS), complies with Rule 23(c)(2)(B). First, the content of the content of the Notice was sufficient under Rule 23(c)(2)(A). (Dkt. No. 92-1.) Second, following preliminary approval, SCS provided notice as follows: (1) 2,657 notice packets were mailed to potential Settlement Class Members or nominees; (2) 4,028 emails were sent with the direct link to the Notice packet from nominee responses; and (3) nominees separately mailed notice packets to 40 clients and emailed 5,671 clients a direct link to the notice packet on the settlement website. (Dkt. No. 102-1 at ¶ 5.) As of January 11, 2024, 12,402 "potential Settlement Class Members were either mailed a Notice Packet or emailed a direct link to the Notice Packet." (*Id*.) Third, only 71 Notice packets were returned, and of those, 40 were re-mailed to updated addresses. (*Id*. at ¶ 6.) Fourth, SCS also sent the Depository Trust Company ("DTC") the notice packet for publication in its Legal Notice System ("LENS"). (Dkt. No. 92 at ¶ 5.) "LENS provides DTC participants the ability to search and download legal notices as well as receive e-mail alerts based on particular notices or particular CUSIPs once a legal notice is posted." (*Id*.) Fifth, SCS published the Summary Notice on Investor's Business Daily and transmitted it once over the PR Newswire. (Dkt. No. 102 at ¶ 25.) Sixth, SCS created a website: https://www.strategicclaims.net/embark/, where the notice, claim form, settlement agreement, motion for preliminary approval of class action settlement, supplemental memorandum in support of Plaintiffs' unopposed motion for preliminary approval, the preliminary approval order, and Plaintiffs' motion for attorneys' fees and costs, were posted. (*Id.*) Finally, 1,497 claims were filed which represents a 12 percent claims rate.

5

1	Given the above, the Court concludes the parties have sufficiently provided the best
2	practicable notice to class members.

### III.	FINAL APPROVAL OF THE SETTLEMENT AGREEMENT

To grant final approval, the Court must find that the terms of the parties' settlement are fair, adequate, and reasonable under Rule 23(e). In making this determination, courts generally must consider the following factors: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Churchill*, 361 F.3d at 575. "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). Under the revised Rule 23(e), the Court must also consider whether the settlement resulted from collusion among the parties. *See Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (holding that courts must apply the collusion factors set forth *in In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011), to post-class action settlements as well as those settled before certification.)  When the settlement is reached pre-certification, however, the court must apply "an even higher level of scrutiny" and "substantively grapple with whether the *Bluetooth* warning signs created an unfair settlement." *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 608 (9th Cir. 2021) (cleaned up).

#### A.	The Fairness Factors

##### 1.	The Strength of Plaintiffs' Case and Risk, Expense, Complexity, and Likely Duration of Further Litigation

The Court first considers "the strength of [Plaintiffs'] case on the merits balanced against the amount offered in the settlement." *See Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (internal quotation marks and citation omitted). Although this action settled before the Court ruled on the merits of Plaintiffs' claims, the Court need not reach an ultimate conclusion about the merits of the dispute now, "for it is the very

uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Id*. (internal quotation marks and citation omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id*.

Here, although Plaintiffs believe they have a strong case, they recognize the expense, risk, and length of continued proceedings necessary to prosecute the action through trial and potential appeal. At the time the parties settled the action, the case was in its early stages with Defendants' motion to dismiss under submission. While that motion to dismiss was pending, Embark filed its 2022 Annual Report on Form 10-K indicating the board had "approved a process to explore 'potential strategic alternatives'" including "alternative uses of the Company's assets to commercialize its technology, additional sources of financing, as well as potential dissolution or winding up of the Company and liquidation of its assets." (Dkt. No. 82-14 at 8.) According to the 10-K, the Company also planned to reduce its headcount by 70%. (*Id*.) Further, several news articles reported the company "was moving toward a total shutdown after running out of money to get to commercial production." (Dkt. No. 82 at ¶ 6.) Given this information, Plaintiffs were concerned Embark might declare bankruptcy during the pendency of this suit and be unable to pay the estimated $230.3 million estimated aggregate damages were they to prevail at trial. (*Id*. at ¶ 7.) Given the risks posed by continuing to litigate Plaintiffs' claims through another trial and an almost certain appeal, the certainty of Class Members' recovery under the settlement weighs in favor of granting final approval.

### 2. Settlement Amount

When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be

7

examined for overall fairness." *DIRECTV, Inc.*, 221 F.R.D. at 527. "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Id.* (collecting cases).

The Court previously concluded the amount of the settlement was within the range of possible approval. (Dkt. No. 91 at 13.) Its opinion has not changed. While the settlement amount represents approximately 1% of the estimated aggregate damages, given the evidence in the record, particularly as to Defendants' financial situation, the settlement amount falls "within the range of reasonableness" in light of the risks and costs of litigation. *See Villanueva v. Morpho Detection, Inc.*, No. 13-cv-05390-HSG, 2016 WL 1070523, at *4 (N.D. Cal. March 18, 2016) (citing cases). "It is well-settled law, that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Officers for Justice v. Civil Serv. Comm'n of City & County of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982).

### 3.     Extent of Discovery Completed and Stage of Proceedings

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Rather, a court's focus is on whether "the parties carefully investigated the claims before reaching a resolution." *Ontiveros*, 303 F.R.D. at 371. The Court's preliminary approval order discussed Class Counsel's investigation of Plaintiffs' claims, review of Embark's public filings including its SEC filings, interviews with former Embark employees and consultants, and its investigation of Embark's current financial situation. (Dkt. No. 91 at 10-11; *see also* Dkt. No. 102 at ¶ 11.) Further, as part of the settlement process, Class Counsel also consulted with damages and accounting experts. (Dkt. No. 102 at ¶ 34.) In light of the above, the Court concludes the extent of investigation and stage of proceedings supports approval of the settlement.

### 4.     Experience and Views of Counsel

The experience and views of counsel also weigh in favor of approving the settlement. Class Counsel has extensive experience in the securities litigation field and strongly supports approval of the settlement given the risks and challenges involved. (Dkt. No. 95-1 at ¶ 9; Dkt. No.

8

102 at ¶¶ 41-42.)

#### 5.  Presence of a Government Participant

No government entity is a party to this action.

#### 6.  Reaction of Class Members

As previously discussed, the Settlement Administrator attests 12,402 potential Settlement Class Members were either mailed a Notice packet or emailed a direct link to the Notice packet. (Dkt. No. 102-1 at ¶ 5.) As of the date of this Order, only three class members have requested exclusion from the settlement and one objection has been filed to the motion for attorney's fees and costs. (*Id*. at ¶¶ 9-10.) "[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs., Inc*., 559 F.Supp.2d 1036, 1043 (N.D. Cal. 2008) (citation omitted); *see also Churchill Vill*., 361 F.3d at 577 (holding approval of a settlement that received 45 objections (0.05%) and 500 opt-outs (0.56%) out of 90,000 class members was proper).

The Court also looks at the claims rate as a sign of class member sentiment regarding the settlement. *See Rodriguez*, 563 F.3d at 967.  The claims rate here is 12.1 percent, which is lower than anticipated, but according to SCS, comparative to other securities settlements it recently administered. (Dkt. No. 105-2 at ¶ 6; Dkt. No. 105-2 at 10 (listing cases with claims rates of 4.9 percent to 14.9 percent).)  "Settlements of large class action suits have been approved even where less than five percent of the class files claims." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1306 (9th Cir. 1990).

#### 7.  Objections

Only one objection was received; it is from Eric Jarva, a former Embark employee.  (Dkt. No. 100.)  While Plaintiffs initially maintained Mr. Jarva lacked standing, they have since withdrawn their objection.  (Dkt. No. 104 at 4.)  Mr. Jarva's objection is not to the settlement as a whole; instead, he objects to the request for attorney's fees and costs.  Mr. Jarva objects to "Class Council's [sic] proposal to take $835,000 in fees and $140,000 in reimbursement (39% of the total settlement)."  (Dkt. No. 100 at 1.)  Mr. Jarva notes he "appreciate[s] the work done by Pomerantz

9

to bring the case to court [but] do[es] not feel that their efforts should entitle them to such a large portion of the settlement fund at the expense of the stockholders that were damaged by actions of the company." (*Id.*) As described in more detail below, the Court finds the request for attorneys' fees is excessive and reduces the award as discussed below.

The Court thus denies Mr. Jarva's objection as moot.

\*\*\*

In sum, the fairness factors weigh in favor of granting Plaintiffs' motion for final approval of the class action settlement.

### B. The *Bluetooth* Factors

Finally, the Court must determine whether the settlement was the result of good faith, arms-length negotiations or fraud and collusion. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). In determining whether the settlement is the result of collusion, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Id.* The Ninth Circuit has identified three such signs:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
>
> (2) when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id*. at 947 (internal quotation marks and citations omitted).

For the first *Bluetooth* factor, the Court compares the payout to the class to class counsel's unopposed claim for fees. *See Harris v. Vector Mktg. Corp.*, No C-08-5198 EMC, 2011 WL 4831157, at \*6 (N.D. Cal. Oct. 12, 2011) (examining "whether a disproportionate part of the settlement is being awarded to class counsel" under the settlement agreement). The gross settlement amount is $2.5 million and Class Counsel seeks $835,000 in attorney's fees—33.4% of

1 the settlement amount. This ratio taken alone may be a sign of collusion. *See Bluetooth*, 654 F.3d

2 at 947.  Class counsel contends this amount is nearly two-thirds of Class Counsel's $1,359,589.50

3 lodestar. (Dkt. No. 95-1 at ¶ 16.) However, as discussed below, the Court finds this amount both

4 excessive and unsupported.  Thus, while the high percentage is a red flag, the Court has addressed

5 the issue through reduction of the fees.

6       The second warning sign—a "clear sailing" provision—is not present here. While the

7 Settlement Agreement states Class Counsel may submit an application for an award of attorneys'

8 fees and costs to be deducted from the Settlement Fund, the agreement does not prohibit

9 Defendants from objecting to requested fee award. (Dkt. No. 82-1 at ¶ 45.)  Even if Defendants

10 waived their right to object (and, indeed, they have not objected), the Settlement Agreement does

11 not appear to be an example of Defendants agreeing to pay Class Counsel excessive fees and costs

12 in exchange for accepting an unfair settlement for the class given the amount of fees sought is

13 much less than counsel's lodestar.

14       The third warning sign—whether the parties have arranged for fees not awarded to the

15 class to revert to defendant rather than be added to the settlement fund, *see Bluetooth*, 654 F.3d at

16 948—is not present here. The Settlement Agreement is non-reversionary—all of the funds will be

17 distributed to the class members or *cy pres*.  (Dkt. No. 82-1 at ¶ 20.)

18       Notwithstanding the existence of one of the three *Bluetooth* factors, the Court concludes

19 the Settlement Agreement did not result from, nor was it influenced by, collusion. Instead, the

20 Settlement Agreement adequately satisfies the Settlement Class Members' claims.

21       \* \* \*

22       In sum, the *Churchill* fairness factors support approval, and the *Bluetooth* factors do not

23 indicate collusion. The Court is therefore satisfied the Settlement Agreement was not the result of

24 collusion between the parties and instead is the product of arms-length negotiations between

25 experienced and professional counsel.  For each of these reasons, the Settlement Agreement passes

26 muster under Rule 23(e) and final approval is appropriate.

27 **IV.    FINAL APPROVAL OF PLAN OF ALLOCATION AND *CY PRES***

28       "Approval of a plan of allocation of settlement proceeds in a class action ... is governed by

the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Oracle Sec. Litig.*, No. C–90–0931–VRW, 1994 WL 502054, at *1-2 (N.D. Cal. June 18, 1994) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992)). "A settlement in a securities class action case can be reasonable if it fairly treats class members by awarding a pro rata share to every Authorized Claimant, but also sensibly makes interclass distinctions based upon, inter alia, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue." *Hampton v. Aqua Metals, Inc.*, No. 17-CV-07142-HSG, 2021 WL 4553578, at *10 (N.D. Cal. Oct. 5, 2021) (internal quotation omitted). "[C]ourts recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel." *Id*

The Plan of Allocation here uses a "recognized loss" value that tailors the recovery of each class member to the purchase and sale of Embark and Northern Genesis common stock relative to the class periods, as well as the number of shares at issue in each class member's claim. (Dkt. No. 82-3 at 13-15.) The Net Settlement Fund will be distributed on a pro rata basis according to each Settlement Class Member's recognized loss. (Dkt. No. 82 at ¶ 24.) Any funds remaining in the Settlement Fund following distribution, if re-distribution is not cost-effective, shall be distributed to the *cy pres* recipient Bay Area Legal Aid. (Dkt. No. 82-1 at ¶ 41; Dkt. No. 101 at 32.) The Court approved the proposed Plan of Allocation and *cy pres* recipient in its preliminary approval order and no facts have come to light which cause the Court to reconsider its approval. (Dkt. No. 91 at 14-15.)

V. **MOTION FOR ATTORNEY'S FEES, COSTS, AND CLASS REPRESENTATIVE PAYMENT**

   A. **Attorney's Fees**

Rule 23 permits a court to award "reasonable attorneys' fees ... that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination of whether the settlement is 'fundamentally fair, adequate, and reasonable.'" *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003) (quoting Fed. R. Civ. P.

23(e)).

When a negotiated class action settlement includes an award of attorney's fees, the fee award must be evaluated in the overall context of the settlement. *Knisley v. Network Assocs.*, 312 F.3d 1123, 1126 (9th Cir. 2002). At the same time, the court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941. The Ninth Circuit has approved two methods of determining attorney's fees in cases where the amount of the attorney's fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains discretion in common fund cases to choose either method. *Id*. Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Here, Plaintiffs seek 33.4% of the fund—$835,000—in attorney's fees.

### 1. Percentage-of-the-Fund

"Under the percentage-of-recovery method, the attorney's fees equal some percentage of the common settlement fund." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015). In the Ninth Circuit, "courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure." *In re Bluetooth*, 654 F.3d at 942. "The benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). Courts consider

> several factors [] when assessing requests for attorneys' fees calculated pursuant to the percentage-of-recovery method: (1) the extent to which class counsel achieved exceptional results for the class; (2) whether the case was risky for class counsel; (3) whether counsel's performance generated benefits beyond the cash settlement fund; (4) the market rate for the particular field of law; (5) the burdens class counsel experienced while litigating the case; (6) and whether

13

the case was handled on a contingency basis.
*In re Optical Disk Drive Prod. Antitrust Litig.*, 959 F.3d 922, 930 (9th Cir. 2020) (citation omitted).

Plaintiffs' request for 33.4 percent of the Settlement Fund is higher than the Ninth Circuit's 25 percent benchmark for a reasonable award. While recognizing this amount is higher than the benchmark, Plaintiffs urge this amount is "well within the range of such fees awarded under similar circumstances and by judges in this District and Circuit," (Dkt. No. 95 at 15), and have submitted a chart listing cases purportedly awarding 33 percent or more of the common fund. (Dkt. No. 95-6.) They maintain a similar result is warranted here because of the result obtained, the contingent fee risk, the number of hours counsel dedicated to this action, counsel's "financial commitment," and the important public policy advanced by securities litigation weigh in favor of an award of 33.4 percent of the class recovery. (Dkt. No. 95 at 15-16.) Although the Court agrees the overall result and benefit to the class is notable given the hurdles Plaintiffs faced surviving the pleading stage, Plaintiffs have not shown that it warrants an upward departure from the 25 percent benchmark. The recovery here represents one percent of the potential aggregate damages. Further, this case settled very early which the Court must take into account when considering both the level of risk and the burdens on Class Counsel. Under these circumstances, counsel has not demonstrated the presence of unusual circumstances that would justify a departure from the Ninth Circuit's 25 percent benchmark. *See In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1122 (9th Cir. 2021) ("the district court properly considered all relevant circumstances, including the value to the class members, and concluded that a 25% benchmark was appropriate). This is especially true when, as here, the amount is not supported by the lodestar cross-check as discussed below.

### 2. Lodestar Method

The lodestar method "requires multiplying a reasonable hourly rate by the number of hours reasonably expended on the case." *Shirrod v. Dir., Office of Workers' Comp. Programs*, 809 F.3d 1082, 1086 (9th Cir. 2015). "In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended." *Chalmers*

14

1    *City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), amended on denial of reh'g, 808 F.2d

2    1373 (9th Cir. 1987).

3        Counsel attests the total lodestar is $1,359,589.50 which is 61 percent of the $835,000

4    attorney's fees sought. (Dkt. No. 95-3; Dkt. No. 95-1 at ¶ 16.)

                              **a.     Reasonable Rate**

6        "In determining a reasonable hourly rate, the district court should be guided by the rate

7    prevailing in the community for similar work performed by attorneys of comparable skill,

8    experience, and reputation." *Chalmers*, 796 F.2d at 1210-11 (citation omitted). The relevant

9    community for the purposes of determining the prevailing market rate is generally the "forum in

10   which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008)

11   (citation omitted). In addition to affidavits from the fee applicant, other evidence of prevailing

12   market rates may include affidavits from other area attorneys or examples of rates awarded to

13   counsel in previous cases. *See Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1167 (N.D. Cal.

14   2012) (citation omitted). Civil Local Rule 54-5(b)(3) requires the party seeking fees to submit "[a]

15   brief description of relevant qualifications and experience and a statement of the customary hourly

16   charges of each such person or of comparable prevailing hourly rates or other indication of value

17   of the services."

18       Class Counsel Brenda Szydlo submitted a declaration in support of fees attesting "[t]he

19   attorneys at Pomerantz are experienced and skilled practitioners in the securities litigation field."

20   (Dkt. No. 95-1 at ¶ 9.)  Ms. Szydlo attached the firm's 60-page resume as evidence of "the

21   expertise and experience of Pomerantz."  (Dkt. No. 95-7.)  Class Counsel's current rates range

22   from $900 for partners, and $450-$550 for associates. (Dkt. No. 95-1 at ¶ 18.)  Counsel contends

23   "requested rates are in line with those prevailing in the community for similar services by lawyers

24   of reasonably comparable skill, experience, and reputation[.]" (Dkt. No. 95 at 24 (quoting

25   *Camancho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008)).)  Counsel attaches a chart

26   reflecting similar hourly rates charged by "peer plaintiff and defense counsel in complex

27   litigation."  (Dkt. No. 95 at 24; Dkt. No. 95-4.)

28       Class Counsel's hourly rates are generally in line with rates prevailing in this community

for similar services by lawyers of reasonably comparable skill, experience and reputation. *See, e.g., Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018) (rates from $650 to $1,250 for partners or senior counsel, $400 to $650 for associates); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (billing rates ranging from $275 to $1600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals reasonable "given the complexities of this case and the extraordinary result achieved for the Class.").

### b. Hours Reasonably Expended

The number of hours billed must equal the number of hours that can reasonably be billed to a private client. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013). Thus, the court should only award fees based on "the number of hours reasonably expended on the litigation" and should exclude "hours that are excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983). "There is no precise rule or formula for making these determinations," and the court "necessarily has discretion in making this equitable judgment." *Id.* at 436-37.

On preliminary approval, the Court indicated it had concerns regarding the amount of fees sought and ordered Class Counsel to "submit a motion for attorneys' fees, including declarations and detailed billing records, so the Court may determine an appropriate lodestar figure, and to allow Settlement Class Members the opportunity to object to the requested fees." (Dkt. No. 91 at 18.) Class Counsel did not do so and instead submitted this chart:

**TIME REPORT BY CATEGORY**

**FIRM NAME:** Pomerantz LLP
**REPORTING PERIOD:** Inception to October 6, 2023

**CATEGORIES BY HOUR:**
(1) Lead Plaintiff Motion   (4) Settlement
(2) Pleadings and Investigations   (5) Other
(3) Motion to Dismiss

| Name | Position | (1) | (2) | (3) | (4) | (5) | Hourly Rate | Cumulative Hours | Cumulative Lodestar |
|---|---|---|---|---|---|---|---|---|---|
| Brenda Szydlo | Partner | - | 350.50 | 382.50 | 484.10 | 1.00 | $900 | 1,218.10 | $1,096,290.00 |
| Dean Ferrogari | Associate | - | 32.55 | 204.60 | 310.60 | 2.10 | $450 | 549.85 | $247,432.50 |
| Thomas Pryzyblowski | Associate | 2.60 | 9.10 | - | - | - | $550 | 11.70 | $6,435.00 |
| Simon Hall | Paralegal | - | - | - | 26.20 | - | $360 | 26.20 | $9,432.00 |
| TOTAL: | | 2.60 | 392.15 | 587.10 | 820.90 | 3.10 | - | 1,805.85 | $1,359,589.50 |

(Dkt. No. 95-3.) When asked at the final approval hearing about the failure to supply lodestar

16

backup, counsel stated that she believed the Court would ask for the detailed billing records if it had concerns regarding the chart. But, as explained above, the Court had expressly asked for billing records in the order granting preliminary approval. (Dkt. No. 91 at 18.) The chart alone is inadequate to support the hours claimed. According to the chart, Ms. Szydlo spent the equivalent of nine and half 40-hour workweeks on the opposition to the motion to dismiss and her colleague, Mr. Ferrogari, spent the equivalent of five 40-hour workweeks opposing the same motion. And Class Counsel collectively spent the equivalent of over 20 40-hour workweeks on settlement.

While a lodestar figure is generally "presumptively reasonable," it is based on "the number of hours the prevailing party *reasonably* expended on the litigation (as supported by adequate documentation)." *In re Bluetooth*, 654 F.3d at 941 (emphasis added). The party seeking fees "bear[s] the burden of showing the time spent and that it was reasonably necessary to the successful prosecution of [the] claims." *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1557 (9th Cir. 1989) ("hours should be credited only if reasonable under the circumstances and supported by other evidence such as testimony or secondary documentation."). Counsel has not provided adequate support for the hours requested and the Court finds them excessive.

The lodestar cross-check thus does not support the 33.4% percentage-of-the-fund claimed here.

\*\*\*

In sum, the Court finds it would be inappropriate to deviate from the Ninth Circuit's 25 percent-of-the-fund benchmark here and awards attorney's fees of $625,000.

**B.     Litigation Expenses**

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (internal quotation marks and citation omitted). Generally, reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54. Attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters. *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir.

17

1994).

Plaintiffs seek $120,456.77 in litigation costs. (Dkt. No. 95-1 at ¶ 19.) These litigation costs are set forth in Exhibit D to Ms. Szydlo's declaration. (Dkt. No. 95-5.) At the Court's request, Class Counsel has submitted a declaration in support of the expenses claimed. (Dkt. No. 109.) The bulk of the expenses relate to retention of the experts, research, and investigation costs. The Court concludes counsel's expenses are reasonable and grants the request for $120,456.77 in litigation costs.

### C. Settlement Administration Costs

The preliminary approval order approved settlement administration costs of up to $250,000. (Dkt. No. 91 at 20.) However, SCS now represents the maximum total estimated administration costs are actually $105,000. (Dkt. No. 105-2 at ¶ 7.)

### D. Awards to Plaintiffs Under 15 U.S.C. § 78U-4(A)(4)

Under the PSLRA, the representative parties may not recover more than other members of the class except the representatives may recover "reasonable costs and expenses (including lost wages) directly relating to the representation of the class." *See* 15 U.S.C. § 78u-4(a)(4). Plaintiffs Tyler Hardy and Danny Rocherfort each seek $2,500 for their representation of the class. To support their request each submitted declarations attesting they spent 17 and 25 hours, respectively, performing tasks related to this action including collecting documents, reviewing court filings, consulting on the litigation, and consulting before and during settlement discussions. (Dkt. No. 95-8 at ¶¶ 5, 9; Dkt. No. 95-9 at ¶¶ 5, 9.) Neither, however, attests to have incurred out-of-pocket costs or lost wages as a result of their participation this action.

Plaintiffs' insistence that they are nonetheless entitled to an award of $2,500 each because they "lent their name to the case" is unpersuasive. As Plaintiffs now concede, the case they relied upon at the hearing was not a PSLRA case. (Dkt. No. 109 at ¶ 17.) Under the PSLRA, named plaintiffs are not allowed to recover the types of incentive/service awards awarded in other cases. *See* 15 U.S.C. § 78u-4(a)(4); *see also In re Lyft Inc. Sec. Litig.*, No. 19-CV-02690-HSG, 2023 WL 5068504, at *13 (N.D. Cal. Aug. 7, 2023) ("Plaintiff is essentially requesting to be paid for his time and effort at an unsubstantiated hourly rate, not seeking recovery of costs, expenses, or lost

18

wages that would be permissible under the PSLRA" and collecting cases denying incentive awards under the PSLRA).

The Court thus denies Plaintiffs' request for service awards.

## CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiffs' motion for final approval of the parties' class action settlement. In addition, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion for attorney's fees and costs; specifically, the Court awards the following: $625,000 in attorney's fees; $120,456.77 in litigation costs; and settlement administration costs of no more than $105,000.

In accordance with the Northern District's Procedural Guidance for Class Action Settlements, "[w]ithin 21 days after the distribution of the settlement funds and payment of attorneys' fees," Class Counsel shall file "a Post-Distribution Accounting" that provides the following, to the extent applicable:

> The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average and median recovery per claimant, the largest and smallest amounts paid to class members, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, and the multiplier, if any.

https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/. Class Counsel shall "summarize this information in an easy-to-read chart that allows for quick comparisons with other cases," and "post the Post-Distribution Accounting, including the easy-to-read chart, on the settlement website." *See id.* Class counsel represented at the final approval hearing that they will comply with this requirement.

//

//

//

//

19

This Order disposes of Docket Nos. 95, 101.

**IT IS SO ORDERED.**

Dated: March 29, 2024

                                                                                              _____
                                                                                              JACQUELINE SCOTT CORLEY
                                                                                              United States District Judge